UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                               :

CLAREX LIMITED and BETAX LIMITED,       :

                               :            12 Civ. 7908 (PAE)

                         Plaintiffs,      :

                               :        __OPINION & ORDER__

                   -v-                   :

                               :

NATIXIS SECURITIES AMERICAS LLC et al.,   :

                               :

                       Defendants.    :

                               :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       Plaintiffs Clarex Limited ("Clarex") and Betax Limited ("Betax") (collectively,

"Clarex"), companies operating in Nassau, Bahamas allege in this action that defendants Natixis

Securities America LLC and its predecessors (collectively, "Natixis"), Delaware corporations

operating in New York, New York, violated a contractual duty to deliver 46,000 Warrants.

Clarex purchased these Warrants, along with Nigerian Bonds, in five separate transactions—on

February 11, 2000, August 22, 2001, August 28, 2001, September 5, 2001, and September 10,

2001.  Natixis now moves for partial summary judgment pursuant to Federal Rule of Civil

Procedure 56 on two grounds:  that (1) the statute of limitations bars Clarex's claim for the 5,000

Warrants purchased on February 11, 2000; and (2) the doctrine of impossibility excuses Natixis's

non-performance as to all five transactions.

       For the reasons that follow, the motion is denied.

I.      **Background**[1]

A.      **Evidence Considered**

At the outset, the Court must resolve what evidence is properly considered in deciding this motion.  In its reply brief, responding to certain arguments made by Clarex, Natixis submitted a letter agreement signed by it and Clarex on March 25, 2008.  *See* Levine Rep. Decl. Ex. X ("Letter Agreement").  The Letter Agreement states, in pertinent part, that "no statement made, no document prepared, nor any action taken or not taken, since August 21, 2007 . . . may be offered in evidence or otherwise used for any purpose in any action or proceeding arising from or relating to any claim allegedly arising from any transaction prior to August 21, 2007" between the parties.  *Id.*  Natixis argues, based on the Letter Agreement, that the Court may not consider any document created, action taken, or statement made after August 21, 2007.  *See* Def. Rep. Br. 1–2.

On November 11, 2013, more than a month after Natixis raised this argument, Clarex submitted a three-page letter.  Dkt. 64.  Clarex argued that, notwithstanding the Letter Agreement, the Court should consider post-August 21, 2007[2] evidence:  specifically, the reinstatement by Natixis of instructions to Euroclear to deliver the 46,000 Warrants at issue, and the written demands Natixis made to JPMorgan for payments on these Warrants.  *See id.* at 2.

---

[1] The following abbreviations are used herein for the parties' memoranda of law:
(1) Defendants' Memorandum of Law in Support of Their Motion for Partial Summary Judgment ("Def. Br.") (Dkt. 50); (2) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Br.") (Dkt 56); and (3) Defendants' Reply Memorandum of Law in Further Support of Their Motion for Partial Summary Judgment ("Def. Rep. Br.") (Dkt. 63).

[2] Throughout its letter, Clarex refer to "post-March 28, 2008 evidence," but the Court assumes this to be a double error, one typographical, the other a misreading of the Letter Agreement.  The Letter Agreement was signed by the parties on March 25, not March 28, 2008.  More important, the agreement was to exclude all evidence that post-dated August 21, 2007.

On November 12, 2013, Natixis submitted a letter, which argued that the Court should disregard Clarex's letter as an untimely sur-reply.

As to this issue, the Court agrees with Natixis.  Clarex was on notice of the Letter Agreement—Clarex executed it in 2008.  To the extent Clarex relied on post-August 21, 2007 evidence in its opposition brief, it was on notice that Natixis might move to exclude such evidence pursuant to the Letter Agreement.  Clarex nevertheless failed to brief this issue in its opposition.  And, after Natixis raised the issue in reply, Clarex, even more inexplicably, waited more than a month to submit a letter concerning this ostensible new issue to the Court.  Such delay is unacceptable and inexcusable.  For purposes of this motion, the Court will heed the plain language of the parties' Letter Agreement, and exclude all evidence of documents created, actions taken, or statements made after August 21, 2007.

The Court recognizes, however, that in light of its decision to deny summary judgment, this issue of whether the post-August 21, 2007 evidence is admissible may arise in connection with the upcoming trial of this matter.  As discussed in the Conclusion, the Court is directing that a complete Joint Pretrial Order be submitted by January 31, 2014.  Should either party wish to file any motions *in limine* on any subject, including a motion by Natixis to exclude post-August 21, 2007 evidence from trial, such motions are due by January 31, 2014, along with the Joint Pretrial Order.  An opposition brief is due February 7, 2014; replies are not invited.  In other words, the Court's ruling precluding consideration of such evidence on this motion is without prejudice to Clarex's right to argue against excluding such evidence at trial.

**B.    Facts**[3]

The Court has previously issued several decisions in this matter.  *See Clarex Ltd. v. Natixis Sec. Americas LLC*, No. 12 Civ. 722 (PAE), 2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012) ("*Clarex I*") (dismissing Clarex's original Complaint without prejudice for lack of standing); *Clarex Ltd. v. Natixis Sec. Americas LLC*, No. 12 Civ. 7908 (PAE), 2013 WL 2631043 (S.D.N.Y. June 11, 2013) ("*Clarex II*") (granting in part and denying in part Natixis's motion to dismiss Clarex's second Complaint); *Clarex Ltd. v. Natixis Sec. Americas LLC*, No. 12 Civ. 7908 (PAE), 2013 WL 3892898 (S.D.N.Y. July 29, 2013) ("*Clarex III*") (granting reconsideration as to the dismissal of Clarex's contract claim for the 5,000 Warrants purchased on February 11, 2000).  Familiarity with those decisions is assumed.  The Court recites facts here solely as relevant to the pending motion.

---

[3] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion, including:  Defendant's Local Rule 56.1 Statement ("Def. 56.1") (Dkt. 49); the Declaration of Eric R. Levine in Support of Defendant's Motion for Partial Summary Judgment ("Levine Decl.") (Dkt. 48) and attached exhibits; Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1") (Dkt. 61); the Declaration of Martin Domb in Opposition to Defendant's Motion for Partial Summary Judgment ("Domb Decl.") (Dkt. 58–59) and attached exhibits; the Declaration of Edward Farah in Opposition to Defendant's Motion for Partial Summary Judgment ("Farah Decl.") (Dkt. 51); the Declaration of Perry A. Rolle in Opposition to Defendant's Motion for Partial Summary Judgment ("Rolle Decl.") (Dkt. 52); the Declaration of Glen Shipway in Opposition to Defendant's Motion for Partial Summary Judgment ("Shipway Decl.") (Dkt. 53); and the Reply Declaration of Eric R. Levine in Support of Defendant's Motion for Partial Summary Judgment ("Levine Rep. Decl.") (Dkt. 62) and attached exhibit.  References herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials cited therein.  Where facts stated in a party's Statement of Material Facts are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

### 1.    Nigeria Issues Bonds and Warrants

In 1991, Nigeria, in exchange for defaulted commercial bank loans, issued Fixed Rate Bonds due in 2020 ("Bonds").  Def. 56.1 ¶ 9; Levine Decl. Ex. G (EMTA's Primer on Nigeria Payment Adjustment Warrants ("EMTA Primer")).[4]  These Bonds were issued with Payment Adjustment Warrants ("Warrants"), which were "designed to provide a partial recovery of value lost as a result of the debt-service reduction . . . in the event of a significant increase in [Nigeria's] capacity to service its external debt."  EMTA Primer at 1; Def. 56.1 ¶ 9.  Specifically, the Warrants "provide[d] for the possibility of semi-annual payments, beginning in 1996, based upon certain increases in the price of oil."  EMTA Primer at 1.  The Warrants, issued by the Central Bank of Nigeria, were guaranteed by the Republic of Nigeria.  *Id.*

Although the Warrants were initially attached to the Bonds, they "were detachable, and therefore transferable, at any time and, accordingly, were assigned their own unique [ISIN Security Number] upon initial issuance."  *Id.*; Def. 56.1 ¶ 10.  From their issuance until October 2002, however, the market practice was for the Bonds to trade together with the Warrants.  Def. 56.1 ¶ 11; *see* EMTA Primer at 2 (on September 30, 1992, EMTA recommended that, "unless otherwise specified," the Nigerian Bonds "should trade with the[ir corresponding] rights or warrants").  On October 21, 2002, EMTA changed this market practice.  Effective for all trades entered into on or after November 1, 2002, Nigerian Bonds would, unless otherwise agreed, trade "without their related Warrants."  EMTA Primer at 3.

---

[4] EMTA is a "trade group for the Emerging Markets trading and investment community," that is "dedicated to promoting the orderly development of fair, efficient and transparent trading markets for Emerging Markets instruments and to helping integrate the Emerging Markets into the global capital markets." *See* http://emta.org.

## 2.     Clarex Orders Nigerian Bonds and Warrants

Between February 8, 2000 and September 10, 2001, in a series of five transactions, Clarex and Betax ordered, through Natixis, $46 million in Nigerian Bonds and 46,000 corresponding Nigerian Warrants.  Def. 56.1 ¶¶ 31–36.[5]

- On February 8, 2000, Clarex ordered $5 million in Nigerian Bonds and 5,000 corresponding Nigerian Warrants.  *Id.* ¶ 31.  The settlement date for this transaction was February 11, 2000.  *Id.* ¶ 32 ("February 11, 2000 Transaction").[6]

- On August 22, 2001, Clarex ordered $16 million in Nigerian Bonds and 16,000 corresponding Nigerian Warrants.  *Id.* ¶ 33.

- On August 28, 2001, Betax ordered $7 million in Nigerian Bonds and 7,000 corresponding Nigerian Warrants.  *Id.* ¶ 34.

- On September 5, 2001, Clarex ordered $10 million in Nigerian Bonds and 10,000 corresponding Nigerian Warrants.  *Id.* ¶ 35

- On September 10, 2001, Clarex ordered $8 million in Nigerian Bonds and 8,000 corresponding Nigerian Warrants.  *Id.* ¶ 36.

Because these transactions occurred before November 1, 2002, the market practice was that the Bonds would trade together with the Warrants.  It is undisputed that Clarex and Betax received, via these five transactions, the $46 million worth of Bonds but not the 46,000 Warrants.  *Id.* ¶¶ 37–40.  Both Clarex and Betax were aware immediately after the settlement date for each of these five transactions that they had not received the Warrants corresponding to their purchased Bonds.  *Id.* ¶ 41.[7]

---

[5] Although not a subject of this litigation, before February 8, 2000, Clarex had already purchased, through Natixis, Nigerian Bonds with a face value of more than $100 million.  Def. 56.1 ¶ 15.

[6] The settlement date is provided here only for the February 11, 2000 Transaction, because it is the only transaction Natixis claims falls outside the statute of limitations.

[7] After September 10, 2001, Clarex did not place any orders with Natixis for Nigerian Bonds or Warrants.  *Id.* ¶ 66.

All of the transactions in Nigerian Bonds and Warrants between Clarex and Natixis were structured the same way.  Def. 56.1 ¶ 24.  Sam Fitting ("Fitting") was the broker at Natixis responsible for Clarex' account.  *Id.* ¶ 25.  For each transaction, Fitting would check the market, and Clarex and Natixis would agree on a price.  *Id.* ¶ 26.  Fitting would then purchase the Nigerian Bonds and Warrants from other market participants ("counterparties") and resell them to Clarex shortly thereafter.  *Id.* ¶¶ 27, 49.  Natixis purchased the $5 million in Bonds and 5,000 Warrants from JPMorgan in the transaction on February 11, 2000, and the remaining $41 million in Bonds and 41,000 Warrants from Citibank in the other four transactions.  *See* Domb Decl. Ex. 52, Schedule A; Shipway Decl. ¶ 5; Farah Decl. ¶¶ 10–14.  The purchases by Natixis from the counterparties, and the sales by Natixis to Clarex, were settled through Euroclear.  Def. 56.1 ¶ 12.  To properly settle such transactions, Fitting was required to enter settlement instructions for the ISIN numbers (for Bonds and, separately, for Warrants) with Euroclear.  *Id.* ¶ 13.  Fitting had to, and did, enter these separate instructions with Euroclear for both sides of this transaction—*i.e.*, the purchase from a counterparty and the sale to Clarex.  *Id.* ¶ 28.

For each of the five transactions at issue, it is undisputed that Fitting correctly entered settlement instructions in Euroclear: (1) to receive the Nigerian Bonds and Nigerian Warrants from its counterparty; and (2) to deliver the Nigerian Bonds and Nigerian Warrants to Clarex's custodial agent, ScotiaTrust.[8]  Def. 56.1 ¶¶ 44–45.  Nonetheless, the counterparties (JPMorgan and Citibank) did not provide the Warrants to Natixis, and Natixis did not provide the Warrants to Clarex.  *See* Def. 56.1 ¶ 50.

---

[8] The Bank of Nova Scotia Trust Company (Bahamas) Limited ("Scotiatrust") served as Clarex' custodial agent, holding securities at Euroclear and crediting them to Scotiatrust's account.  *Id.* ¶ 4.

### 3.    Tolling Agreements

As discussed above, Natixis purchased, on behalf of Clarex, 5,000 Warrants from JPMorgan (on February 11, 2000) and, on behalf of Clarex and Betax, a total of 41,000 Warrants from Citibank (in August and September 2001).  *See* Domb Decl. Ex. 52, Schedule A.  In January 2006, as the six-year anniversary of the February 11, 2000 transaction approached, Natixis sought to enter into a tolling agreement with JPMorgan, but JPMorgan refused.  Domb Decl. Ex. 32; Pl. 56.1 ¶¶ 146–47.[9]  Natixis was more successful with Citibank: On January 19, 2006, it and Citibank entered into a tolling agreement with respect to the 41,000 Warrants purchased in August and September 2001.  *See* Domb Decl. Ex. 33; Pl. 56.1 ¶ 151.

On August 17, 2007, as the six-year anniversary of the first Citibank transaction approached, Natixis and Clarex also entered into their own tolling agreement.  Def. 56.1 ¶ 76; *see* Levine Decl. Ex. O ("Tolling Agreement").  This agreement tolled the statute of limitations as to the four Citibank transactions:  August 22, 2001 (16,000 Warrants), August 28, 2001 (7,000 Warrants), September 5, 2001 (10,000 Warrants), and September 10, 2001 (8,000 Warrants).  Def. 56.1 ¶ 79; Tolling Agreement ¶ 2.  However, the parties did not include in the agreement the 5,000 Warrants from the February 11, 2000 transaction.  Def. 56.1 ¶ 79; Pl. 56.1 ¶ 150; Tolling Agreement.[10]

Since the failed Warrant transactions in 2000 and 2001, Natixis has sent monthly account statements to Clarex reflecting the number of undelivered Nigerian Warrants, listing these Warrants at a current value of $0.  Def. 56.1 ¶ 67; Pl. 56.1 ¶¶ 102–105. *see* Levine Decl. Ex. J; Domb Decl. Ex. 14.  From 2001 to at least August 17, 2007, Natixis also maintained its

---

[9] For reasons that are unclear, Natixis did not pursue a legal claim against JPMorgan with respect to the 5,000 warrants.  Pl. 56.1 ¶ 149.

[10] Natixis does not dispute that Clarex' claims relating to the Warrants purchased in the four transactions tolled on August 17, 2007 are timely.

instructions to Euroclear to deliver all 46,000 Warrants to Clarex's agent, Scotiatrust.  Pl. 56.1

¶¶ 93–94.

####     C.        Procedural History

On January 20, 2012, Clarex filed the original Complaint against Natixis.  *See* No. 12

Civ. 722, Dkt. 1.  On April 2, 2012, Natixis filed a motion to dismiss.  *Id.*, Dkt. 12.  On October

12, 2012, the Court dismissed the Complaint without prejudice, holding that, because an

affiliated company, Landsdowne Investments Inc., had owned the Bonds until April 12, 2012,

Clarex, on the date the lawsuit was brought, lacked standing to bring suit.  *See Clarex I*, 2012

WL 4849146.

On October 24, 2012, Clarex and Betax filed the Complaint in this case, alleging that

Natixis's failure to deliver 46,000 Warrants associated with $46 million in Nigerian Bonds

purchased by Clarex constituted a breach of contract, a breach of the duty of good faith and fair

dealing, and negligence.  Dkt. 1 ("Compl.").  On January 7, 2013, Natixis moved to dismiss the

Complaint.  Dkt. 9–11.  On June 11, 2013, the Court denied Natixis's motion to dismiss as to

Clarex's contract claims, but granted the motion as to negligence and good faith and fair dealing

claims.  *See Clarex II*, 2013 WL 2631043.  The Court further held that Clarex's contract claim

for the 5,000 Warrants purchased on February 11, 2000 was barred by New York's six-year

statute of limitations on breach-of-contract claims.  *Id.* at *7–8.

On June 24, 2013, Clarex filed a motion to reconsider, Dkt. 32–34, which was opposed

by Natixis, Dkt. 39.  On July 29, 2013, the Court granted reconsideration as to the dismissal of

the contract claim for the 5,000 Warrants purchased on February 11, 2000, but denied it as to the

dismissal of Clarex's negligence claims.  *See Clarex III*, 2013 WL 3892898.  The Court held that

the Complaint had "plausibly alleged an acknowledgment by Natixis of the debt" at issue, which

could, if proven, be "sufficient to toll the statute of limitations" on the February 11, 2000 contract claim. *See id.* at *4.

On August 30, 2013, after the completion of discovery, Natixis moved for partial summary judgment. Dkt. 47–50. On September 27, 2013, Clarex filed an opposition. Dkt. 51–61. On October 11, 2013, Natixis filed its reply. Dkt. 63.

## II.   Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

### III.   Discussion

#### A.   Statute of Limitations

##### 1.   Legal and Factual Background

With discovery complete, Natixis renews its argument that Clarex's contract claim for the 5,000 Warrants purchased but not delivered on February 11, 2000 is barred by New York's six-year statute of limitations for contract claims.  *See* N.Y. C.P.L.R. § 213(2).

The first issue is when to start the clock on Clarex's claim.  Under New York law, the limitations period begins to run when the cause of action accrues. N.Y. C.P.L.R. § 203(a).  "A cause of action for breach of contract ordinarily accrues and the limitations period begins to run upon breach."  *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (citing *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399 (1993)).  Here, as alleged, the original breach of contract occurred when Natixis failed to deliver the 5,000 Warrants to Clarex.  *See Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 197 (2d Cir. 2003) ("Based on clear New York law, the proper valuation for the Warrants was the date of the breach—the date [defendant] failed to deliver the Warrants."); *Waxman v. Envipco Pickup & Processing Servs., Inc.*, No. 02 Civ. 10132 (GEL), 2006 WL 1788964, at *4 (S.D.N.Y. June 28, 2006) (holding that date of breach was date of closing where "defendants do not assert any other valid reason why delivery of the receipts was delayed past the date of the closing").  The settlement date for the relevant transaction was February 11, 2000.  *See* Def. 56.1 ¶ 32.  Accordingly, that is when the statute of limitations on Clarex's breach-of-contract claim for that transaction began to run.

Ordinarily, the breach-of-contract claim relating to the 5,000 Warrants would, therefore, have expired on February 11, 2006, well before Clarex filed their present Complaint (on October 24, 2012).  However, under N.Y. Gen. Oblig. Law § 17-101, a written acknowledgment of the

debt by Natixis could restart the six-year limitations period.  *See Guilbert*, 480 F.3d at 149

(under § 17-101, a written "acknowledgment or promise to perform a previously defaulted

contract" may restart the statute of limitations).  Specifically, § 17-101 states:

> An acknowledgment or promise contained in a writing signed by the party to be
> charged thereby is the only competent evidence of a new or continuing contract
> whereby to take an action out of the operation of the provisions of limitations of
> time for commencing actions under the civil practice law and rules . . . .

This written acknowledgement by Natixis must have been communicated to Clarex or someone

on Clarex's behalf.  *See Lynford v. Williams*, 826 N.Y.S.2d 335, 337 (2d Dep't 2006) (a written

acknowledgment does not restart the statute of limitations under § 17-101 if it was not

"communicated to the plaintiff or to anyone on his behalf, nor intended to influence the

plaintiff's conduct in any manner"); *In re Brill*, 318 B.R. 49, 60 (Bankr. S.D.N.Y. 2004) ("When

the debtor acknowledges the existence of the debt to a stranger, the acknowledgment will be

effective *if it appears that it was the intention of the debtor* that the acknowledgment should be

communicated to and should influence the creditor.") (quoting *In re Sonnenthal's Estate*, 242

N.Y.S.2d 135 (Sur. 1963)) (emphasis in *Brill*); *see also Moore v. Candlewood Holdings, Inc.*,

714 F. Supp. 2d 406, 410 (E.D.N.Y. 2010).

The timeliness of Clarex's February 11, 2000 claim thus turns on whether Natixis

provided a written acknowledgment of its debt to Clarex (or its representative) on or after

October 24, 2006.

Clarex argues that Natixis acknowledged the debt in three separate ways:  (1) by

providing Clarex with monthly account statements that reflected Clarex's ownership and

entitlement to these 5,000 Warrants; (2) by continuously instructing Euroclear to deliver the

5,000 Warrants to Clarex via Scotiatrust; and (3) through "[a]dditional statements and conduct."

*See* Pl. Br. 5–11.

The Court addresses the monthly account statements in detail below.  However, the Court disposes of the Euroclear instructions and the additional statements and conduct at the outset. First, there is no evidence in the record that the Euroclear instructions entered by Natixis were, at any time before August 21, 2007, sent to, or shared with, Clarex or its representatives—which is a required element under New York law.  *See Lynford*, 826 N.Y.S.2d at 337; *In re Brill*, 318 B.R. at 60.  To the extent that Clarex relies on the fact that Scotiatrust discovered the cancellation of Natixis's Euroclear instructions on December 22, 2011, *see* Pl. 56.1 ¶ 96, this evidence is barred by the parties' agreement not to use evidence of events that took place after August 21, 2007. *See* Section I.A, *supra*.  Also barred by the same Letter Agreement is the evidence that Natixis e-mailed Euroclear, instructing them to "rematch the bargains" concerning the purchase of Clarex's 5,000 Warrants, or that Euroclear agreed to do so.  *See* Pl. 56.1 ¶¶ 97–101.  Based on the record before the Court, the Euroclear instructions are thus not a viable written acknowledgment under New York law.  They do not create a disputed material issue of fact sufficient to preclude summary judgment for Natixis.

The additional "statements and conduct" relied on by Clarex suffer from similar legal infirmities.  Pl. Br. 9–11.  Either the statement was not in writing (*e.g.*, oral conversations between representatives of Betax and Natixis), not shared with Clarex (*e.g.*, internal Natixis documents), or post-dated August 21, 2007 (*e.g.*, writings between Natixis and JPMorgan since 2008).  *Id.*  In addition, some conduct claimed by Clarex occurred well before 2006 (*e.g.*, payments made by Natixis on distributions associated with the 5,000 Warrants in December 2002), and thus are irrelevant to the statute of limitations issue.  Even if the Court found that this conduct constituted a legal acknowledgment, it would not restart the statute of limitations late enough to make Clarex's claim timely.  Based on this record, none of the additional statements

and conduct Clarex identifies creates a disputed material issue of fact sufficient to defeat summary judgment.

### 2.   Monthly Account Statements

The monthly account statements are of a different nature.  These statements were, undisputedly, in writing, sent to Clarex, and sent continuously between 2001 through and after October 24, 2006 (at which point, the claim would have become timely).  Clarex's claim with respect to these 5,000 Warrants therefore turns on whether, under New York law, a reasonable jury could find that listing 5,000 Warrants on Clarex's monthly account statement constituted a written acknowledgment by Natixis of its debt to Clarex, such that the statute of limitations on Clarex's breach-of-contract claim relating to those 5,000 Warrants restarted each month that Clarex received its account statement.

For a writing to restart the limitations period for a debt, it must (1) "recognize an existing debt" and (2) "contain nothing inconsistent with an intention on the part of the debtor to pay it." *Knoll v. Datek Securities Corp.*, 769 N.Y.S.2d 581, 582 (2d Dep't 2003) (citing *Lew Morris Demolition Co., Inc. v. Bd. of Ed. of City of New York*, 40 N.Y.2d 516, 519 (1976)).  In determining whether a written acknowledgement meets these requirements, the "critical determination is whether the acknowledgment imports an intention to pay." *Estate of Vengroski by Vengroski v. Garden Inn*, 495 N.Y.S.2d 200, 202 (1985) (citing *Curtiss-Wright Corp. v. Intercontinent Corp.*, 97 N.Y.S.2d 678 (1st Dep't 1950)).  This analysis does not require resort "to any subtle or refined distinctions contrary to ordinary business understanding and rules of common sense." *Vengroski,* 495 N.Y.S.2d at 201–02 (citation omitted).  But whether an "acknowledgment is sufficient to restart the running of a period of limitations depends on the circumstances of the individual case."  *Id.* at 201 (citation omitted).

Here, it is undisputed that Natixis sent monthly account statements to both Clarex and Betax from 2001 to the present.  Def. 56.1 ¶ 67; Pl. 56.1 ¶¶ 102–105.  Clarex has put only some of these statements in the record before the Court.  In the Domb Decl. Ex. 14, Clarex provided the following statements:

- Clarex statements for May 2002 (reflecting 41,000 Nigerian Warrants), November 2002 (same), and December 2002 (reflecting 39,000 Nigerian Warrants).

- Betax statements for December 2001 (reflecting 7,000 Nigerian Warrants), July 2003 (same), November 2012 (same), and December 2012 (same).

For its part, Natixis, in the Levine Decl. Ex. J, has provided just one Betax statement from September 2009 (reflecting 7,000 Nigerian Warrants), which is claimed to be "substantively identical to all other account statements," Def. 56.1 ¶ 67, notwithstanding the fact that the Betax statements are materially distinct from the Clarex statements, in that the former reflects 7,000 Warrants and the latter reflects 39,000 Warrants after December 2002.

Disappointingly, neither side in this case provided the Court with the most relevant account statements (from October 2006 to August 2007), and neither side has cogently explained how the various transactions are reflected on these statements, leaving the Court to engage in unnecessary reconstruction and interpretation.[11]  However, viewing the evidence in the light most favorable to Clarex, the Court infers the following from the record at hand:  (1) Betax was the purchaser of the 7,000 Warrants in the August 28, 2001 transaction, and thus its account statements are irrelevant to the February 11, 2000 transaction at issue; (2) the 39,000 Nigerian Warrants reflected on the December 2002 Clarex statement include the 5,000 Warrants purchased on February 11, 2000 (because 39,000 Warrants, plus the 7,000 held by Betax, equals the total 46,000 Warrants at issue in this case), *see* Pl. 56.1 ¶ 103; and (3) a monthly statement

---

[11] The Court continues to urge counsel in this case to aspire to a higher level of quality and attention to detail in their legal and factual submissions.

identical to the December 2002 Clarex statement was sent by Natixis to Clarex each month after December 2002 (reflecting 39,000 Nigerian Warrants outstanding).  For purposes of this motion, the Court will therefore assume—despite Clarex's failure to articulate this point clearly—that a statement identical to the December 2002 statement was sent by Natixis to Clarex sometime after October 24, 2006 (but before August 21, 2007).

The issue, then, is whether such a statement, under New York law, would constitute a written acknowledgment or promise to perform by Natixis.  Put differently, does this account statement "recognize an existing debt" and "contain nothing inconsistent with an intention on the part of [Natixis] to pay it"?  *See Knoll*, 769 N.Y.S.2d at 582.  If it does, then an account statement sent by Natixis after October 24, 2006 would have restarted the statute of limitations as of that date—making Clarex's breach-of-contract claim for the February 11, 2000 transaction timely when the Complaint was filed on October 24, 2012.

Examining the statement itself, the Nigerian Warrants are listed under the heading of "COD Account" in the "Portfolio Holdings" section.  *See* Domb Decl. Ex. 14 ("December 2002 Statement").  The line-item states, "Nigeria Call Wts Exp 11/15/20 EC #359016 Equities NICWF":  the quantity is listed as 39,000, the current price is listed as "N/A," and the current value is listed as "0.00."  *Id.*  Clarex, citing *Chase Manhattan Bank v. Polimeni*, 685 N.Y.S.2d 226 (1st Dep't 1999), argues that a defendant's financial statement, reflecting the existence of a debt to plaintiff, may qualify as an acknowledgment or promise under § 17-101.  *See* Pl. Br. 3–4. But this begs the question—although the COD Account lists the number of Warrants purchased by Clarex from Natixis (39,000), does the act of listing the number of Warrants on an account statement constitute a written acknowledgment by Natixis that it owed these Warrants to Clarex?

As to this point—the meaning and effect of the COD Account statement—the parties

disagree.  Natixis designated Daniel Briggs ("Briggs"), an Executive Director, as its Rule

30(b)(6) witness.  Pl. 56.1 ¶ 190.   Briggs testified at his deposition that COD means, "Cash on

delivery," and that the number of Warrants in the COD account reflects transactions "that didn't

complete by the date the statement was generated"—*i.e.*, unsettled accounts.   *See* Levine Decl.

Ex. U ("Briggs Dep.") 57:11–58:11.  Briggs contrasted a cash account—where Natixis would

hold actual custody of the assets for a client—with a COD account, which are "securities that the

client holds at another institution."  *Id.* 59:3–59:14.  According to Briggs, "all unsettled COD

positions in a customer's account will get captured on their monthly statement."  *Id.* 60:3–60:6.

Natixis contends that Briggs's testimony means that in a "custodial account, the account

statement shows what is held in the account," while in a "DVP account, the statement shows the

transaction."  Def. Rep. Br. 4.  But Natixis cites no evidence for this proposition.  Although

Briggs testified that DVP ("Delivery versus Payment") means the same thing as COD, *see*

Briggs Dep. 58:12–58:19, there is no evidence in the record (at least referenced by Natixis) that a

DVP/ COD account statement simply shows the *transaction*, and not the *assets*, in such an

account.  And if Natixis is correct that its only purpose for listing the 39,000 Warrants in the

COD Account statement was to show a failed transaction, it is elusive why Natixis would

continue to list those 39,000 Warrants on every account statement from 2001, rather than listing

this historical fact only once.

Clarex, by contrast, provides the sworn testimony of Glen Shipway, a consultant in the

regulatory and compliance division of the Bates Group LLC, and the former Executive Vice

President of the Nasdaq Stock Market Inc. between 1989 and 1999.  Shipway Decl. ¶ 1–2.

Shipway reviewed the monthly account statements sent by Natixis to Clarex and Betax, as well

as Briggs' testimony.  *Id.* ¶ 10.  According to Shipway, the account statements reflect that Clarex "held, and still hold, a certain number of warrants in their accounts with Natixis."  *Id.* ¶ 11.  The fact that the Warrants have not yet been delivered, or "that the statements do not show a market price and show a current value of zero" does not affect the fact, according to Shipway, that "Natixis 'owes' those warrants" to Clarex.  *Id.* ¶¶ 11–12.  "Natixis as a principal committed itself to deliver certain warrants to Clarex and Betax," and these account statements reflect that "Natixis has continued to correctly carry that obligation in its books and records."  *Id.* ¶ 12.

As the moving party, Natixis has the burden to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of" the non-moving party, which, in this case, is Clarex.  *See Johnson*, 680 F.3d at 236 (citation omitted).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  Clarex can survive a summary judgment motion establishing a genuine issue of material fact based on record evidence.  *See Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

Whether the account statements Natixis sent to Clarex are acknowledgements, by Natixis, of an existing debt to Clarex is material, under New York law, to whether the statute of limitations on Clarex's contract claim relating to the February 11, 2000 transaction restarted any time after October 24, 2006.  Viewing the record evidence "in the light most favorable" to the Clarex, *see Celotex*, 477 U.S. at 323, the Court cannot resolve this issue of material fact in favor

of Natixis.  Accordingly, Natixis's motion for partial summary judgment with respect to the

statute of limitations is denied.[12]  This issue will need to be resolved by the trier of fact.

### B.    Doctrine of Impossibility

The second basis for Natixis's summary judgment motion is that the doctrine of

impossibility excuses Natixis's failure to deliver the 46,000 Warrants to Clarex.  Def. Br. 10–17.

According to Natixis, the fact that the market in Nigerian Warrants failed during this time period

excuses its non-performance.  *Id.*  Natixis admits, however, that it was "unable to find any

authority specifically applying the law of impossibility to non-delivery of securities due to a

general market failure."  Def. Br. 14.  The Court has also found no such legal authority.

Under New York law, the defendant in a contract dispute has the burden to prove that

non-performance is excused by impossibility.  *See Inter-Am. Dev. Bank v. NextG Telecom Ltd.*,

503 F. Supp. 2d 687, 696 (S.D.N.Y. 2007) ("The burden of showing impossibility is on the party

seeking to excuse performance."); *Brignoli v. Balch, Hardy & Scheinman, Inc.*, 577 N.Y.S.2d

---

[12] Natixis relies on the facts that: (1) the tolling agreement entered into by the parties on August 17, 2007 did not include the February 11, 2000 transaction, *see* Def. 56.1 ¶ 76; (2) Peter Turnquest at the Bank of Nova Scotia believed that 5,000 Nigerian Warrants were "lost to tolling," Def. 56.1 ¶ 82; and (3) Clarex entered a power of attorney with Capital Markets Financial Services, Inc., on October 9, 2009, which, like the Tolling Agreement, did not list the February 11, 2000 transaction, *id.* ¶ 84; Levine Decl. Ex. Q.  As to the latter argument, however, Natixis itself has urged the Court not to consider evidence that post-dates August 17, 2007, and this evidence is therefore off-limits on this motion.  As to the purported acknowledgment by Clarex in connection with the tolling agreement that its contract claim on the 5,000 Warrants was already lost, that agreement cannot be so construed.  The agreement is silent as to the status of the Warrants bought on February 11, 2000.  The tolling agreement's silence as to the 5,000 Warrants is not fairly read as a binding admission by Clarex that its claims as to those Warrants were then untimely.  Moreover, even if the tolling agreement could be read to reflect that Clarex's agents subjectively believed, at the time, that a claim as to the 5,000 Warrants was time-barred, it would remain a materially disputed issue of fact whether Natixis had later acknowledged, and thereby revived, the debt.

375 (1st Dep't 1991) (stating, in the context of a breach of contract claim, that the "defendant

bears the burden of proof on an affirmative defense").

New York courts have construed the impossibility defense very narrowly.  In *Kel Kim

Corp. v. Cent. Markets, Inc.*, 70 N.Y.2d 900 (1987), the New York Court of Appeals held that

impossibility did not excuse a lessee from a lease provision requiring her to purchase liability

insurance, because, even if it was difficult to obtain such insurance, the lessee should have

"foreseen and guarded against" that difficulty when she "undertook that obligation."  In general:

> [O]nce a party to a contract has made a promise, that party must perform or
> respond in damages for its failure, even when unforeseen circumstances make
> performance burdensome . . . . While [impossibility] defenses have been
> recognized in the common law, they have been applied narrowly, due in part to
> judicial recognition that the purpose of contract law is to allocate the risks that
> might affect performance and that performance should be excused only in
> extreme circumstances.

*Id.* at 902.  Accordingly, impossibility "excuses a party's performance only when the destruction

of the subject matter of the contract or the means of performance makes performance *objectively*

*impossible*."  *Id.* (emphasis added); *Sher v. Allstate Ins. Co.*, No. 10 Civ. 5644 (JGK), 2013 WL

2317140, at *11 (S.D.N.Y. May 28, 2013) (applying *Kel Kim*).

Accordingly, Natixis has the burden to prove that its performance was "objectively

impossible."  At the summary judgment stage, Natixis must also show "that there is no genuine

dispute as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  Clarex need only establish a genuine issue of material fact in the record to survive

summary judgment.  *See Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

Here, Clarex has established multiple issues of material fact, all of which relate to

whether performance by Natixis was objectively impossible.  Among the disputed issues for trial

are whether:  (1) Natixis had access to other sources of Nigerian Warrants, such that it could

have purchased the Warrants and provided them to Clarex to satisfy the contract, *see id.* ¶¶ 155–

58; (2) there was a cure that Natixis could have implemented on its own—such as a buy-in

procedure—or whether only a market-wide settlement was viable, *see id.* ¶¶ 170–72; and,

potentially, (3) the market difficulties affecting Nigerian Warrants were foreseeable to Natixis,

such that it should have protected itself against such risk in its contract with Clarex, *see* Def. 56.1

¶¶ 53–57.

As just one example, Clarex has adduced substantial evidence that on February 26, 2007,

Nigeria issued a tender offer to Warrant holders, in which it offered to buy Warrants at a price

not lower than $220 per Warrant.  Pl. 56.1 ¶ 155; Domb Decl. Ex. 37.  On March 29, 2007,

Nigeria announced that a total of 1,175,619 Warrants had been tendered, and that it had decided

to buy 369,154 of the Warrants at a price of $220.  *Id.* Ex. 38.  Viewing this evidence in the light

most favorable to Clarex, a reasonable jury might conclude that there were over 800,000

Warrants left available on the market at some price higher than $220 per Warrant, and that

Natixis should have purchased 46,000 of those Warrants to satisfy its contract with Clarex.

While Natixis argues that such a solution would be "fanciful," *see* Def. Rep. Br. 9, this is

conclusory.  Clarex has provided the testimony of Shipway that "Natixis could have gone into

the market and bought a sufficient number of Nigerian warrants to meet its obligation to deliver

46,000 warrants to Clarex and Betax."  Shipway Decl. ¶ 20.  Shipway's testimony is that,

"[b]ased on [his] experience, anyone tendering securities at a price to the issuer, in this case,

offering the warrants to Nigeria at $220 per warrant, would have been willing and pleased to sell

those warrants to Natixis at a somewhat higher price, say $230 or $240 per warrant."  *Id.*  A

reasonable jury could credit Shipway's testimony and conclude that Natixis was in fact obligated

to purchase 46,000 Warrants to satisfy its contract with Clarex, and that its performance was

therefore not "objectively impossible."

The question of impossibility under New York law is inherently fact-specific, and thus should be resolved by the jury at trial. Accordingly, Natixis's motion for summary judgment on the basis of impossibility is denied.

## CONCLUSION

For the foregoing reasons, Natixis's motion for summary judgment is denied on both grounds. The Clerk of Court is directed to terminate the motion pending at docket number 47.

The Court intends shortly to set the case for a jury trial. The Court expects to schedule trial between February 2014 and June 2014. The Court directs the parties to submit a complete—and fully compliant—Joint Pretrial Order by January 31, 2014. *See* Individual Rules 5(A). Any motion *in limine* is due along with the Joint Pretrial Order; any opposition to such a motion is due February 7, 2014; replies are not invited.

So as to enable it to set a trial date, the Court also directs counsel for each side, by January 10, 2014, to submit a joint letter: (1) identifying the witnesses that each side intends to call at trial; (2) estimating the length of trial; (3) identifying lead trial counsel for each side; and (4) identifying any specific dates on which lead counsel is unavailable during this period, and, as to each such date, the specific reason for that unavailability. General statements of unavailability will be disregarded. The Court will attempt, if possible, to accommodate counsels' schedules. Counsel are to confer by phone by close of business on Tuesday, January 7, 2014, to share lists of expected trial witnesses and estimates of the trial's length.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: December 20, 2013
New York, New York

22