1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   CLAREX LIMITED and BETAX LIMITED,

4                   Plaintiffs,

5               v.                        12 CV 7908(GHW)

6   NATIXIS SECURITIES AMERICAS, LLC,     Trial
    et al.,
7
                    Defendants.
8
    ------------------------------------x
9                                         New York, N.Y.
                                          May 27, 2014
10                                        9:20 a.m.

11  Before:

12          HON. GREGORY H. WOODS

13                                        District Judge

14

15          APPEARANCES

16

17  AKERMAN LLP
         Attorneys for Plaintiffs
18  BY:  MARTIN DOMB
         BENJAMIN JOELSON
19

20  EISEMAN, LEVINE, LEHRHAUPT & KAKOYIANNIS, P.C.
         Attorneys for Defendants
21  BY:  ERIC R. LEVINE
         ERIC P. HEICHEL
22       ERIC ASCHKENASY

23

24

25

 1                  (Case called; jury not present)

 2            THE COURT:  Good morning.  Thank you all for being

 3    here.  We expect our jury to arrive around 10 a.m.  This gives

 4    us an opportunity to take a few moments to discuss some

 5    preliminary matters.

 6            The first thing I will mention is the acoustics in

 7    this room, as you can tell, are not great.  You should use your

 8    microphones when you are speaking for the benefit of the court

 9    reporter and the jurors, and for my benefit.  Please, if you

10    need to move the microphones to make sure that you are easily

11    heard, do so.  Similarly, please let me know if you think there

12    is an issue with the witness and the microphone.  My deputy,

13    Mr. Daniels, will help adjust it to make sure that the

14    acoustics in this room are as little a problem as possible.

15            A couple of housekeeping matters before I address any

16    questions that the parties may have.  First, we have already

17    discussed duration of openings.  I think I said that an opening

18    of up to 30 minutes will be fine.  Both of you are experienced

19    counsel.  I know that you will stay within bounds with respect

20    to your openings, so I won't address that.  I will simply ask

21    you to stay within the 30 minutes that we discussed earlier.

22            Second, again housekeeping, you don't need to ask me

23    if you want to approach the witness.  Please feel free to

24    approach the witness.

25            Similarly, with respect to objections, please no

 1   argument in the course of an objection.  I don't mind if you

 2   state the basis for your objection together with the fact of an

 3   objection:  Objection, hearsay; objection, authenticity,

 4   whatever the basis is.  I will appreciate that.  If you can

 5   time the objections correctly so at the end of a question, not

 6   during the witness's testimony in response, I would also

 7   appreciate that, to make sure that the proceedings are as

 8   streamlined as possible.

 9        Can I ask, before the jurors come in, briefly for you,

10   Mr. Domb, do we have an estimate of when you think we may get

11   to Ms. Kase's testimony and whether or not we might have to

12   take Friday off?  It goes to what I am going to tell the jurors

13   in terms of their time here.

14        MR. DOMB:  Your Honor, over the weekend we decided not

15   to call Ms. Kase, and yesterday we informed opposing counsel.

16   We also decided not to call Mr. Edward Farah, and also informed

17   opposing counsel.  So that is not an issue.

18        THE COURT:  Thank you very much.  I appreciate that.

19   We will intend to proceed through Friday.

20        With respect to exhibits, I should thank both sides

21   for working as hard as you have to agree on exhibits and their

22   admissibility beforehand.  I very much appreciate that.  I'm

23   sure the jurors will very much appreciate that, because the

24   presentation will be much more fluid.

25        There are a couple of issues that I reserved on that

 1   are addressed in your letters, which I can take up now, before

 2   the jury comes in.  But I want to make sure that we first get

 3   to two other matters, which are a description of the case that

 4   I am going to provide to the members of the venire and then

 5   also the content of the voir dire questions themselves.

 6        I handed out to you in a previous conference my

 7   proposed voir dire questions.  I am now going to read to you

 8   and hand out to you my proposed summary of the case, which

 9   differs from the version that I previously gave to you because

10   of the defendants' concession that they are not objecting to

11   the existence of a contract between the plaintiffs and the

12   defendants with respect to the delivery of these warrants nor

13   as to their failure to perform with respect to the delivery of

14   the warrants.  This revised version addresses those changes.

15   I'll ask you if you have any comments on this now.

16        Mr. Daniels, would you hand these to the parties so

17   they can follow along.  I will read it out loud.  Here is the

18   proposed summary of the case.

19        "In this case, the parties agree that Clarex and

20   Betax, plaintiffs, contracted with Natixis to buy a number of

21   bonds issued by the Republic of Nigeria together with a number

22   of warrants.  The warrants entitled the holder to receive

23   payments that fluctuated in amount based on the price of oil.

24        "Over the course of five separate transactions,

25   Natixis sold 46 million in face value of Nigerian bonds to

1    plaintiffs.  The parties agree that Natixis was also obligated

2    to deliver a total of 46,000 Nigeria warrants to the

3    plaintiffs.  Natixis did not deliver those Nigerian warrants to

4    the plaintiffs together with the Nigerian bonds.  The

5    plaintiffs claim that Natixis's failure to deliver the warrants

6    caused Clarex and Betax to sustain damages.

7         "Natixis asserts two defenses.  First, Natixis asserts

8    that it was impossible for it to perform its obligations under

9    the contract at the time because of adverse market conditions.

10   Therefore, Natixis contends that its performance should be

11   accused by what we call the doctrine of impossibility.

12        "Second, Natixis contends that one of the contracts at

13   issue in this case, specifically, a February 8, 2000,

14   transaction involving 5,000 Nigerian warrants, is barred by the

15   statute of limitations, which generally requires that a lawsuit

16   for breach of contract be brought within six years after the

17   contract was breached.

18        "The plaintiffs contest that defense, asserting that

19   the defendants acknowledged their debt to the plaintiffs

20   attending the statute of limitations period."

21        I'll be reading this to the members of the venire.

22   They won't have a written copy of it front of them.  Would you

23   like me to make any amendments or modifications to this

24   summary?  Mr. Levine?

25        MR. LEVINE:  Yes, your Honor, we have a very strong

1      objection to the section extend, "The warrants entitled the

2      holder to receive payments that fluctuated in amount based on

3      the price of oil."

4              THE COURT:  I'm happy to delete that sentence.

5              MR. LEVINE:  Thank you.

6              THE COURT:  Mr. Domb?

7              MR. DOMB:  I think that in lieu of deleting it

8      altogether, it might be fair to put in something neutral, like

9      "The warrants entitled plaintiffs to certain rights about which

10     you will hear evidence at trial," or something to that effect.

11             THE COURT:  I think for purposes of what the venire is

12     going to be hearing for purposes of listening to our questions,

13     they don't need to hear those details.  They will hear it more

14     amply when evidence comes in.

15             Next, can I turn to the voir dire questions

16     themselves.  I'm hoping that you have, as I suggested at our

17     last conference, few comments, in part because we have printed

18     these out for the jurors.  Still, I open the floor to any

19     proposed changes or amendments.

20             MR. LEVINE:  We have no objections.

21             THE COURT:  Thank you, Mr. Levine.

22             MR. DOMB:  We have nothing.

23             THE COURT:  Thank you, Mr. Domb.

24             I'd be happy to take up now the question of the

25     plaintiffs' proposed exhibits regarding which there was some

1    question and also the defendants' proposed exhibits as to which

2    there is some question as described in the exchange of letters

3    on May 21st and 22nd.  Does either side have any other issues

4    that you would like me to address before I turn to those

5    matters?

6              MR. LEVINE:  I have another issue, but we can do these

7    first.

8              THE COURT:  I'm happy to hear yours.

9              MR. LEVINE:  I would request that the witnesses be

10   asked to leave.

11             THE COURT:  I think we already discussed the question

12   of sequestering witnesses other than the experts for purposes

13   of the proceedings.  Unless there is an objection, I think I

14   would prefer that to apply now as well.

15             MR. DOMB:  OK.  For clarification, that holds also

16   during the opening statements?

17             THE COURT:  Yes.

18             MR. DOMB:  Let me ask those witnesses to leave.

19             THE COURT:  Thank you.

20             MR. LEVINE:  Your Honor, in light of your most recent

21   rulings about what Mr. Shipway is permitted to testify about --

22   and specifically you said he can testify as to market

23   conditions, market practices around the time of the breach,

24   that's it, that's all he can testify about -- because his

25   report contains nothing relating to those topics about which he

 1   is permitted to testify, the rules prohibit him and the law

 2   prohibits him from testifying on those issues at all.

 3          We have no problem with him testifying on what he

 4   thinks the account statements say.  But on those particular

 5   issues that you limited him to testifying about -- putting

 6   aside that we don't think he is qualified to testify about it,

 7   that's not the point I'm making -- his report does not address

 8   it at all.  The law is very clear:  If it's not in the report

 9   and the report is not supplemented timely, you cannot testify.

10          THE COURT:  Can I ask a practical question, Mr. Domb,

11   before you respond.  When would you be calling Mr. Shipway?

12          MR. DOMB:  After the fact witnesses.  Our fact

13   witnesses are Ms. Sherman, Mr. Rolle, Mr. Fitting, Mr. Briggs,

14   and then Mr. Shipway.  I doubt that we will get to him until

15   sometime late tomorrow at the earliest.  And I do disagree with

16   Mr. Levin's statement, if you would like now to address that.

17          THE COURT:  Thank you.  I think because we have the

18   additional time and because this is the first time I have heard

19   this argument, it provides both of you an opportunity to

20   provide me with a short letter explaining your positions on the

21   issue with respect to the scope of his testimony and the basis

22   for excluding his testimony on issues that, if I take Mr.

23   Levin's comments at face value, do not extend to issues that

24   were covered in his expert report.  I would like to ask both

25   sides to provide me with a letter to explain their positions on

1    this issue before we begin court tomorrow.

2            MR. LEVINE:  There is one other issue relating to Mr.

3    Rolle.  Your Honor has given plaintiffs more than enough time

4    to show you a document that he is going to testify about.  If

5    they can't put it in front of you right this minute, he should

6    be precluded.

7            THE COURT:  I did want to talk about Mr. Rolle.  As

8    you know from our last conference, I was looking for the

9    writing about which he was going to testify, the piece of

10   paper.  This goes in part to the original writing rule and now

11   the question as to whether or not, assuming that the proposal

12   is that Mr. Rolle testify as to the content of a writing, why

13   it is that I shouldn't permit him to do that given the

14   strictures of the best evidence rule and particularly F.R.E.

15   1004.

16           I think I have an obligation to make a determination

17   as to whether or not those preconditions are in fact satisfied

18   to the extent that the content of Mr. Rolle's testimony is to

19   establish the existence and content of a writing which is not

20   in front of the Court.  Can I ask that you respond to that,

21   please, Mr. Domb.

22           MR. DOMB:  Yes, your Honor.  The General Obligations

23   Law requires acknowledgment in writing.  I think for at least a

24   couple of decades now writing includes electronic writings.  An

25   email that is not printed out is a writing.  An email that

1   existed, was not printed out, and is no longer capable of being

2   printed out nevertheless was a writing.

3          Even if you speak about a letter, a letter that

4   existed, was read, the contents of which are remembered and

5   testified to, and now the letter cannot be produced because it

6   has been misplaced or destroyed or whatever, nevertheless is a

7   writing.

8          I think when the Court hears Mr. Rolle testify, the

9   Court and the jury will understand the nature of the writings

10  that we are alleging.  Whether it is a writing sufficient to

11  satisfy the General Obligations Law is a fact issue for the

12  jury.

13         THE COURT:  I agree with that.  But there is a gating

14  matter.  There is the question of Rule 1004, which constrains

15  the admissibility of other evidence of content of writing.  It

16  reads, "An original is not required, and other evidence of the

17  content of a writing, recording, or photograph is admissible if

18  (a) all the originals are lost or destroyed and not by the

19  proponent acting in good faith, (b) an original cannot be

20  obtained by any available judicial process, (c) the party

21  against whom the original would be offered had control of the

22  original . . . (d) the writing, recording, or photograph is not

23  closely related to a controlling issue."

24         I think, and I'll again ask for supplemental briefing

25  on this if necessary, that it is incumbent on me to ensure that

1  these prerequisites under 1004 have been satisfied to the

2  extent you seek to introduce verbal testimony regarding the

3  content of a writing.  I would need to actually see evidence,

4  not constrained by the rules of evidence, in making that

5  determination.  I would need some evidence that these

6  prerequisites under 1004 have been satisfied.

7         Again, I don't disagree with you that you can prove

8  the content of a writing through other means, just that the

9  rules of evidence require that these conditions be satisfied in

10  order for that testimony to be admissible.  In this case it is

11  not clear to me that the originals are lost or destroyed or

12  that an original could not have been obtained by an available

13  judicial process, obviously not right now, but at some point

14  during the proceedings up to the moment that we are about to

15  begin trial.

16         MR. DOMB:  Your Honor, Mr. Rolle explains why the

17  original as it existed at the relevant times in this case is no

18  longer capable of being printed out from the Euroclear

19  computer.  Your Honor has precluded us from putting in

20  information past a certain date.  But right now Natixis as well

21  as our client could go to the Euroclear computer and print out

22  the current version of it.  I think under the Court's ruling

23  that may be precluded.

24         So, what Mr. Rolle will testify is that a printout

25  existed or could have been printed out at the relevant times

 1   and this is what it contained.  We do think that his testimony

 2   will explain and will fall under the conditions of Federal Rule

 3   of Evidence 1004 that you referred to.

 4           THE COURT:  I am going to have to ask that he not

 5   testify on that topic until I have seen supplemental argument

 6   on this.  I'll take as a given that you, plaintiffs, cannot

 7   today simply press a button from the Euroclear screen and see

 8   what it showed at a prior date.

 9           The question therefore for the Court will be whether

10   or not 1004(b) actually requires that you have gone out to

11   Euroclear and asked them whether or not the information that

12   was available on the screen in those prior days could have been

13   presented by them.  I understand you could not press the

14   button, but could you have issued a third party subpoena or

15   requested documentary production of that document from

16   Euroclear?

17           MR. DOMB:  I think the record in this case shows that

18   Euroclear could not do that.  We have not subpoenaed Euroclear,

19   to directly answer your question.  But evidence, which will not

20   come in because it post-dates August 21, 2007, evidence from

21   Natixis's records and from our records shows that Natixis tried

22   to find out the status of instructions that fell away.

23   Euroclear had no information on that.

24           The information available to each side through

25   Euroclear today is no different from the information available

1    to Euroclear, as I understand it.  So we have a case where a

2    document existed in electronic form that was capable of being

3    printed out and, as I understand it, cannot be printed out

4    today in the same form.  But it did exist.  That is really the

5    basis of our argument.

6         THE COURT:  In order to get through this gate of 1004,

7    as I understand it, I'm not constrained by decisions regarding

8    admissibility of evidence for purposes of these other issues.

9    If there is evidence, information, that you want to convey to

10   me to justify the introduction of this evidence under 1004, I'm

11   open to it.  If it results from information that is otherwise

12   precluded from the case in chief, I'm open to that.  I just

13   need to make sure that I'm satisfying my gating obligations

14   under the rules of evidence.

15        MR. LEVINE:  First, your Honor's question was right on

16   about getting it from Euroclear.  Neither party, and this would

17   have been the burden for the plaintiffs, asked the exact

18   question your Honor asked about whether or not Euroclear can

19   click it, print it out, accepted it.  That was never asked.

20   That should be said.  So they fail on that point.

21        The other thing, let's remember what they want to put

22   this in for.  They want to say this is a direct communication

23   from Natixis, however circuitous, a direct communication to

24   Clarex and Betax.  That means they got it.  They are claiming

25   they got it.

1    If they lost it, if they destroyed it, if they failed

2  to print it out, that's not our fault.  They knew in 2006 and

3  2007 that they didn't get the warrants back in 2000 and 2001.

4  The burden was on them to keep that if it was relevant, if it

5  mattered.

6    This idea that we are going to be cross-examining

7  against a nonexistent document that we can't tell you what it

8  is, no matter how detailed Mr. Rolle's testimony is -- who

9  knows, maybe there is a disclaimer that says this is not

10  intended to be a communication to third parties, only to the

11  person on the other side of the computer?

12    Mr. Rolle worked for Scotiatrust, he did not work for

13  Clarex, so we can't cross-examine him.  They do not satisfy the

14  evidentiary rule that your Honor is citing.  Mr. Rolle should

15  be precluded.  They have had two years to show you that.

16    THE COURT:  Thank you.  I'm going to again take

17  advantage of the fact that we are going to be running a

18  relatively short day today to give you a chance to present

19  whatever your best case is to me in writing regarding why it is

20  that this testimony should be introduced, admitted, or

21  precluded on this basis.  If you can get me those before

22  tomorrow morning, I will try to be in a position to rule on

23  that question.  Thank you.

24    There are a number of exhibits about which the parties

25  were unable to agree.  I should express my thanks again for the

1   fact that you are able to agree on as much as you have.  I very

2   much appreciate it.

3        Exhibit 15 from the plaintiffs' exhibits, could I ask

4   first a question.  Who is going to be authenticating this

5   document?  I recognize Mr. Fitting's name, but I didn't

6   recognize the other people's names on this email chain.

7        MR. DOMB:  Your Honor, one important thing about this

8   exhibit that the middle email appears to be written by Robert

9   Pivinski, but Mr. Fitting testified at his deposition that that

10  was actually Mr. Fitting who wrote this.  At that time Mr.

11  Fitting had an issue with his email account and he was using

12  Mr. Pivinski's email account.  So those are the words of Mr.

13  Fitting.

14        THE COURT:  I have a question about authentication

15  which I expect that you will establish.  With respect to the

16  question of whether or not this should be excluded on the basis

17  that it is intended to introduce evidence of the post-2000-2001

18  valuation and post-2000-2001 damages, I'm not going to preclude

19  introduction of this evidence.  I'm accepting the plaintiffs'

20  description that although these are later-dated documents, that

21  they are intended to demonstrate the value of the warrants at

22  the time of the transaction.

23        Exhibit 19.  I appreciate the acknowledgment from the

24  plaintiffs that this document is potentially barred by the

25  motion in limine number 1.  I did say that you would be

1   permitted to conduct a voir dire on this document regarding the

2   time at which it was produced.   I will allow you to do that

3   before I make a final determination regarding its

4   admissibility.

5           With respect to Exhibits 32 and 33, I'm going to skip

6   those and go to 86 and 87, and address 32 and 33 together with

7   Defendants' Exhibits K, L, and M.   So 86 and 87.

8           Can I ask, Mr. Domb, 86 and 87 each contain a large

9   volume of account statements.   I take it from your letter that

10  you are intending only to introduce some subset of these?

11          MR. DOMB:   Yes, your Honor.   Let me first preface by

12  saying that yesterday, while going through that exhibit, we saw

13  that in the printing process two page ranges were duplicated a

14  total of three times within that.   We took those out.   It is

15  easy to see because the exhibit really is a sequential number

16  of Bates numbers P262 through P400-something.   We removed that.

17  The exhibit now is maybe two-thirds or half of that size.

18          The answer to your question is yes, the statements are

19  all there.   We intend to question witnesses on perhaps a couple

20  before October of 2006 and one or two after.   So we are talking

21  about four or five exhibits.

22          The reason they are all there is, number one, there is

23  no basis to exclude them and, number two, we want to show the

24  continuity, that there was no change, that whatever was shown

25  during the relevant period of 2006 through '07 is the same and

1    carries forward from what it was before.

2         THE COURT:  Is it your intention not to introduce all

3    of what is currently included as 86 and 87 but to have

4    individual account statements --

5         MR. DOMB:  Right.  For example, we will ask witnesses

6    to comment on the statement for May of 2002 and then for

7    January or February of 2007, something like that.

8         THE COURT:  Each of those would be marked separately

9    6A, 6B, instead of introducing the entire volume?

10         MR. DOMB:  If that would make things easier, we could

11    do that.  We just felt uneasy.  You might remember at one point

12    in the case we were criticized for giving samples of statements

13    and not putting in statements that the Court felt were the most

14    relevant even though we had testimony that all of the

15    statements were essentially the same.

16         Having seen no reason why they should be excluded, our

17    first choice would be to include those exhibits as they are and

18    question witnesses about a select few of them.  If the Court

19    feels that that is an issue, we could subnumber exhibits or

20    particular statements 86A, B, etc., and use only those.

21         THE COURT:  I would like to ask your comments, Mr.

22    Levin.  My principal concern with these was simply redundancy

23    and taking up time of the jury.  It doesn't sound as though Mr.

24    Domb's proposed approach is actually going to consume much

25    time.  Given that, is there a basis for me to preclude him from

1    introducing the exhibits?

2         MR. LEVINE:  Our view is, your Honor, that they should

3    not be permitted to cherry-pick.  We would think if some of

4    them are going to come in, then we would want all of them to

5    come in, because we want to show it's here, it's here, it's

6    here, it's not disappearing and coming back, disappearing and

7    coming back.  I don't want to leave the jury with that

8    misimpression.

9         THE COURT:  All right.  They can all come in, assuming

10   of course that you are going to remove the duplicative Bates-

11   stamped pages from the ones that go to the jury.

12        MR. DOMB:  We sent the other side a PDF of the correct

13   exhibit.  Our courtroom technician has it, and we can give it

14   to the Court in either paper or electronic form at your

15   convenience.

16        THE COURT:  Thank you very much.  I would appreciate a

17   paper copy of it.  You can hand it to Mr. Daniels whenever you

18   have a moment free.

19        With respect to Defendants' Exhibits K, L, and M --

20   tell you what.  I did not interpret the power of attorney at K

21   to be the extrinsic evidence of the content of the contract,

22   the meaning of the contract.  I have a general concern about

23   the intended purpose of these exhibits as described, Mr. Domb,

24   in your letter, namely, that they go to the question of whether

25   or not the claim is actually time-barred with respect to these

 1   warrants.

 2        The reason why I raise that question is because my

 3   understanding is that they are time-barred absent an extension

 4   of under the General Obligations Law.  My question is, by

 5   trying to demonstrate to the jury, introduce the argument

 6   perhaps, that they are not in fact time-barred, that we are

 7   pointing the jury toward an issue that is not actually a

 8   question in this case, because they are time-barred unless

 9   there is an extension.  Would you mind addressing that.

10        MR. DOMB:  First of all, we concede that without the

11   General Obligations Law, these warrants, the claim on them

12   would be time-barred.  We sued long after six years.  The

13   tolling agreement I believe will come in.  I think neither side

14   objected.  The tolling agreement clearly covers 41,000

15   warrants.  What does this power of attorney add by showing that

16   the power of attorney covers 41,000 warrants?  Plus, Mr. Farah

17   is not testifying.

18        The same thing goes for Exhibit L.  There is a

19   handwritten note that this tolling agreement doesn't cover the

20   5,000 warrants.  That is evident on its face.  This adds

21   nothing.  And Exhibit M is a handwritten note by Mr. Turnquest

22   that includes the phrase "5,000 lost to tolling," which is

23   again a statement that the tolling agreement doesn't have the

24   5,000 warrants.

25        In one of your pretrial rulings your Honor said that

1    there is no need for extrinsic evidence to interpret what the

2    tolling agreement means or covers.  We concede that but for the

3    General Obligations Law, these claims would be covered.  So

4    none of this is at issue.  For what purpose is it being

5    offered?  That is our position.

6           THE COURT:  Mr. Levine.

7           MR. LEVINE:  I'm here to tell you.  Their claim is

8    that under the General Obligations Law there is this either

9    account statements or the invisible document Mr. Rolle wants to

10   testify about.  Somehow we have acknowledged an obligation that

11   that extends the statute.

12          These documents are admissions that the account

13   statements do not say what they claim they say.  K, the power

14   of attorney, it's very convenient, Mr. Fitting will be

15   testifying, but Ms. Sherman signed the document and she will be

16   testifying.  This is not a tolling agreement.  It's a document

17   between Clarex and Betax on the one hand and Mr. Farah's

18   company on the other hand to bring the case in 2009, October of

19   2009.

20          They say go sue on our claims and our claims are

21   defined as 41,000 warrants.  This is not interpreting a tolling

22   agreement.  It is an admission that they know that those

23   account statements don't say what they claim they say.

24          (Continued on next page)

25

 1          THE COURT:  I accept your argument with respect to K.

 2          MR. LEVINE:  L.  One of the arguments they want to

 3   make is -- and Mr. Domb makes it -- is if the client doesn't

 4   know, they don't know what their rights are.  L is signed by

 5   Mr. O'Naghten, their lawyer.  He knows what their rights are.

 6   It is an admission that their lawyer knows that these account

 7   statements don't say what they are trying to say they say.

 8          THE COURT:  Can I ask with respect to L, L is the

 9   tolling agreement itself?

10          MR. LEVINE:  Yes.  And it's signed by Mr. O'Naghten,

11   the lawyer from Akerman.

12          THE COURT:  And I think as Mr. Domb just said the

13   expectation is that the tolling agreement itself would be

14   introduced.  So, is the purpose of L then simply to get in

15   this --

16          MR. LEVINE:  Sorry, I apologize, your Honor.  I was

17   confusing it with the other one.  But M comes in.  The

18   handwriting, again it could have been written on a napkin.

19          THE COURT:  Sorry.  L.

20          MR. LEVINE:  OK, Exhibit L.  Is the fourth amended and

21   restated tolling agreement.

22          THE COURT:  Can you start by telling me -- so assuming

23   the agreement itself were to come in, can you tell me is the

24   purpose of this exhibit then to introduce simply the summary

25   comments regarding the content of the agreement which are

1    included in the handwritten notes?

2              MR. LEVINE:  Two purposes.  One is that that

3    handwritten note is an admission by the plaintiffs that they

4    know the account statements don't claim what they say.  And the

5    second is the handwriting, this fourth amended and restated

6    tolling agreement is signed by Mr. O'Naghten, Mr. Domb's

7    partner.  So when they make the claim that clients don't

8    necessarily understand what their rights are, the lawyers do.

9    The fact that he signs it and that the claims are 41,000, not

10   46,000, is an admission by their own lawyer that they know that

11   the account statements don't say what they say.

12             THE COURT:  Do we know whose handwriting this is?

13             MR. LEVINE:  Yes, where it signs for Clarex and

14   Betax -- oh, the signature handwriting I believe is

15   Mr. Turnquest's.

16             THE COURT:  The note on page 2.

17             MR. LEVINE:  I believe that's Mr. Turnquest's.

18             THE COURT:  It would have to be authenticated.  It's

19   not clear to me what the purpose of this Exhibit L is, to the

20   extent we are just talking about not the agreement itself but

21   the handwritten notes that are included in it.  Am I focused on

22   this correctly?

23             MR. LEVINE:  There are two points to it.  That's one

24   of them.  That's one of them.  The first one is we want to

25   introduce it to show that handwriting is an admission that they

1    know the account statements don't say what they claim they say.

2          THE COURT:  Can I ask on that, why do we need to have

3    a description of what it is that the agreement says in

4    someone's handwriting as opposed to having the agreement speak

5    for itself and the fact that those 5,000 warrants aren't

6    covered by the agreement?

7          MR. LEVINE:  Because it is still an admission.  When

8    someone says why isn't the 5,000 there, it's because the

9    5,000 -- it's an admission the 5,000 was lost to tolling.  In

10   other words, the account statements don't say what plaintiffs

11   purportedly claim they say.  And if they want to say that there

12   is another way to interpret what that means, they're free to

13   say that, but we are entitled to make the point that they are

14   admitting that the account statements don't mean what they say

15   they mean.

16         And then their fallback to that -- and that leads into

17   my second point -- is what do the clients know?  They don't

18   know what their rights are.  That's why this document is

19   particularly important because of who signs it on behalf of

20   Clarex and Betax.  It is signed by Mr. O'Naghten, Mr. Domb's

21   partner.  He is not the client; he's the lawyer.  And when the

22   lawyer signs it, that's a statement that he knows that the

23   account statements don't say what they purportedly claim they

24   say.

25         If they want to argue it some other way, that Mr.

1    O'Naghten doesn't know what he is talking about, and it's just,

2    you know, he doesn't know what their rights are, they are free

3    to say that.  They want to put Mr. O'Naghten on the stand to

4    testify, go right ahead, but we are entitled to argue that by

5    Mr. O'Naghten signing this fourth tolling agreement years after

6    the 5,000 -- statute of limitation of the 5,000 warrants have

7    expired, we are entitled to make the argument this is an

8    admission not by just the client but by the lawyer on behalf of

9    the client, who understands what their rights are and knows

10   that the account statements don't say what they purport to say.

11             MR. DOMB:  May I have a moment, your Honor?

12             THE COURT:  Please.

13             MR. DOMB:  Your Honor, what I did is confirm.  I

14   didn't know whether this was Mr. O'Naghten's signature, which

15   he says it was.  He was authorized by the client to sign on

16   their behalf as a convenience.

17             I do still believe that the sole purpose that this is

18   being offered for is to show that someone in a handwritten

19   note -- by the way, I don't believe that is was Mr. Turnquest.

20   We identified Mr. Turnquest's handwriting during depositions,

21   which was much different.  I believe the state of the record is

22   no one knows whose handwriting this is.  It's being offered to

23   interpret what the agreement itself states.

24             THE COURT:  Thank you.  So to the extent that this is

25   being offered to include this handwritten statement, which is a

note on the top of page 2 that says JP Morgan Chase 5,000 not

covered by this tolling agreement, I believe that is extrinsic

evidence that summarizes or interprets the meaning of the

remainder of the agreement and, therefore, need not be included

and should not be presented as evidence regarding the meaning

of the contract.

I think there is a separate question as to whether or

not the agreement itself without that handwritten note -- which

I will also note seems not to be authenticated -- could be

introduced is a separate question, and I am not seeing a basis

right now to exclude the introduction of the agreement itself.

MR. DOMB:  Without the handwritten note?

THE COURT:  Correct.

MR. DOMB:  OK.

MR. LEVINE:  So, we can admit it.

THE COURT:  If you have a copy of it without the

handwritten note.

MR. LEVINE:  We have it; we can redact it.

THE COURT:  OK, redact it.

M, do we --

MR. LEVINE:  Maybe plaintiffs have a clean copy.

THE COURT:  I will let you work that out.

MR. DOMB:  It has to be redacted.

THE COURT:  In any case, we will redact it.

With respect to Defendant's Exhibit M, again do we --

1    this may have been said before –– is this clearly

2    authenticated?  Is this somebody who is going to be testifying

3    here.

4              MR. LEVINE:  Mr. Turnquest authenticated this at his

5    deposition.

6              MR. DOMB:  Yes, I agree with that.  And we have

7    objected to the reading of that portion of Mr. Turnquest's

8    deposition that refers to this on the same basis that

9    sometimes –– I don't think he could pin down the date.  I think

10   he said it was around 2008, maybe later, that in recapping his

11   understanding of the situation he did write that note 5,000

12   lost to tolling for the obvious reason that the 5,000 were not

13   included in the tolling agreement.

14             So, the tolling agreement is clear on its face.  The

15   fact that Mr. Turnquest was not a lawyer, was in the Bahamas,

16   and was told that the 5,000 was not included in the tolling

17   agreement, the fact that he wrote that as a note to himself is

18   not probative of anything about the general obligations law and

19   whether that revived the statute of limitations.

20             THE COURT:  I don't interpret this to be extrinsic

21   evidence of the meaning of the contract itself.  I can

22   understand why it would be the defendants would argue that this

23   is relevant to the jury for them to interpret –– for them to

24   have an understanding of how the plaintiffs reasonably

25   understood the account statements that were being sent to them

 1   by defendants, so I can't exclude this on the basis of

 2   relevance, and I don't believe that this is -- at least as put

 3   forth here -- a description of the meaning of -- sorry --

 4   intended to be extrinsic evidence of the meaning of the

 5   contract itself.

 6             So, with that, let me turn back to the plaintiffs two

 7   exhibits that I stepped over, which are 86 and 87 -- sorry, 32

 8   and 33.  Excuse me.

 9             MR. LEVINE:  Just a point of clarification.  On the

10   power of attorney, that is admitted in K.

11             THE COURT:  Yes, K can be admitted.  L can be admitted

12   with the redaction we discussed, and M can be admitted.

13             MR. LEVINE:  Thank you.  If you are still working -- I

14   believe they have also objected to KK.

15             THE COURT:  Sure.

16             MR. LEVINE:  Which is the --

17             THE COURT:  JJ.

18             MR. LEVINE:  Well, they objected to JJ as well and KK.

19             THE COURT:  So JJ is the EMTA primer.  I understand

20   that Ms. Werner is going to be testifying.

21             MR. LEVINE:  Yes, your Honor.

22             THE COURT:  So I think that with respect to this I do

23   think that it is hearsay.  I would not exclude it on the basis

24   simply that it is dated after the date of the events at issue.

25   To the extent that it describes events that happened before the

date of publication, that I think would be something that my

prior ruling would not strictly keep everything out.  I think

that to the extent there are particular provisions of this that

spoke to that time, it would be valid.

My concern with respect to this is that it is hearsay.

Ms. Werner is going to be here testifying as to exactly the

same information and can give a more targeted description of

it.  Mr. Levine?

MR. LEVINE:  Your Honor, I apologize, but I believe

you're wrong.

THE COURT:  OK, please tell me if you think I'm wrong.

MR. LEVINE:  It would come in as --

THE COURT:  Respectfully.

MR. LEVINE:  It would come in both as a market

report -- EMTA issues these on a regular basis.  The markets

follow them.  This could come in under the Bloomberg exception,

and your Honor is going to allow them to put in Exotix, and

that we didn't think met this.

This squarely falls within the Bloomberg exception of

803(17).  It comes in.  It's also a business record.  EMTA is a

trade association.  One of its principal obligations and

responsibilities is to follow the markets, issue reports, alert

their participants to developments in the market.  And Ms.

Werner drafted this document, she drafted it in the ordinary

course of her business.  They maintain the file.  It is not

1  hearsay.  It speaks to what caused the market-wide failure,

2  something that EMTA does, that this is part of their

3  responsibility, and this falls squarely within both the

4  Bloomberg exception, and it comes in as a business record.

5  It's simply not hearsay.

6         THE COURT:  Can I pause you on the 803(17).  803(17)

7  has an exception for market quotations, lists, directories or

8  other compilations that are generally relied on by the public

9  or by persons in particular occupations.  Is this a market

10  quotation, list, directory or other compilation?

11        MR. LEVINE:  Yes, this is a compilation of market data

12  that they put together to explain what caused the failure.

13  They hear from the participants, they monitor the market, and

14  then they publish these primers.  This is why they exist.  They

15  set the rules, they set the standards.  It was EMTA that came

16  up with the protocol of trading the bonds with the warrants.

17  It was EMTA that later came up in 2002 with the protocol

18  separating the bonds from the warrants.  The way they do it is

19  by issuing these primers, and then the market responds to it.

20  This is a market report, and it is a business record.  This is

21  what they do.

22        MR. DOMB:  Well, number one, to call this primer --

23  which I hope you can look at in front of you, which is a three

24  or four page textual description of something -- to call that a

25  market quotation, list, directory or compilation under 803(17)

 1    is just wrong.  It doesn't fit in there.

 2           Number two, it's not a business record.  Mr. Levine

 3    makes it seem like this is something routine that's done all

 4    the time.  As far as I could tell from the record, there was

 5    this primer which was the first one that Ms. Werner wrote, and

 6    then she updated it approximately four times, the last of which

 7    was in October or November of 2007.  It is not maintained in

 8    the regular course of business.  I happen to have gone into the

 9    EMTA website over the weekend to update my information on EMTA.

10    They have a section on documents covering all sorts of

11    government obligations:  Argentina, Chile, Venezuela, probably

12    25 countries.  I was surprised and interested to see that they

13    no longer have a section on Nigeria.  Perhaps the issue is

14    over.  It is not maintained in the ordinary course of business.

15           THE COURT:  You are pointing me, Mr. Levine, to

16    803(6), is that right?

17           MR. DOMB:  You mean the business records exception?

18           MR. LEVINE:  Mr. Domb is simply wrong that it's not

19    created in the ordinary course of business.  This is what she

20    does, these drafts, these primers.  The fact that she may have

21    drafted three or four on Nigeria doesn't mean that she doesn't

22    draft countless number of primers throughout the year on a

23    whole host of issues.  That's what she does, she follows the

24    market, and she issues these primers, and they give directives

25    to the market, and the market follows them.  They are the ones

 1    who established these protocols.  Their protocols is the reason

 2    we're here today.

 3         THE COURT:  Should I be looking at an exception other

 4    than 803(6)?

 5         MR. LEVINE:  803(6), it would satisfy 803(6) as well.

 6         THE COURT:  And what else are you looking at?  What

 7    other hearsay exception would you point me to?

 8         MR. LEVINE:  Well, because this would be within her

 9    normal occupation and within her normal zone of knowledge, she

10    should be able to testify about the document.  This document

11    just reflects what is in her head.  If you're not going to let

12    the contents of the document in, are you going to preclude her

13    from testifying about what happened in the market?  Because all

14    this is channeling what was in her mind, what she learned, and

15    put it into the market.  If you're not going to let the

16    document in -- EMTA, they are the only ones on the planet who

17    could tell you about the market-wide failure.

18         THE COURT:  I'm not disagreeing with having her

19    testify.  It's the basis under 6.

20         MR. DOMB:  Your Honor, (6)(a) says the record was made

21    at or near the time.  So stopping on that one, this is an

22    October 2002.

23         MR. LEVINE:  Precisely.

24         MR. DOMB:  May I?

25         MR. LEVINE:  Precisely.  Because that's when they

1    learned about the failure.

2          THE COURT:  Sorry.  Please, each of you please take

3    your turn.  Mr. Domb, it's your turn right now.

4          MR. LEVINE:  I apologize.

5          MR. DOMB:  This is a document written in October of

6    2002, which Natixis wants to introduce to show what was the

7    situation in February 2000 and in August and September 2001,

8    which were the dates of breach.

9          If you continue with (6)(a), it was made at the time

10   or from information transmitted by someone with knowledge.

11   This document is double hearsay.  Ms. Werner didn't go out in

12   the field and find out what was going on.  She put down what

13   was reported to her.  That will be evident when she testifies.

14         So, the document is double hearsay.  And if you fit

15   this within the business record exception, I think any document

16   written by any corporation then could be deemed to be a

17   business record.  Because it was created, they made three

18   versions of the document, ergo it's a business record?

19         THE COURT:  Again, I'm going to take advantage of the

20   fact that we have extra time to allow both of you to provide me

21   with supplemental briefing on this question.  I will ask it to

22   be brief briefing.

23         But I agree with you, Mr. Domb, that the places where

24   I was stalled, to the extent we are looking at 803(6) are both

25   803(6)(a) which asks that the record be made at or near the

1   time of the act, event, condition, opinion or diagnosis, also

2   by the introduction to 803(6) itself, which is a record of an

3   act, event, condition, opinion or diagnosis, and I would be

4   interested in the parties' view as to whether or not the I will

5   call it forward-looking, market-setting standards that EMTA is

6   setting forth in the primer is an act, event, condition,

7   opinion or diagnosis as described in introduction to that rule.

8   In any case, we have an opportunity for you to put forth your

9   best argument on that.

10          MR. LEVINE:  Just one point.  On the comment Mr. Domb

11  made about "at the time," that's a good argument for us,

12  because part of what we want to say is EMTA didn't learn about

13  it until then.  What she is writing about and what she learned

14  at the time, she is writing it contemporaneously with that.

15          Part of our point is that not even EMTA learned about

16  the fails until sometime in mid or late 2002.  So if the

17  entity -- the trading association whose job it is and the

18  reasons for its existence is to monitor the market -- doesn't

19  learn about the market-wide fail until a year after it occurs,

20  how are we supposed to know?  So the timing is critical.  And

21  she does draft it at or about the time she learns about it.

22          THE COURT:  OK.  And there is no question that she

23  will have the opportunity to testify to that.  I want to make

24  sure I make the best possible decision on this.  I will ask you

25  for both short letters on this question.  I assume we won't get

 1   to the introduction of this document until defendant's case in

 2   chief and, therefore, unlike the other question which goes to

 3   testimony that the plaintiffs expect to introduce shortly, you

 4   need not get it to me by tomorrow morning but sometime before

 5   the defendant's case in chief.  Thank you.

 6           So, I have just been handed a noted saying that our

 7   jury panel is ready.  So, unless the parties have other issues

 8   that we need to address now, I'd like to allow the members of

 9   the jury to enter the courtroom and for us to begin the voir

10   dire process.  We are going to take a short recess as the

11   jurors come over, and I will call us back to order as soon as

12   the jury panel reaches the courtroom.  Thank you.

13           (Recess)

14           THE COURT:  Sorry.  This will just be a minute.  One

15   thing I wanted to do before we had the jury panel come in was

16   just to remind you of the practice for jury selection, which I

17   have already described to you.  I have handed out a sheet

18   describing it to you.  We are using the struck panel method.

19   Each side will have three peremptory challenges which will be

20   exercised simultaneously.  We will be putting 14 people in the

21   jury box before we exercise the peremptory challenges.  We will

22   aim for a jury of eight, though, as I said in my written

23   statement, I reserve my discretion whether to decide to impanel

24   a larger jury if any peremptories overlap or are waived.

25           Typically in this courthouse court reporters are

1    excused for the voir dire process.  And the reason why I wanted

2    to come back in is to ask the parties if either of you has an

3    objection to allowing our court reporter to take a break as we

4    conduct the voir dire.

5              MR. DOMB:  No objection, your Honor.

6              MR. LEVINE:  Fine with us.

7              THE COURT:  Thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  A F T E R N O O N   S E S S I O N

 2                           2:00 p.m.

 3          (A jury of eight was selected and sworn)

 4          (Jury present)

 5          THE COURT:  Thank you very much.  Welcome back from

 6     lunch, ladies and gentlemen of the jury and counsel.  Now I'm

 7     going to give you some preliminary instructions.  Now the case

 8     is officially on trial.  So, to begin with, you are here to

 9     administer justice in this case according to the law and to the

10     evidence.  You are to perform this task with complete fairness

11     and impartiality and without bias, prejudice or sympathy for or

12     against the plaintiffs or the defendants.

13          Now, let me explain the jobs that you and I are going

14     to perform during the trial.  I will decide what rules of law

15     apply to the case.  I will decide this by making legal rulings

16     during the presentation of evidence, and also, as I told you,

17     in giving final instructions to you after the evidence and the

18     arguments are presented.

19          In order to do my job, I have to interrupt the

20     proceedings from time to time to confer with the attorneys

21     about rules of law that should apply here and, as I mentioned

22     earlier, sometimes we will talk here at the bench outside of

23     your hearing.  But some of these conferences may take more time

24     than others, so as a convenience to you I may excuse you from

25     the courtroom.  I will try to avoid those interruptions as much

1  as possible, but please be patient.  The conferences are

2  necessary to ensure the fairness of the trial as a whole, and

3  will also, I certainly hope, have the effect of making the

4  trial proceed faster.

5       While I decide the law that applies to this case, you,

6  ladies and gentlemen of the jury, are the triers of fact.  You

7  are going to weigh the evidence presented and decide whether or

8  not the plaintiffs have proved by a preponderance of the

9  evidence that the defendants are liable to the plaintiffs.

10      You must pay close attention to all of the evidence

11  presented, and you must base your decision only on the evidence

12  in the case and my instructions on the law, which I will

13  provide to you in more detail at the end of the evidence.

14      So, first off you are going to be evaluating the

15  evidence.  So, what is and what is not evidence?  Evidence

16  consists only of the testimony of witnesses, documents and

17  other things that are admitted into evidence, or any facts that

18  the lawyers have agreed on or stipulate to, or that I may

19  instruct you to find.

20      Some of you probably have probably heard of

21  circumstantial evidence and direct evidence.  Direct evidence

22  is direct proof of a fact, such as the testimony by a witness,

23  an eye witness.  Circumstantial evidence is proof of facts from

24  which you may infer or conclude that other facts exist.  The

25  word infer here, or the expression to draw an inference means

1    to find that a fact exists from proof of another fact.  An

2    inference is to be drawn only if it is a logical and reasonable

3    thing to do and not by speculation or guesswork.  So you can

4    draw inferences that are logical or reasonable conclusions from

5    other facts in evidence, but you shouldn't speculate or take

6    guesses.

7             In deciding whether to draw an inference, you must

8    look at and consider all of the facts in the light of reason,

9    common sense and experience.  Now, whether a given inference is

10   or is not to be drawn is completely a matter for you.  You are

11   the jury, you are the triers of fact.

12            Circumstantial evidence does not necessarily prove

13   less than direct evidence, nor does it necessarily prove more.

14            So here is an example to help you think about the

15   difference between direct and circumstantial evidence.  Assume

16   when you came into the courthouse this morning the sun was

17   shining and it was a nice day outdoors.  It was.  Also assume

18   that the courtroom blinds were drawn and you could not look

19   outside.  Assume further as you are sitting here that somebody

20   walked in with an umbrella that was dripping wet, and then a

21   few moments later somebody else walked in with a raincoat that

22   was also dripping wet.  Now, because you couldn't look outside

23   the courtroom and you could not see whether it was raining, you

24   wouldn't have direct evidence of the fact that it was raining,

25   but on the combination of facts I just asked you to assume it

1    would be reasonable and logical for you to conclude that it was

2    raining.  That's circumstantial evidence.  That's all there is

3    to it.  You infer on the basis of reason, experience and common

4    sense from one established fact the existence or nonexistence

5    of some other fact.

6         I will give you further instructions on these issues

7    regarding evidence as well as on other matters at the end of

8    the case, but keep in mind that you are to consider all of the

9    evidence at trial.

10        Some things though, just so you know, are not evidence

11   and should not be considered by you.  First, statements and

12   questions by the lawyers, they're not evidence and should not

13   be considered by you.  Nor are statements that I make, or

14   questions that I may ask of a witness to clarify testimony.

15   Arguments by the lawyers are not evidence.  What you hear from

16   the witnesses' mouths and from the document and other things

17   introduced into evidence, that's the evidence.

18        Second, objections to questions are not evidence.

19   Lawyers have an obligation to their client to make objections

20   when they believe that evidence offered is improper under the

21   rules of evidence.  You shouldn't be influenced by the

22   objection, the fact that they've made it, or by my ruling on

23   the question.

24        If an objection is sustained, so that one of the

25   parties says objection and I said sustained, what you should do

1    is you should just ignore the question that was just asked as

2    if it had not been asked, and also ignore any answer that may

3    have been given.  If it's overruled, so, objection, overruled,

4    you can treat the answer like any other answer.

5         If you are instructed that some item of evidence is

6    received for a limited purpose only, you must follow that

7    instruction.  So, I will let you know if a piece of evidence is

8    something that should be considered only for limited purposes.

9         Third, testimony that I have excluded or told you to

10   disregard is not evidence, and you shouldn't consider it.  I

11   will let you know if there is a piece of evidence that you

12   should disregard, and I will do that as clearly as possible.

13        Fourth -- and you can infer this from what I said

14   earlier -- anything that you may have seen or heard outside the

15   courtroom is not evidence and must be disregarded.  You are to

16   decide the case solely on the basis of the evidence that's

17   presented here in the courtroom.

18        So, in deciding the facts of this case you will have

19   to decide the credibility of the witnesses, that is, how

20   truthful you think they are, and how credible they are.  There

21   is no formula to evaluate evidence.  That's why we have all of

22   you members of our community here to decide.  For now, let me

23   just say that you bring into this courtroom all of your

24   experiences, and all of your common sense, all of the

25   background of your lives.  Don't leave that common sense

 1    outside the door, outside the courtroom.

 2            The same types of tests that you would use to evaluate

 3    the credibility of a person that you were interacting with in

 4    your daily life are the kinds of tests of credibility that we

 5    ask you to bring to the evaluation of the witnesses and the

 6    evidence that is going to be presented to you here.  The

 7    evidence doesn't require you to accept all of the evidence

 8    that's admitted at trial.

 9            In determining what evidence to accept, you have to

10    make your own evaluation of the testimony from each of the

11    witnesses and evaluate them, evaluate the witnesses and the

12    exhibits that are received into evidence.

13            As I said earlier though, it's essential that you keep

14    an open mind regarding the case and the outcome until you have

15    heard all of the evidence.  By the nature of our process a case

16    can only be presented step by step, witness by witness, and as

17    you know from experience you can hear one person describe their

18    side of the story independently, and based on their version of

19    the story alone you think that it's completely right, and then

20    you hear the other side tell their side of the story and you

21    have second thoughts or you think that that second story may be

22    right.  So, what I want to ask you to do is to keep an open

23    mind, not make up your minds until after both sides have

24    presented all of their evidence.

25            There may be another side to any witness's story, so

1    wait and listen to cross-examination and the full testimony

2    with respect to any particular witness.

3         So, you should use your common sense and good judgment

4    to evaluate each witness's testimony based on all of the

5    circumstances.  Again, keep an open mind until the trial is

6    over.  You shouldn't reach any conclusions until you have all

7    the evidence before you.

8         So, I asked many of you, all of you, whether or not

9    you had served on a jury, whether you served on a criminal or a

10   civil case.  This is a civil case.  And you may have heard of

11   the concept of beyond a reasonable doubt as a standard of

12   proof.  That's the standard of proof in a criminal case, and it

13   does not apply here.  In civil cases the burden is different,

14   and it's called proof by a preponderance of the evidence.

15        The plaintiffs have a burden of proving their claim by

16   a preponderance of the evidence, and the defendants have the

17   burden of proving their affirmative defenses by a preponderance

18   of the evidence.  The balance shifts depending on the nature of

19   the claim.  This means the party with the burden of proof must

20   prove that their set of facts are more likely true than not

21   true.

22        A preponderance of the evidence means the greater

23   weight of the evidence.  It refers to the quality and

24   persuasiveness of the evidence, not to the number of witnesses

25   and documents.  It's you who will judge those facts, and you

1   will weigh them based on your own evaluation of the testimony

2   that's put in front of you, and the exhibits.  This means that

3   the party with the burden of proof has to produce evidence that

4   considered in light of all of the facts leads you to believe

5   that what the plaintiff claims is more likely true than not, or

6   that the defendant's claims are more likely true than not.

7          To put it differently, imagine you were reviewing one

8   of the plaintiff's claims, for example.  If you are to put the

9   evidence that supported the claims on one side of the scale,

10  and evidence that supported the defendant's on the other side

11  of the scale, the plaintiffs would have to make the scales tip

12  somewhat in his favor, or their favor, to prove their claims by

13  a preponderance of the evidence.  If the plaintiff fails to do

14  that with respect to such a claim, it has not met its burden,

15  and your verdict on the plaintiff's claims must be for the

16  defendants.

17         I will instruct you further on the burden of proof

18  after all the evidence has been received, but that scales

19  metaphor is frequently very useful for preponderance of the

20  evidence.

21         So, let me remind you about certain rules and

22  principles regarding your conduct as jurors in this case.

23         First, as I said to you earlier, you must not talk to

24  each other about this case or about anyone who has anything to

25  do with it until the end of the case when you go to the jury

1    room to decide the verdict.  I recognize that can be difficult,

2    but please just hold all of that commentary until you get into

3    the jury room after the case is closed to have conversations

4    about the substance of the case and anything about the case.

5    The reason for this requirement is that you must not reach any

6    conclusion on the claims or defenses until all of the evidence

7    is in.

8             As I have said, keep an open mind until you start your

9    deliberations at the close of the case.

10            Second, do not communicate with anybody else about

11   this case or with anyone who has anything to do with it until

12   the trial has ended and you have been discharged as jurors.

13   Anyone else in this case, in case you are curious, includes

14   family members and friends.  Again, I recognize that's really

15   hard, but you can tell your family and friends that you are a

16   juror in a civil case, but please don't tell them anything else

17   about it until you have been discharged by me.  If you would

18   like, you can tell them that I have ordered you not to discuss

19   it with them.

20            Similarly, I said this earlier, but no communicating

21   about the case includes any means of communication including

22   Facebook, Twitter, other websites and the like.

23            Third, don't let anybody talk to you about the case or

24   anyone who has anything to do with it.  If anybody tries to

25   communicate with you about the case at any time through the

1    trial either in the courthouse or outside of it, please report

2    it immediately to my deputy Mr. Daniels and no one else.  When

3    I say report that communication to no one else, I mean you

4    shouldn't tell anyone including your fellow jurors.  Just come

5    to Mr. Daniels and tell him privately.  You don't need to do it

6    in open court.  We will address it separately.

7            So to minimize the probability of any such improper

8    communication, it's important that you go straight to the jury

9    room when you come in in the morning, the room right back

10   there, and that you remain in the jury room for the duration of

11   the trial day.  You should use the bathrooms in the jury room

12   rather than using the other ones on the floor.  You shouldn't

13   use the cafeteria downstairs.  I will be providing lunch for

14   you.  But part of the reason why you shouldn't do that is

15   because the lawyers and other people involved in the case may

16   be down using the cafeteria.

17            You shouldn't use public phones or cell phones on this

18   floor.  And given that the breaks will be short and that we

19   want to keep ourselves moving as efficiently as possible, to

20   the extent you can please try to stay in the jury room, that

21   way we will all be on time.

22            Fourth, don't do any research or investigation about

23   the case or anyone involved in it on your own.  Don't go and

24   visit any of the places that are described in the trial.  Don't

25   read or listen to or watch any news reports about the case, if

 1    there happen to be any.  Don't go on the Internet or use any

 2    kind of digital communications or other communications device

 3    in order to see what you can learn to inform yourself about

 4    this.

 5         It's hard, but it's because -- I can't say it too many

 6    times -- your decision in this case has to be based on the

 7    evidence that's presented to you here.  All that you need to

 8    know will be presented to you here by very capable counsel on

 9    both sides of the case.

10         If any of your fellow jurors violate any of these

11    rules, please again don't hesitate to let my deputy Mr. Daniels

12    know about it, and we will address it appropriately.

13         Also, can you please let me know through Mr. Daniels

14    if any person that you know happens to come into the courtroom.

15    It's a public trial, and anybody can come in here if they want

16    to.  You may see different people coming in over the course of

17    the trial.  It's a public and open courtroom.  If you see

18    anybody that you know that does come into the courtroom, make

19    sure that you do not hear from them anything that may have

20    happened in the court while the jury wasn't present.  You

21    shouldn't communicate with them at all, but certainly you

22    shouldn't communicate with them about things that happened

23    while you're not here.

24         If you see a friend or relative come into the court,

25    please send me a note again through Mr. Daniels.

1          Now, finally, I have heard that some of you may be

2     interested in taking notes.  I will ask my deputy to provide to

3     any of you who may be interested a pad of paper and a pen.  Let

4     me just give you a couple of thoughts about notes if you choose

5     to take notes.

6          First, you can see we have a court reporter.

7     Everything that I and the parties and the witnesses say will be

8     transcribed by the court reporter, so there is going to be a

9     record of everything that's said.  And you are going to have

10    the right when you retire to deliberations to request any

11    portion of the transcript to be read back to you should you

12    like.

13         So, if you take notes, first, begin writing on the

14    second page of your legal pad.  Put your juror number on the

15    first page of the pad so that we can be sure that only you will

16    be making and reviewing the notes on that pad.  Do so only in

17    those pads.  Don't take your pads and your notes home with you;

18    leave them in the jury room.  They will be safe there.  And

19    leave them there during our lunch breaks as well.

20         You don't have to take notes.  It's a memory aid.  If

21    you want to, you are welcome to, but any notes that you take,

22    remember, are for your use only, to aid your own recollection.

23    Your memory controls.

24         If you do take notes, be careful to not get so

25    involved in taking notes that you stop paying attention to the

1   witnesses or the exhibits.  That's something that I might do,

2   but don't fall into that trap.

3           Once you are in deliberations, if there is a

4   disagreement between one juror's notes and another juror's

5   notes, or between one juror's notes and another juror's

6   recollection, you can ask the court reporter to read back the

7   relevant testimony, or to have the portion of the transcript

8   sent to you, because ultimately it's the official court

9   transcript that controls, not any individual juror's notes, so

10  they shouldn't be a substitute for the actual text of what was

11  said on the record.

12          So, during the course of the trial exhibits will be

13  received into evidence.  You have probably seen all of that on

14  TV shows.  You will see it happen here.  The exhibits will be

15  marked with an exhibit number.  If there is an exhibit that you

16  are particularly interested in when you go back into

17  deliberations, and you are interested in seeing it, you can

18  write down the exhibit number, or if you don't remember the

19  exhibit number, describe it in a note to the court, and we can

20  have it sent back to you so that you can review it during

21  deliberations.

22          I expect to provide you with a list of all of the

23  witnesses who have testified at trial at the end of the case,

24  together with a list of all the exhibits that have been

25  received into evidence so that can you use those to remind

1    yourselves what you may want to ask for.

2           So, we are now going to begin the trial.  Sorry for

3    the long introduction.  Let me say one thing too.  If any of

4    you from this side of the jury box, if you'd like to reorganize

5    after I'm finished, before we begin opening statements, I will

6    ask my deputy to help you reorganize if you would like to be

7    closer to the witness box.  If you are comfortable where you

8    are, that's fine, but I will give you a brief moment to think

9    about that.

10          So I told you during the earlier part of the process

11   we are going to begin hearing testimony every day at 9:30 a.m.

12   We are going to continue to approximately 2:30 or three,

13   including breaks.  We are going to proceed today, Wednesday,

14   Thursday, Friday of this week, and we will start again next

15   week on Monday, to the extent that's necessary.  Please be on

16   time.  Please try to arrive in the jury room no later than 9:15

17   a.m.  If any of you are late, we cannot start until all of you

18   are here, and all of us have to wait until you are here.  If we

19   lose ten, 20 minutes a day, we may not be able to get this

20   trial completed as quickly as we might otherwise.

21          So, let me tell you how the trial is going to be

22   conducted and tell you what we're going to be doing, you, the

23   lawyers from both sides and me.

24          So, at the end of the trial I will give you more

25   detailed instructions, and those instructions will control your

1    deliberations in this case, but let me just simply explain sort

2    of the order of how the trial is going to proceed.

3              The first step in the trial are opening statements.

4    First the plaintiff's attorney will make an opening statement,

5    which is simply an outline to help you understand the evidence

6    as it's presented.  The opening statement itself is not

7    evidence; it's a statement of what each side expects the

8    evidence to show.  Its purpose is to help you understand what

9    the evidence will be and what the plaintiffs or the defendants

10   are trying to prove.

11             After the plaintiffs have made their opening

12   statement, the defendants will make their opening statement.

13   At that point in the trial, after the opening statements, there

14   will be no evidence.  No one has introduced any evidence

15   because all that you will have heard is arguments from the

16   lawyers or statements from the lawyers, which are not

17   themselves evidence.

18             After opening statements, the plaintiffs will present

19   their evidence.  The plaintiffs' evidence will consist of

20   testimony of witnesses as well as documents and exhibits.  The

21   plaintiffs' lawyer will examine the witnesses, and then the

22   defendants' lawyer may cross-examine them.

23             Following the plaintiffs' case, the defendants may

24   present a case.  Counsel for the plaintiff will have an

25   opportunity to cross-examine any witnesses testifying for the

 1     defendants.  After the presentation of evidence is completed,

 2     the attorneys will deliver their closing arguments to summarize

 3     and interpret the evidence.  Just as lawyers' opening

 4     statements are not evidence, their closing arguments are not

 5     evidence either.

 6            After the closing arguments happen, I'm going to

 7     instruct you on the law.  Then you will retire from here to

 8     deliberate on your verdict.  Your verdict has to be unanimous.

 9     All eight of you have to be unanimous, and the verdict must be

10     based on the evidence that's presented at the trial and based

11     on my statement of the law as I give it to you.

12            Your deliberations will be secret.  You don't need to

13     explain your verdict to anyone.  And that's the basic outline

14     of the process.

15            So, with all of that introduction, we are going to

16     begin the initial stage of the case, which as I said to you is

17     opening statements.  We are going to begin with the plaintiffs.

18     So at this time I'm going to ask all of you to give your

19     undivided attention to the lawyers as they make their opening

20     statements.

21            Mr. Domb, before you begin, can I ask Mr. Daniels,

22     would you like to see if the jurors would like to reorganize

23     themselves in the box.

24            Thank you.  Mr. Domb.

25            MR. DOMB:  Thank you, your Honor.  Good afternoon,

 1    members of the jury.  First I want to echo what Judge Woods has

 2    already told you earlier, that we thank you for serving as

 3    jurors in this case.  It is a big imposition on your time.  I'm

 4    sure some if not all of you would rather be elsewhere doing

 5    other things.  This is a way that for many years we have

 6    settled disputes in this country, and so we thank you for your

 7    service.  We will do our best, our team, to present the case to

 8    you as efficiently and clearly as possible so you may render a

 9    just verdict.

10          As your Honor said, the purpose of this opening is

11    simply to give you a road map.  This is not going to be long,

12    maybe 20, 30 minutes tops.  So, my purpose will be to give you

13    a road map, tell you what the elements in dispute are, what is

14    not in dispute, discuss a little bit the issues that are in

15    dispute, and tell you the witnesses that we intend to call.

16          Let me start with who are the parties.  The

17    plaintiffs, our clients are two corporations, Clarex Limited

18    and Betax Limited.  We call them Clarex and Betax for short.

19    They are incorporated, one in the Cayman Islands and one in the

20    Bahamas.  They are investment companies.  They don't

21    manufacture things, they don't provide services; their whole

22    purpose is to invest funds on behalf of the owners of those

23    corporations.  Those companies are owned ultimately by a

24    wealthy family in Latin America.

25          The companies are managed by professionals at a bank

1    called the Bank of Nova Scotia Bahama Limited.  We called them

2    Scotiatrust for short.  So the professionals at Scotiatrust are

3    the actual directors and officers of our clients who carry out

4    the functions of our client under instructions from other

5    people who manage the investments of these companies.

6                (Continued on next page)

1          Who is on the other side?  Natixis.  We call them

2     "Natixis" for short.  You have heard several names under which

3     they were known.  For many years they were known as Arnhold

4     Bleichroeder.  Although there are several parties, as his Honor

5     I think explained to you, they are really all one and the same,

6     because those other names are prior names by which the company

7     was known.  Now Natixis is the company.  They are here in New

8     York.  They are ultimately owned by a large French bank.

9          So those are the parties.  What happened and why are

10    we here?  Our clients were long-time customers of Natixis and

11    they invested in various securities, investments.  A lot of

12    them were foreign government bonds.

13         If you will put up Exhibit 45, page 2, please.

14         The particular investments in this case that we are

15    going to talk about were Nigerian government bonds.  The board

16    here on the left, which I think may also be visible on your

17    monitors, is Exhibit 45, page 2.  For context I'm showing you

18    the investments that were made in the Nigerian bonds.  Our

19    client started investing by buying Nigerian bonds from Natixis

20    in contractual arrangements, buyer and seller.  Our client was

21    the buyer, Natixis was the seller.  The bonds were issued by

22    Nigeria at the end of 1991.

23         Beginning in 1992 and going to 2001, a period of about

24    ten years, our clients -- this listing, by the way, shows

25    Clarex, Betax.  This is one or the other.  There is one other

1    company here called Agem, not involved in this case.  It was a

2    related company, but no claims are being made by Agem.

3          These are the face amounts of the bonds that our

4    clients bought in the middle column.  The M stands for

5    thousands, or three zeros.  To take an example, the first

6    listing is six thousand thousand, $6 million face value.  You

7    can see these are all millions.  The total was $197 million

8    face value of bonds.  Take away the 9 million that Agem, the

9    uninvolved company, bought, you get $188 million face value of

10   bonds.

11         I should say that that sounds like a lot of money, and

12   it is.  The bonds did not sell at the full face value of them.

13   They tended to sell at a discount, as is common with foreign

14   government bonds.  At the point at issue in this case, which is

15   towards the end of this period, they were selling at

16   approximately 60 cents on the dollar.  For example, a million

17   dollars of face value would cost about $600,000.  Still a lot

18   of money.  You remember, I said our clients are a wealthy

19   familiarly.  They did invest.  This is one of the investments

20   they did.

21         All of these transactions, this shows the bonds.

22   Throughout this period if an investor bought a bond, the

23   investor had the right to receive a warrant for no extra cost.

24   It came with the bond.

25         What is a warrant?  A warrant is a document, it's an

1   instrument, that describes the rights that the warrant holder

2   had.  As you will hear in testimony, the rights that were given

3   by this warrant had to do with the right to receive payment at

4   future dates if the price of oil -- Nigeria is an oil producer.

5   If the price of oil in the market, the type of oil that Nigeria

6   produces, rose above a certain threshold, then Nigeria would

7   make payments to the holders of those warrants.

8           When were they going to look at the price of oil?

9   Twice a year until the year 2020.  The transactions at issue in

10  this case happened one in the 2000 and four in the year 2001.

11  The problem with the transactions in this case is that although

12  for most of the earlier transactions, for all of the earlier

13  transactions, Natixis properly delivered the bonds and the

14  warrants that came with them for five transactions, five

15  transactions at issues are detailed in this graph, Natixis did

16  not deliver the warrants.

17          This is the trade date.

18          THE COURT:  Mr. Domb, can you identify what you are

19  pointing at.

20          MR. DOMB:  Would you put that up on the screen, the

21  table of five transactions, please.

22          On that table the date on the left should match the

23  date over here in the overall table.  These are the amounts of

24  bonds and warrants.  The bonds were delivered, the warrants

25  were not.  A total of 46,000 warrants were not delivered by

1    Natixis.  Out of the $188 million in bonds, which corresponded

2    to 188,000 warrants, our clients did not receive 46,000

3    warrants.

4              You are going to hear several times from Natixis's

5    counsel and witnesses that our clients didn't pay for the

6    warrants.  In a sense that's true.  I told you before, when you

7    buy the warrants, you are entitled to get the warrants.  When

8    you buy the bonds, I'm sorry, you are entitled to get the

9    warrants that came with it.

10             In preparing this case over many months, I thought of

11   an analogy that has helped me understand it.  Why should we

12   recover for something that we didn't pay for?  It's very

13   simple.  A person walks down the street and there is a clothing

14   store selling --

15             THE COURT:  I'm sorry.  Can you restrain yourself to

16   the evidence.  We will have closing argument at closing

17   argument.

18             MR. DOMB:  Yes, your Honor.

19             There is no dispute in this case, as I believe your

20   Honor said in the very opening instructions, that these were

21   contracts for the purchase and sale of bonds with warrants.

22   There is no dispute that Natixis did not deliver the 46,000

23   warrants that it was contractually required to deliver.

24             So why are we here?  There are three main issues for

25   you, the jury, to decide.  I'll list those issues, and then

1    I'll speak for a few minutes about each of them.

2           Issue number one:  Is the first of these transactions

3    barred by the statute of limitations?  The other four, it is

4    agreed that they are not barred.  But Natixis claims that the

5    first one is barred.

6           Number two:  Was it, quote, impossible for Natixis to

7    deliver all 46,000 warrants?  They are relying on something

8    called the doctrine of impossibility.  That's part of New York

9    law.  The Court, your Honor, will instruct you on what that

10   means.

11          What I say, of course, is subject to your Honor's

12   instructions, but my understanding is that in order to prove

13   that it was impossible to deliver those warrants in a way that

14   would excuse their not performing, Natixis has to show to you,

15   has to prove, that it was objectively impossible for them to

16   deliver the warrants.  Not that it was difficult, not that it

17   was really, really difficult, not that it would have cost them

18   a lot of money, but that it was truly objectively impossible.

19   And Natixis has the burden of proving that, that tipping of the

20   scales that your Honor spoke about.  That's impossibility.

21          Let me get back to the statute of limitations.  As you

22   can see, this transaction happened in February of 2000.  The

23   dates on the right side are simply the settlement dates.  When

24   you make a securities transaction, the contract is made on a

25   certain date and the delivering payment is supposed to happen

 1   three business days later.  That's what happens.  If it's not

 2   exactly three business days later, it means a weekend

 3   intervened.

 4          These transactions all happened 13 or so years ago or

 5   more.  The statute of limitations is 6 years.  Why aren't they

 6   all barred?  Well, as I told you, the last four transactions

 7   are not barred by limitations, because in 2007, before the

 8   6-year period for these 2001 transactions expired, the parties

 9   entered into a tolling agreement, an agreement that stopped the

10   running of that 6-year period because they tried to work things

11   out.  That agreement was extended I think 13 times until the

12   year 2012, when we sued.  So there is no bar as to these four.

13          As to the first one, more than 6 years did pass

14   because this first transaction was not covered by that tolling

15   agreement.  By the time the parties made the tolling agreement

16   in 2007, it was already more than 6 years after the first

17   transaction.  Natixis told our clients, and our clients

18   believed that that transaction was barred by the 6-year

19   limitations.

20          But there is a law in New York, the General

21   Obligations Law, that says that if a debtor, in this case

22   Natixis, who owned the warrants, acknowledges that obligation

23   in writing to the creditor, to our clients who are owed the

24   warrants, that restarts the 6-year period.

25          We will show you evidence during the trial,

 1    principally through monthly account statements that Natixis

 2    sent to our clients, including the warrants at issue here in

 3    the portfolio of those statements, that that was an

 4    acknowledgment in writing, and therefore there is no statutory

 5    bar.

 6          Those are the two issues that I mentioned, statute of

 7    limitations and impossibility.  There is a third important

 8    issue for you, and that is:  What were these warrants worth?

 9    That is our client's damages.  They lost the opportunity to

10    have these 46,000 warrants.

11          The law says that the damages, if you believe that we

12    are entitled to recover damages, is the value of those warrants

13    on each of the contractual settlement dates.  So, for the 5,000

14    warrants, what is the value as of this date, February 11, 2000,

15    and so on.

16          How do you value these warrants?  They are not on some

17    stock exchange, like the New York Stock Exchange or NASDAQ.

18    You can't go into a store or look them up on the Internet.  You

19    can't go into Bloomberg and say what were these worth.  The

20    cash or funds that the warrant holder would receive depended on

21    future events.  No one knew.

22          The main future event was the price of oil.  What was

23    the price of oil in the market going to do?  Was it going to go

24    up?  Was it going to go down?  Was it going to stay the same?

25    And if it would change, how?  So it's a valuation issue.  That

1    is the third thing for you to decide.

2            There are very smart people out there, smarter than

3    me, who value these things.  This is their profession and what

4    they do for a living.  They teach it.  Each side will call an

5    expert witness, a very smart person.  I think both are Ph.Ds in

6    economics.  They will give you their opinions based on the work

7    that they did on this case on valuing these warrants.

8            Although both of these gentlemen are extremely smart

9    and good at what they do, surprise, they come up with very

10   different valuations.  You will see that Natixis's expert, Dr.

11   Okongwu, has valued all the 46,000 warrants at about $300,000.

12   Our expert, Professor Sundaram, who teaches at the NYU Stern

13   School, values them at about $5.5 million.  That will be the

14   main issue, in effect, for you the jury to decide.

15           Who are we going to call as part of our case?  We are

16   going to start with Iris Sherman, who was one of these

17   professionals at Scotiatrust in the Bahamas who acted for our

18   clients.  A lot of what she will say will be background and not

19   in dispute.  But I think the jury is entitled to see the

20   background of these transactions and how the ones that are at

21   issue, which happened here towards the end of the period -- by

22   the way, they are not the very last five.  They started on

23   February 8th.  They are five transactions that happened

24   somewhere in the last eight or nine or so.

25           We may or may not, depending on what we cover with Ms.

1  Sherman, we may call a second gentleman from Scotiatrust, whose

2  name is Perry Rolle.

3       After that, we will call two Natixis people, Sam

4  Fitting who for something like 25 years I think was the main

5  person at Natixis who dealt with these two clients.  These were

6  his two main clients.  He dealt with these transactions.  And

7  we are going to call Daniel Briggs, who is an operations and

8  compliance person from Natixis, who Natixis told us is their

9  designated witness, too, who has knowledge of some of the

10  issues in the case.

11       After that, we will call an expert witness in the

12  securities industry, someone who knows the customs and

13  practices of how securities work for some of the issues that

14  are involved here, Mr. Shipway, who is actually in the

15  courtroom, the gentleman in the front row there.  After that,

16  we will call Professor Sundaram on valuation.  Natixis will

17  call its own witnesses, and I will let Natixis's counsel tell

18  you who they will be.

19       That is my roadmap of what we expect to prove.  Thank

20  you again for your attention.

21       THE COURT:  Thank you, Mr. Domb.

22       Mr. Levine.

23       MR. LEVINE:  Thank you, your Honor.  Good afternoon.

24  Ladies and gentlemen of the jury, good afternoon.  Thank you

25  for your service.  My name is Eric Levine.  I have the honor of

1    representing Natixis.

2              This case is very simple.  This case is about

3    something for nothing.  This case is about getting millions of

4    dollars for something for which they paid absolutely nothing.

5    This case is about getting millions of dollars from a defendant

6    who, through no fault of their own, could not deliver the

7    warrants.

8              We don't dispute that they were supposed to get the

9    warrants.  But, as I will discuss in more detail, it was the

10   result of a marketwide failure wholly unrelated to anything

11   Natixis did that resulted in Natixis's inability to deliver the

12   warrants.  Simply put, there were no warrants to deliver.

13             What is this case not about?  Clarex and Betax is not

14   some elderly couple that was cheated out of its life savings by

15   a big bad bank.  Clarex is an investment vehicle for an

16   enormously wealthy family.  I'm going to refer to this family

17   as the owners.

18             Let's be clear.  The owners are Clarex and Betax.

19   These aren't some people living off in a cloud who have no role

20   in this.  They are involved in every aspect of this case.  They

21   own the companies, they set them up, they direct what

22   securities they buy.  They fund the entities, they realize the

23   profits when there are profits, and they incur the losses when

24   there are losses.

25             Let's also understand the trading here:  In Nigerian

 1    bonds alone, $188 million of face value bonds from 1992 to

 2    2001.  In fact, in a given month, and you will see these

 3    account statements, in one month these owners traded almost

 4    $200 million in face value of sovereign debt obligations, one

 5    month.

 6          What is a sovereign debt obligation?  It's when a

 7    government lends you money.  It is like a U.S. savings bond,

 8    except these are countries that really don't have the same

 9    chance of recovery, of paying the bonds.  They are much more

10    risky investments.

11          Let's be clear on who the plaintiffs are.  This

12    litigation is being brought on behalf of the owners.  They are

13    directing that it be brought.  They are Clarex and Betax.

14          You know what is interesting?  Do you know who Mr.

15    Domb didn't mention as to witnesses?  The owners.  You won't

16    hear from any of them.  You will never hear them.  You will

17    never see them.  You will never meet them.  Why not?  Ask

18    yourselves throughout this case as you hear about their role --

19          THE COURT:  Mr. Levine, would you please restrain

20    yourself to the evidence that is going to be presented during

21    the trial.  You can make argument at closing arguments.

22          MR. LEVINE:  You won't hear from them even though it

23    was their decision to purchase the bonds.  They determined how

24    many bonds they would buy, they determined how much they would

25    pay.

 1              The owners' failure to appear is in sharp contrast to

 2     Natixis.  The bank is not just brick and mortar, it is made up

 3     of people.  It is an institution of people who do their jobs.

 4     You will meet them.  You will meet Sam Fitting.  You will meet

 5     Dan Briggs.  They will tell their stories.  You will have a

 6     chance to test their credibility.

 7              They are going to tell you that they placed trades

 8     correctly every single time from 1992 to 2001.  They will the

 9     tell you that all the value is in the bonds and that the

10     warrants had literally no value in 2000 and 2001.  They will

11     tell you that they couldn't get the warrants, because it was

12     out of their control.  You will be able to test and judge their

13     credibility.  You will see them.  You won't see the owners, but

14     you will see them.

15              Specifically, one of the people you're going to see is

16     a fellow by the name of Sam Fitting.  Mr. Fitting, here is a

17     perfect example, dealt directly with the owners.  The owners

18     placed the orders with him.  He made the recommendations.  He's

19     going to tell you that when he made the recommendations, all

20     the value was in the bonds and that the warrants were virtually

21     worthless if not completely worthless.  That testimony

22     throughout this entire case will be unrefuted.  There will not

23     be a single witness that is going to disagree with that.  That

24     is going to be the fact of the case from the beginning until

25     the end.

1          They will parachute in an expert to try to explain why

2     the warrants had value, but that expert is going to have to

3     ignore the facts.  And the undisputed fact that Sam Fitting

4     will tell you is that when he recommended these securities, all

5     the value was in the bonds, there was no value in the

6     securities.  The owners will not show up to refute that.

7          Sam is going to tell you why these bonds had value.

8     He is going to explain it to you.  When you have $1 million of

9     face value of bonds, you are entitled to 6.25 percent interest

10    a year on that million dollars.  But you only paid a percentage

11    of the face value of the bond.

12         For instance, if you hear someone saying that they

13    paid 65 percent of par, par is the million dollars and you pay

14    65 percent of that, $650,000, the investor makes $62,000 on a

15    $650,000 investment a year.  That is .96 percent.  Let me say

16    that again.  It's 9.6 percent, almost 10 percent.  9.6 percent,

17    almost 10 percent.

18         The warrants, on the other hand, were extraordinarily

19    risky.  They had to be in the money at the time.  For the

20    warrants to be in the money, certain conditions had to be met,

21    and in 2000 and 2001 it was anyone's guess if they would ever

22    be.  They had no value.  All the value was in the bonds.

23         It also depended in large part on the ability of

24    Nigeria to pay.  It doesn't help that Nigeria was a significant

25    credit risk.  The Nigerian bonds themselves were part of what

1    they call a category of Brady bonds.  Brady bonds were created

2    in the late 1990s and 2000s specifically because countries

3    defaulted on their debt, so they had to restructure their debt

4    and they had to come up with new bonds and new debt securities.

5    These are all part of those Brady bonds.  Understand that these

6    bonds are in play specifically because countries like Nigeria

7    defaulted in the first instance.

8            Let's talk about the structure of the transactions.

9    There were five:

10           February 28, 2000, 5,000 warrants for Clarex;

11           August 22, 2001, supposed to be 16 warrants for

12   Clarex;

13           August 28, 2001, 7,000 warrants for Betax;

14           September 5, 2001, 10,000 warrants for Clarex; and

15           September 10, 2001, 8,000 warrants for Clarex, for a

16   total of 46,000 warrants.

17           For every $1 million of bonds that you purchased, face

18   value of bonds that you purchased for whatever discount you

19   got, you were entitled to get 1,000 warrants.  If you have

20   $5 million face value of bonds, you have 5,000 warrants, you're

21   entitled to get 5,000 warrants.  If you had $16 million face

22   value of bonds, you're entitled to get 16,000 warrants.

23           However, all the consideration, every single penny,

24   was paid for the bonds, not a penny for the warrants.  The

25   plaintiffs are going to admit this.  All the documentation that

 1   you are going to see is going to show this.  And all that

 2   consideration was paid for the bonds even if the warrants

 3   weren't delivered.  That's because the owners were buying the

 4   bonds.  That's where the value was.  They didn't count on the

 5   value of the warrants for anything.  The bonds had all the

 6   value.

 7          This is confirmed by Clarex and Betax's own accounting

 8   firm, Deloitte & Touche.  Their financial statements will

 9   reflect that while the bonds had millions and millions of

10   dollars of value, the warrants had none.  They were ascribed no

11   value.  You're going to see those documents.

12          Let's talk about the mechanics of the transactions,

13   because this is very important.  As I said before, when you

14   bought $1 million face value of bonds at whatever discount it

15   was, you were entitled to get a thousand warrants.  But it is

16   not technically so easy.  It's not a matter of here is

17   $650,000, give me a million bonds and a thousand warrants.  You

18   have to issue instructions.

19          You are going to hear about a company called Euroclear

20   and you are going to hear about a concept called a riskless

21   principal.  Natixis was a riskless principal.  What does that

22   mean?  It means it did not have any warrants in its own

23   inventory --

24          THE COURT:  Mr. Levine, I'm going to ask you to

25   refrain from this line at this time.

1          MR. LEVINE:  Natixis did not have any warrants in its

2     inventory.  It had to go out and buy them.  It didn't have any

3     bonds in its inventory.  It had to go out and buy them.  What

4     it would do was it would buy the bonds and the warrants from a

5     third party, a counterparty, and then turn around

6     simultaneously and sell it to Clarex and Betax.  These were

7     virtually simultaneous.

8          In order to do this, you have to issue instructions.

9     Natixis would issue instructions to a company called Euroclear.

10    They were the clearing agent.  The clearing agent is the

11    company that matches up the sell order and the buy order so

12    they know who is getting what.  Natixis would issue its buy

13    order with its counterparties, its counterparties would issue

14    the sell order.

15         There were two orders that they had to give.  It was

16    not one order.  You must give a separate order for the bonds

17    and you must give a separate order for the warrants because

18    they are two separate securities.  They may trade together by

19    this protocol, this rule, but they are two separate securities.

20    So you have to issue two sets of instructions.

21         If you issue one set of instructions and you just say

22    deliver me bonds with warrants, the trades won't settle.

23    Settle means they have cleared, the transaction has been

24    completed.  If you issue just one set of instructions, they

25    won't settle.  You have to send two sets of instructions.

1        On the flip side of the transaction, once Natixis gets

2   the bonds and the warrants and it turns around and it sells

3   them to Clarex and Betax, it issues two sets of instructions,

4   one to sell the bonds and one to sell the warrants.

5        Clarex and Betax, on the other side of the

6   transaction, they issue two buy instructions, one to buy the

7   bonds and one to buy the warrants.  You have to do them both

8   correctly.  If you don't do them both correctly, the trades

9   won't clear.

10       Natixis did it right every single time.  From 1991

11   through 2001 every single time they did it right, every single

12   time.  That includes the transactions where the warrants were

13   not delivered.

14       Why, why, if they did it right, were the warrants not

15   delivered?  This comes back to the impossibility and the

16   technicalities of how you trade these securities.  There were

17   many people in the market that didn't know how or didn't, for

18   whatever reason, enter the trades correctly.

19       Over time, the warrants began to disappear because

20   people would enter trades just for the bonds, single trade, not

21   issuing two sets of instructions, so bonds would be delivered

22   and then the warrants were not delivered.  Eventually, over

23   time, there were no warrants to deliver.  Someone would get the

24   bonds but they would not get the warrants.  As this snowballed

25   over time, there were no warrants to find.  It was impossible

1    to deliver.

2              This protocol, these rules of trading, were set up by

3    a company called the Emerging Markets Trading Association.

4    You're going to hear from the general counsel.  She is going to

5    tell you that there were no warrants to deliver.  She is going

6    to tell you about this marketwide failure.

7              Obviously, Natixis did this for a fee.  They were paid

8    money.  They were paid a markup.  It should come as no surprise

9    to anyone that Natixis was paid a fee for their services.  You

10   may hear accusations that they didn't disclose the

11   commission -- the markup.  But for 1992 to 2001 Clarex and

12   Betax continued to do business buying bonds and warrants and

13   other securities from Natixis because they wanted the bonds,

14   and they knew they were paying a markup.

15             Let's talk about the issue of foreseeability.  That's

16   one of the elements impossibility.  Was it foreseeable for

17   Natixis to know that there was going to be a marketwide

18   failure?  The answer to that is absolutely not.  These trades

19   are settled.  Hundreds of millions of dollars worth of trades

20   had settled for eight years without a problem.

21             In February of 2000 there was one trade that didn't

22   fail.  On the same day that the warrants weren't delivered,

23   there was another trade that exact same day for 5,000 warrants

24   that were delivered.  There were three more trades over the

25   course of 2000 into 2001 where the bonds and the warrants were

 1   delivered.

 2           Then, in August of 2001, a year and a half later,

 3   there was a second transaction that failed.  The bonds were

 4   delivered but the warrants weren't.  But there was a series of

 5   successful transactions within a couple of weeks, and Natixis

 6   was not on any notice that this was foreseeable at all.  Who

 7   could foresee a marketwide failure that a company, Emerging

 8   Markets Trading Association, whose job it is to monitor the

 9   market, also didn't see coming?

10           What is very interesting about the arrangement between

11   Natixis and Clarex and Betax is they had what they called a DVP

12   agreement, a delivery versus payment agreement.  That agreement

13   provided that when the securities you ordered were delivered,

14   when the securities you bought were delivered, you pay.

15           When Natixis delivered the bonds, in every single

16   instance Clarex and Betax paid the full amount.  That includes

17   the transactions were the warrants were not delivered.  Why is

18   that?  Because the value was in the bonds.  They bought the

19   bonds.  They paid nothing for the warrants.  It was all about

20   the bonds.

21           I want to refer to the statute of limitations argument

22   for a moment.  There is no question that the 6-year statute of

23   limitations has expired on the 5,000 warrants from February

24   2000.  Plaintiffs are going to try to, through an expert

25   witness, demonstrate to you through the account statements that

 1   there was some written acknowledgment of an ongoing obligation.

 2   Let me tell you right now, not even they believe that.  Not

 3   even they believe that.  Their witness is not going to stand

 4   up.  Not even they believe that.  This is something they have

 5   concocted in the last minute to try and maximize the recovery.

 6           Finally, I ask you to do a few things for me.  The

 7   first is constantly ask yourself, where are the owners?  The

 8   second is that after plaintiffs put in their case, please keep

 9   an open mind and let us put in ours.  Lastly, on the same note,

10   after a witness testifies, wait until after I have cross-

11   examined until you reach a final conclusion about their

12   credibility.

13           Thank you.

14           THE COURT:  Thank you, Mr. Levine.

15           Ladies and gentlemen of the jury, I promised you that

16   what I am going to try to do for you for each of the days of

17   trial is to get you out of here by 3 o'clock every afternoon.

18   It is a little after 3:00 right now.  What I am going to do is

19   end your day today with you all having heard both of the

20   parties' opening statements.  Tomorrow morning I would like to

21   ask you to come to the jury room by 9:15 a.m.  We are going to

22   start testimony at 9:30 and we will run through the day as I

23   described.

24           Let me remind you again that you should not discuss

25   the case, don't do any Internet or other research about the

74

1    case, don't discuss it with anyone.  And please continue to

2    keep an open mind about everything until you have heard the

3    evidence.  Also remember that at this point in the process you

4    have heard no evidence.  What the lawyers say is not evidence.

5    Keep an open mind until you begin to hear the evidence.  That

6    will happen tomorrow morning promptly at 9:30.

7              Thank you very much.

8              (Jury not present)

9              THE COURT:  Parties, have a seat.  We are going to

10   have an opportunity to meet again tomorrow morning.  Mr.

11   Levine, the line of argument that the jury should infer from

12   the absence of the owners, something adverse about their case,

13   is something that I am not sure I can permit.

14             I'm not asking for them to speculate about why it is

15   that a particular person has or has not appeared here or that

16   they have or have not testified.  I don't know how I can

17   legitimately expect them to draw an inference, an adverse

18   inference, regarding the plaintiffs' case as a result of the

19   fact that someone is not appearing in this proceeding,

20   particularly given Judge Engelmayer's ruling on this issue

21   before me.

22             I'm very strongly considering some kind of a limiting

23   instruction for the jurors to make it clear to them that they

24   are not to draw an inference from something that is not

25   happening here in court, but rather they are to consider the

1   evidence that is put before them.

2          I didn't interrupt you during your opening, because it

3   sounds as though that was a principal focus of it.  How can I

4   allow the jury to base their decision on the absence of

5   testimony, the absence of evidence, in this case the absence of

6   the owners?

7          MR. LEVINE:  I am not asking you to give them an

8   instruction to draw an adverse inference.  That is the first

9   thing.  The first thing is I'm not asking the Court to give an

10  adverse inference instruction.

11         But I think I am entitled to ask the jury to consider,

12  to draw inferences, not just from what they hear but also from

13  what they don't hear.  When Sam Fitting gets up there and

14  testifies that he spoke directly to the owners, they are the

15  ones who bought it, he made the recommendations based on the

16  bonds, he made the recommendations not at all based on the

17  warrants, I should be entitled to argue to them that the only

18  people that can refute that testimony is the owners, but they

19  didn't show up.

20         I want to be able to argue they didn't show up because

21  if they showed up and they testified, they would have to tell

22  you what Sam Fitting said was right, they would have to tell

23  you that what Sam Fitting said about the value of the bonds is

24  right and the value of the warrants is right.

25         Why can't I make that argument?  We can draw that

1   inference from their failure to appear.  These aren't people

2   out in the ether.  We have established that.  I should not be

3   punished because these people decide not to show up.  The fact

4   that their names are expunged from the record is one thing.

5   But to prevent me from making the argument or to make it sound

6   as if these people have no role and I can't ask them to infer

7   something from people who are so central to these transactions,

8   I'm sorry, your Honor, I think that's just plain wrong.  I

9           should be entitled to tell the jury to think about

10  it.  Normal people would think if you're the client, if you're

11  the one placing these orders, if you're the one running the

12  show, show up and testify.  I should be able to tell them to

13  them.

14          THE COURT:  Can I ask a question before you stand up,

15  Mr. Domb.  If the point is essentially that the testimony that

16  we will hear from Mr. Fitting is uncontroverted, then that

17  testimony is uncontroverted.  The fact that it is

18  uncontroverted is uncontroverted.

19          MR. LEVINE:  Right.

20          THE COURT:  Why, then, if that's the case, is it

21  necessary to say not only that it is uncontroverted, which of

22  course completely supports your case, but also that they, the

23  jury, should look in an adverse manner at the absence of

24  evidence that would, might, make that truth more

25  uncontroverted?  If it is true, it's true.  If there is a lack

 1    of evidence that it is false, that doesn't mean it's less true.

 2                MR. LEVINE:  That may be so.  But if the only people

 3    that can controvert the evidence don't show up, I should be

 4    able to point out to them that they didn't show up so that I

 5    could also argue that had they shown up, they would tell you

 6    that the warrants had no value, they would tell you that they

 7    only cared about the bonds.

 8                It goes to the issue of valuation.  It goes to the

 9    core of the case, which is the valuation.  What these people

10    were buying and cared about were the bonds, not the warrants.

11    This is what makes me so frustrated, your Honor, because these

12    are the decision-makers.

13                THE COURT:  Part of this for me is that this is a case

14    that has a long history and this issue of the owners has driven

15    a lot of conversations between the parties and the Court.  That

16    past history I think of as some costs.  I'm thinking of from

17    where we are now and the case that we are presenting to the

18    jury, regardless of whether or not the case might have

19    developed differently up to this point, we are now where we

20    are.  The owners have a very limited role in the case as it has

21    ultimately been developed.

22                I understand your position, which is that the

23    decisions didn't always run in your favor as to whether or not

24    the beneficial owners would take a larger role in these

25    proceedings.  The fact that that has not come to develop in a

1    way that you might have preferred, though, I'm not sure that

2    that leads in to be such a significant issue as you might want

3    to present to the jury.

4             MR. LEVINE:  Then they can stand up and say ignore it.

5    They can stand up and say it's not a big issue.  One of the

6    issues for your Honor, and I really feel strongly about it, is

7    how many times will they be able to make a misrepresentation to

8    the Court about the role of the owners and not only get away

9    with it but we get punished.  There have been multiple proven

10   misrepresentations both to the Judge Engelmayer and yourself.

11   We should not be punished.  We should be given a little extra

12   leeway on this, if anything.

13            THE COURT:  This is my point about the costs.  This

14   issue, there is a lot of history to it and a lot of baggage.  I

15   understand that you feel strongly about it.  At the same time,

16   I'm not sure that that should lead me to allow you to make

17   arguments to the jury that are very much driven by the

18   frustration that you feel from the inability to --

19            MR. LEVINE:  I appreciate that, your Honor.  But

20   that's not what's driving it.  What is driving it is this case

21   at the end of the day is a valuation case.  If I'm able to

22   demonstrate that the plaintiffs believe that these warrants had

23   no value, I should be permitted to put on my case.

24            One of the ways I can demonstrate that these

25   plaintiffs believe that the warrants had no value is by saying

1     that the individuals who negotiated the transaction with Sam

2     Fitting never bothered to show up.  They didn't show up because

3     they would have told you that the warrants had no value.

4          I am entitled to make that argument.  If they think

5     that it doesn't show that, then they can in their closing

6     statement make whatever argument they want to say it's

7     irrelevant that the owners didn't show up.  Our case will be

8     irreparably harmed if you were to issue an instruction.

9          THE COURT:  Thank you, Mr. Levine.

10          Mr. Domb.

11          MR. DOMB:  I have several points, your Honor.  The

12     first, a general point, is that what Mr. Levine is showing for

13     the fourth or fifth time in this case is that he doesn't want

14     to follow the Court's prior instructions.  We saw not just that

15     example but two or three other examples in opening where I feel

16     Mr. Levine crossed the line.  Like a pit bull who won't let go

17     of something, they continued to grab on to this issue and

18     introduce it improperly.

19          Second, why the plaintiffs bought these warrants is

20     not an issue in this case.  They bought the warrants, they were

21     not delivered, there is a valuation issue.  Mr. Fitting is not

22     going to be able to -- I don't know what he will say, but what

23     may have motivated the purchases in 1992, '94, '95 is not

24     necessarily relevant to why they bought warrants in 2000 and

25     2001.

 1            If Natixis is to be allowed to say through Mr. Fitting

 2   that the owners, plaintiffs to call them more broadly, felt

 3   there was no value to the warrants, then we should be able to

 4   have Mr. Fitting say what he recommended to the owners or

 5   plaintiffs in 2007, when Nigeria was offering $220 a warrant

 6   and Mr. Fitting said no, that's not enough, the warrants are

 7   worth more than that.  If they were worth more than that then,

 8   we can ask the jury to infer that they were worth more years

 9   earlier, before many of the potential payment dates had passed

10   yet.

11            So yes, we are upset about the focus that Mr. Levine

12   put on his opening statement.  I didn't want to stand up and

13   object, but we do think that it would be appropriate for the

14   Court to give an instruction to the jury that the absence of

15   the owners here, nothing is to be inferred from it.

16            THE COURT:  The other issue, Mr. Levine, that I

17   captured where Mr. Domb did stand up was on the issue of

18   riskless principal and the question of whether or not there are

19   obligations on the part of Natixis or rights, contractual or

20   otherwise, that exist outside the scope of the contract.

21            MR. LEVINE:  My understanding is that we all agreed

22   that we were a riskless principal as long as we said we are a

23   principal.  That's what we said.  As long as we said we are a

24   principal, there was no issue.

25            THE COURT:  A principal.  I think the idea of a

D5rcla3

riskless principal connotes riskless.  I think the idea that

you are buying and selling these securities in a transaction, I

think you used the word "commission" a couple of times by

accident, that is clearly established.  I think what Mr. Domb

was concerned about and what concerned me at that point in the

argument was the addition of the word "riskless."

          MR. LEVINE:  Then I misunderstood your Honor's

direction.  I thought that was a hundred percent clear as long

as we are weren't running away from the concept of principal or

riskless principal and we weren't saying we were brokers, that

that was the issue.  I thought I was being consistent with your

Honor's direction.

          MR. DOMB:  Your Honor, I remind you that on that very

issue we said that if they are going to argue some nuance of

difference between riskless principal and principal, Mr.

Shipway should explain that a riskless principal transaction

avoids risk as to price but it does not avoid risk as to

delivery or payment.  That's a critical concept.

          THE COURT:  Correct.  The basis of this issue was in

essence that Natixis's obligations with respect to these

transactions are what they are in the contract.  What I am

trying to avoid is argument that is intended to imply absence

or existence of obligations or duties other than those.

          As Mr. Domb points out, this came up before in the

context of whether or not we would have additional testimony

 1    regarding the scope of particular obligations or duties under

 2    securities practice outside of the agreement itself.  I think

 3    our decision was to make it clear if the obligations of Natixis

 4    are those that are under the agreement and that we weren't

 5    characterizing them as --

 6                MR. LEVINE:  My understanding was that as long as we

 7    said principal and since Mr. Shipway, everyone, agreed that

 8    there was no difference between the obligations of a riskless

 9    principal and a principal, as long as we stayed with principal,

10    we used the word "principal," we were OK.

11                THE COURT:  Agreed.  Use the word "principal," not the

12    word "riskless."

13                MR. LEVINE:  I agree.  Since the obligations were the

14    same, I meant it generically, your Honor.

15                THE COURT:  I appreciate that.  We are on the same

16    page.  The issue that caused me the concern was the "riskless."

17    I agree that we thought you could use the word "principal."

18                MR. DOMB:  Do I understand now, your Honor, that the

19    witnesses are not going to be prompted to say that Natixis

20    acted as a quote riskless principal?

21                MR. LEVINE:  The word "riskless" will never be used

22    again.

23                THE COURT:  Thank you very much.  That was my concern.

24                I am going to take under consideration your point, Mr.

25    Levine, about the inference here.  I am completely sympathetic.

1   I understand the long history of this owner issue in the

2   development of this case.  I'm concerned, however, about asking

3   the jurors to infer that the owners would or would not say

4   something were they to be called here.

5          I'm going to think about it over the course of the

6   evening and as the trial develops.  I hope that from here on we

7   will be hearing evidence up until the point that you give your

8   argument.  As the evidence develops, I'll be considering this

9   issue.  If I think I need to make a limiting instruction before

10  closing arguments or discuss it with you further, I'll raise it

11  at the close of evidence.

12          Is there anything else that we should address?

13          MR. LEVINE:  Unless you want to do the exhibits.

14          THE COURT:  Are we essentially done with the exhibits?

15          MR. DOMB:  I'm not aware of anything.  We have to give

16  you some letters by tomorrow morning.

17          THE COURT:  Right.  KK.

18          MR. LEVINE:  Yes, which is the delivery versus payment

19  agreement, which is the agreement between Clarex and Betax and

20  Natixis providing that when the securities are delivered,

21  that's what I referred to in my opening, when securities are

22  delivered, payment is made.

23          For some reason that we can't comprehend, the

24  plaintiffs are objecting on the basis of relevance.  That is

25  the document that dictates when payment is made, so I can't

1    quite understand the objection.

2             THE COURT:  Let's do this later.  I assume this is not

3    coming in today.

4             MR. LEVINE:  I'm going to use it with Ms. Sherman.

5    She signed it.

6             THE COURT:  All right, let's take it up now.  What is

7    the objection to this?

8             MR. DOMB:  Your Honor, relevance.  Frankly, I have no

9    idea, although we have asked, what point or what use Natixis

10   intends to make of this agreement.  I have read it over four or

11   five times.  I can't grasp, and even as Mr. Levine spoke about

12   it in his opening I couldn't grasp, what they are trying to

13   prove with this.

14            MR. LEVINE:  First of all, paragraph 2 talks about

15   payment when the securities are delivered.  I am going to

16   prove, I am going to argue, that when the securities you order,

17   the securities you buy, are delivered, you pay, and each time

18   that the bonds were delivered, they paid.  So they weren't

19   buying the warrants.  They traded as one to create a

20   transaction, but they were two separate securities, so they

21   paid nothing.

22            This is one of the account-opening statements that

23   Natixis signs with Clarex and Betax.  What is the possible

24   objection, particularly since this is the document that governs

25   the payments of the transactions at issue?

1          THE COURT:  I actually don't see a relevance objection

2    to this document.  I would allow you to introduce it.  Mr.

3    Levine, we have established that there is a contract, that

4    there is performance by plaintiff, there is failure to

5    performance by defendant, in other words, an agreement and

6    breach.  Does this and the fact that the plaintiffs, in your

7    words, paid zero for the warrants go to damages?  Is that what

8    you understand?

9          MR. LEVINE:  Yes, it goes to the damages.  The fact

10   that you pay nothing for something indicates what its value is.

11   When they pay everything for the bonds and nothing for the

12   warrants, that is an indicia that these things are worthless.

13   It is not being put in for the purpose of saying there is no

14   consideration.

15         THE COURT:  Thank you.  That's my question.  I don't

16   have an objection to introducing this if the sole objection is

17   relevance.

18         MR. DOMB:  I still think it is irrelevant because

19   there are five or six other places or maybe a dozen places.  We

20   concede that we paid zero for the warrants and there was a

21   separate transaction for each set of warrants.  The amount due

22   from our client was zero.  We paid it by definition.  I don't

23   see what this adds.

24         THE COURT:  I won't exclude it solely on the basis

25   that it may potentially be cumulative, and I don't see a basis

1   to exclude it on the basis of relevance.  So I will allow its

2   introduction.

3            Is there anything else before I adjourn?

4            MR. DOMB:  Just logistically, your Honor.  I assume we

5   may leave our materials in this courtroom without having to

6   carry them back and forth?

7            THE COURT:  Very good question.  I hope that the

8   answer to that is yes.  Mr. Daniels, will we be locking up the

9   courtroom every night?

10           THE CLERK:  Yes.

11           THE COURT:  We will be locking this up.  Everything

12  should be safe.  I will look forward to seeing all of you here

13  at 9:00 again.  My hope is, as already expressed, that to the

14  extent there is any evidentiary issue that you would like to

15  discuss before we begin testimony, that you raise it with me

16  then.  I expect that we won't have any, but if there is, I'll

17  come in in the morning to address it.

18           Thank you very much.  We are adjourned.

19           (Adjourned to 9:00 a.m., May 28, 2014)

20

21

22

23

24

25