1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   CLAREX LIMITED and BETAX LIMITED,

4                   Plaintiffs,

5           v.                              12 CV 7908(GHW)

6   NATIXIS SECURITIES AMERICAS, LLC,       Trial
    et al.,
7
                    Defendants.
8
    ------------------------------------x
9                                           New York, N.Y.
                                            June 3, 2014
10                                          9:30 a.m.

11  Before:

12          HON. GREGORY H. WOODS

13                                          District Judge

14

15          APPEARANCES

16

17  AKERMAN LLP
         Attorneys for Plaintiffs
18  BY:  MARTIN DOMB
         BENJAMIN JOELSON
19

20  EISEMAN, LEVINE, LEHRHAUPT & KAKOYIANNIS, P.C.
         Attorneys for Defendants
21  BY:  ERIC R. LEVINE
         ERIC P. HEICHEL
22       ERIC ASCHKENASY

23

24

25

```
 1              (Case called; trial resumed)

 2              (Jury not present)

 3          THE COURT:  Good morning.  I apologize for the delay

 4   this morning.  The jury is I think ready, so I will try to keep

 5   the morning's activities relatively short.

 6          Mr. Domb, do you have something you want to say?

 7          MR. DOMB:  A logistical thing before the jury comes

 8   in.  We intend to make a motion for judgment as a matter of law

 9   under Rule 50(a), and since the only additional evidence is a

10   matter of record which are a set of admissions and stipulations

11   of fact, it might be more convenient, depending on your Honor's

12   wishes, to have that motion heard before the jury comes in so

13   we don't interrupt the proceedings.

14          THE COURT:  Why don't we have them come in.  We will

15   introduce the evidence, I will excuse the jury, you can make

16   your motion, and I will rule.

17          So, thank you both very much for the charging

18   conference yesterday.  I thought it was very productive.  I

19   circulated a revised set of the charges last night that I

20   believe accommodated all the requests that we discussed.  Was

21   it acceptable to both sides?

22          MR. DOMB:  Yes, your Honor.

23          MR. LEVINE:  Acceptable to defendant, your Honor.

24          THE COURT:  Thank you.  Now with respect to closing

25   arguments, we talked about a target amount of time.  I look
```

1   forward to hearing them.  I am sure the jury is looking forward

2   to hearing them.  My principal request, since both of you have

3   a lot of experience in this area, is that you follow the rules,

4   but in particular since we have an agreed set of charges, to

5   the extent that either of you wants to argue the law, if you

6   could stick within the language of the charges themselves that

7   we are going to be distributing to the jury, I would appreciate

8   that.

9           In terms of the stipulations that the jurors are going

10  to hear immediately upon their entry, have you two discussed

11  how you would like to present them?  You said that we might

12  have a lawyer read them into evidence as soon as they enter.

13  Do we have a designated reader?

14          MR. HEICHEL:  We haven't discussed it, your Honor, but

15  Mr. Aschkenasy is going to read them in, if that's acceptable

16  to plaintiffs.

17          MR. DOMB:  That's fine with us.

18          THE COURT:  Thank you.  You did a fine job the other

19  day.

20          MR. ASCHKENASY:  Where would you like me to be

21  standing?  I believe the podium is already set up for closing.

22  Would you like me to use the witness box?

23          THE COURT:  That would be fine.  Thank you.

24          MR. HEICHEL:  We have the stipulations and the

25  requests to admit to read in.

```
 1              THE COURT:  Thank you.

 2              In terms of the order of closing arguments, I assume

 3    that it will be plaintiff, defendants and then plaintiff's

 4    rebuttal?

 5              MR. DOMB:  No, your Honor.  My understanding was that

 6    defendants would go first and we go second, and that's it.

 7              THE COURT:  That's fine with me.

 8              MR. LEVINE:  That's acceptable.

 9              THE COURT:  Fine.

10              Now, that is I think all that I had.  Unless any of

11    you have anything else, I will bring in the jury.

12              Yes, Mr. Levine?

13              DEFENDANTS' TECH:  Your Honor, with respect to the

14    stipulations and the requests for admissions, do you want those

15    displayed or just read?

16              THE COURT:  I think just read.  Thank you.

17              Thank you, Mr. Daniels.

18              MR. HEICHEL:  If I might, is the court going to

19    explain to the jury the difference between the stipulated facts

20    and the requests to admit, or is there going to be any

21    introduction?

22              THE COURT:  I think what I would tell them is in

23    summary that they're going to hear stipulated facts which are

24    facts that the parties have mutually agreed are true, and

25    admissions which one party, the party who has made the
```

1    admissions, has admitted are true.  That's the only lead-in I

2    intended to make.  Is that acceptable?

3            MR. HEICHEL:  That's fine, your Honor.

4            THE COURT:  OK.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury present)

 2              THE COURT:  Welcome back, ladies and gentlemen of the

 3   jury.  Thank you.

 4              This morning you are going to hear Mr. Aschkenasy read

 5   to you some stipulations of fact which are facts that both

 6   parties have agreed are true, so they didn't need to introduce

 7   other evidence of them here before you live or through

 8   depositions; and also admissions of parties, or party, which

 9   are admissions by that party that the facts asserted therein

10   are true.

11              So, Mr. Aschkenasy?

12              MR. ASCHKENASY:  The parties stipulate as follows in

13   connection with the trial of this action:

14              1.  Plaintiff Clarex Limited is a company incorporated

15   in the Cayman Islands.

16              2.  Plaintiff Betax Limit is a company incorporated in

17   the Commonwealth of the Bahamas.

18              3.  Clarex and Betax both are based in Nassau,

19   Bahamas.

20              4.  The defendant Natixis Securities Americas LLC is a

21   securities broker dealer based in New York City.  Natixis and

22   certain predecessor entities were previously known by different

23   names such as Arnhold and S. Bleichroeder, Inc.  These other

24   names are also listed as defendants in this case.

25              5.  The Bank of Nova Scotia Trust Company, Bahamas
```

Limited, served as plaintiffs' manager and custodial agent.  It

held securities at Euroclear and credited them to plaintiffs'

accounts, among other duties it performed for plaintiffs.

6.  Plaintiffs and Natixis had a long-standing

relationship as customer and broker dealer.

7.  In 1991 the Republic of Nigeria issued USD

collateralized fixed rate bonds, the Nigerian bonds, together

with payment adjustment warrants, the Nigerian warrants.

8.  Euroclear is the name of the entity through which

transactions in Nigerian bonds and Nigerian warrants were

settled.

9.  From the time the Nigerian bonds were issued

through September 10, 2001 plaintiffs placed orders for

Nigerian bonds and Nigerian warrants with Natixis on multiple

occasions.

10.  The face value of Nigerian bonds ordered by

plaintiffs with Natixis between 1992 and September 10, 2001

equaled $188 million.

11.  Plaintiffs received all the Nigerian bonds they

ordered in such transactions with Natixis during between 1992

and September 10, 2001.

12.  Other than the 46,000 warrants that are the

subject of this litigation, plaintiffs received all the

Nigerian warrants they ordered in such transactions with

Natixis between 1992 and September 10, 2001.

1            13.   The individual who signed the fourth amended

2   tolling agreement, trial Exhibit L, on behalf of Clarex and

3   Betax, is Luis M. O'Naghten, one of their attorneys in this

4   matter.   End of stipulations.

5            Plaintiffs' response to defendants' first set of

6   requests for admissions:

7            Pursuant to Rules 26 and 36 of the Federal Rules of

8   Civil Procedure, plaintiffs Clarex Limited and Betax Limited,

9   or plaintiffs, respond as follows to defendants' first set of

10  requests for admissions:

11           Request 3:  Admit that for a trade date of February 8,

12  2000, Clarex placed an order with defendants for Nigerian bonds

13  with a face value of $5 million and 5,000 corresponding

14  Nigerian warrants, the February 8th transaction.

15           Response:  Admitted.

16           Request 6:  Admit that defendants correctly input

17  settlement instructions for the February 8 transaction with

18  Euroclear.

19           Response:  Admitted.

20           Request 8:  Admit that on or before February 12, 2000,

21  Clarex was aware that it had not received the 5,000 Nigerian

22  warrants related to the February 8 transaction by contractual

23  settlement date.

24           Response:  Admitted.

25           Request 10:  Admit that for a trade date of August 22,

1  2001, Clarex placed an order with defendants for Nigerian bonds

2  with a face value of $16 million and 16,000 corresponding

3  Nigerian warrants, the August 22 transaction.

4       Response:  Admitted.

5       Admit that defendants correctly input settlement

6  instructions for the August 22 transaction with Euroclear.

7       Response:  Admitted.

8       Request 15:  Admit that on or before August 18,

9  2001 --

10       THE COURT:  August 28.

11       MR. ASCHKENASY:  -- August 28, 2001 Clarex was aware

12  that it had not received the 16,000 Nigerian warrants related

13  to the August 22 transaction by the contractual settlement

14  date.

15       Response:  Admitted.

16       Request 17:  Admit that for a trade date of August 28,

17  2001, Betax placed an order with defendants for Nigerian bonds

18  with a face value of $7 million and 7,000 corresponding

19  Nigerian warrants, the August 28 transaction.

20       Response:  Admitted.

21       Request 20:  Admit that defendants correctly input

22  settlement instructions for the August 28 transaction with

23  Euroclear.

24       Response:  Admitted.

25       Request 22:  Admit that on or before September 1,

1   2001, Betax was aware that it had not received the 7,000

2   Nigerian warrants related to the August 28 transaction by the

3   contractual settlement date.

4           Response:  Admitted.

5           Request number 24:  Admit that for a trade date of

6   September 5, 2001 Clarex placed an order with defendants for

7   Nigerian bonds with a face value of $10 million and 10,000

8   corresponding Nigerian warrants, the September 5 transaction.

9           Response:  Admitted.

10          Request 27:  Admit that defendants correctly input

11  settlement instructions for the September 5 transaction with

12  Euroclear.

13          Response:  Admitted.

14          Request 29:  Admit that on or before September 11,

15  2001, Clarex was aware that it had not received the 10,000

16  Nigerian warrants related to the September 5 transaction by the

17  contractual settlement date.

18          Response:  Admitted.

19          Request 31:  Admit that for a trade date of September

20  10, 2001, Clarex placed an order with defendants for Nigerian

21  bonds with a face value of $8 million and 8,000 corresponding

22  Nigerian warrants, the September 10 transaction.

23          Response:  Admitted.

24          Request 34:  Admit that defendants correctly input

25  settlement instructions for the September 10 transaction with

1  Euroclear.

2          Response:  Admitted.

3          Request 36:  Admit that on or before September 14,

4  2001, Clarex was aware that it had not received the 8,000

5  Nigerian warrants related to the September 10 transaction by

6  the contractual settlement date.

7          Response:  Admitted.

8          Request 38:  Admit that plaintiffs did not place

9  orders for Nigerian bonds or Nigerian warrants at any time

10  after September 10, 2001.

11          Response:  Admitted.

12          Request 39:  Admit that plaintiffs did not attempt to

13  place orders for Nigerian bonds or Nigerian warrants at any

14  time after September 10, 2001.

15          Response:  Admitted.

16          THE COURT:  Thank you.

17          Mr. Levine?

18          MR. LEVINE:  Defense rests, your Honor.

19          THE COURT:  Thank you very much.

20          I apologize, ladies and gentlemen of the jury for

21  asking you to step down again so quickly, but I'm going to ask

22  you to just leave for a little while so that we can discuss

23  some other business matters.

24          (Jury not present)

25          THE COURT:  Thank you.  Mr. Domb, I understand you

1    have a motion.

2         MR. DOMB:  Your Honor, plaintiffs move for judgment as

3    a matter of law under Federal Rule of Civil Procedure 50(a) on

4    two points:  Statute of limitations and impossibility.

5         As to statute of limitations, the account statements

6    are in the record, including several during the period after

7    October 24, 2006, which are within the six year period before

8    plaintiffs commenced this action.

9         Testimony by Ms. Sherman confirm her understanding

10   that these statements were acknowledgments of Natixis' debt or

11   obligation to deliver 39,000 warrants to Clarex, and there is

12   no dispute that those 39,000 warrants included the 5,000

13   warrants that are the subject of the first transaction as to

14   which the statute of limitations defense is asserted.

15        Mr. Shipway, an expert with extensive experience in

16   the industry, reviewed the statements, saw that the statements

17   included those warrants in the portfolio holdings section of

18   the statements, and gave his interpretation that they reflect a

19   debt by Natixis that the warrants are owed by Natixis to

20   Clarex, and they are owned by Clarex.

21        There was no rebuttal expert testimony on that point.

22   The only testimony that was elicited was when we called

23   Natixis' operations executive, Mr. Briggs, and he was unable to

24   rebut that.  If I recall -- and we have the quotation if

25   necessary -- I happened to be asking him about the statements

1    involving the 7,000 warrants to Betax -- but the principle is

2    the same, he said it applied to all -- and I asked him if this

3    is a debt of Natixis to Betax, and he said a debt?  And I said

4    an obligation.  And he said I can't answer that, sir.

5            So, as it stands, the statements are in the record,

6    they are unrebutted, they are within the six year period, and

7    we think that they satisfy the general obligations law Section

8    17-101.

9            THE COURT:  Before you proceed, Mr. Domb, just for my

10   convenience, can I ask for a response to the first component of

11   the motion before you move to the second?

12           MR. LEVINE:  Sure.  The first is that Mr. Shipway

13   admitted -- contrary to Mr. Domb's representation -- Mr.

14   Shipway admitted that he didn't understand what the Natixis

15   statements conveyed, as I mentioned yesterday in my

16   application, he also admitted that the account statements did

17   not reflect a debt owed.  So, he made both those admissions,

18   which is why we believe your Honor should find absolutely the

19   opposite of what the application is right now.

20           Secondly, Mr. Briggs in the question before what

21   Mr. Domb quoted to you, he was asked whether or not these

22   reflected a debt or something owed, the account statements

23   reflected that, and he said no.  There may be some legal

24   obligation out there from something else, but that the

25   documents themselves do not reflect a debt; it just reflects

1  that a trade had not settled.  So I think a reasonable jury not

2  only can find for us but will find for us.

3          THE COURT:  Thank you.

4          With respect to this component of the motion, I'm

5  going to deny it, understanding we all understand the standard

6  that I have to apply.

7          I think that one of the issues here for the jury is

8  not whether or not the warrants were owed.  The defendants have

9  conceded that they were in breach of their obligation to

10  deliver the warrants.  The issue is whether or not the account

11  statements could be understood as an acknowledgment of that

12  debt.  And I think that there is testimony that could lead the

13  jurors to conclude that it was, and therefore I'm going to deny

14  that motion.

15          Proceed, Mr. Domb.

16          MR. DOMB:  With respect to impossibility, your Honor,

17  the simple thing is that there is no evidence of impossibility.

18  In fact, what evidence there is is the contrary, that it was

19  possible to deliver the warrants.

20          Mr. Fitting -- who was Natixis' person, prepared by

21  Natixis before his deposition and trial -- I think testified

22  truthfully, he said that there were bonds and warrants

23  available on the first settlement date, and he said that it was

24  possible for Natixis to buy bonds and warrants, deliver the

25  warrants, keep the bonds.

1          Mr. Fitting and Mr. Briggs both testified that they

2     individually did nothing on any of the settlement dates to

3     rectify the failures, and that they knew of no one else at

4     Natixis having done anything.

5          Mr. Shipway gave a list of the things that a broker

6     dealer in a situation like that can do.  And I won't go over

7     the list, but the evidence is that Natixis did none of them.

8          Ms. Werner was promised as the key witness that would

9     show that it was impossible to deliver warrants, and actually

10    she was unable to say that, did not say that.  As to the five

11    specific dates in question, when asked specifically whether she

12    had knowledge whether there were warrants available on those

13    dates, she gave a flat no.  She knew that there were problems

14    with fails dating back to 1996, which I think takes care of the

15    foreseeability issue even for the first transaction.  And for

16    the other four transactions, the failure of the first

17    transaction and of each successive transaction removes any

18    possibility.  We think that Natixis would not have been able to

19    have foreseen these failures.

20         Ms. Werner was unable to say even what percentage of

21    transactions were failing or even that a majority of

22    transactions were failing.

23         Therefore, I think the record is devoid of evidence

24    from which a jury could reasonably find that it was impossible

25    under the New York standard -- and I won't go over that -- but

1   objectively impossible as well as not reasonably foreseeable or

2   capable of being protected against in a contract.  And I will

3   just add that the contract had no protective measures such as a

4   force majeure clause.  So, I won't go longer than that.  The

5   court is aware of the evidence on it.

6           THE COURT:  Thank you.  Thank you, Mr. Domb.

7           MR. LEVINE:  Thank you, your Honor.  First of all,

8   much of what Mr. Domb is referring to regarding Mr. Briggs and

9   Mr. Fitting is in that two week period which of course is

10  irrelevant to at the time, so as to what happened at the

11  February 8, what happened at August 22.

12           Secondly, Mr. Fitting also testified I'm not the

13  settlement guy, when there is a failure you go to the

14  settlement department, I'm not the guy to talk to.  And he

15  didn't know if buy-ins worked.  He also testified that he

16  didn't know if there was anything else to do.  He knew there

17  was a document, Exhibit 15.  He admitted this was a hopeful --

18  a wishful -- it was a hope that something could work out, but

19  he had no idea if something could.

20           Mr. Briggs testified about the Euroclear loan

21  procedures which automatically kick in when there is not a

22  settlement, and when the loan procedures weren't kicked in just

23  meant that there were no warrants available.

24           Mr. Shipway testified that he had no idea if there

25  were warrants available, he never looked into it.  And it is

1    our contention that there were no warrants available, as

2    demonstrated by the failure of the Euroclear loan procedures to

3    kick in.  Mr. Shipway also testified he has no idea how

4    Euroclear works, and that the jury is as big an expert if not a

5    bigger expert on that point than he is.

6         Ms. Werner couldn't tell you the number of fails, but

7    she could tell you that it was quote unquote huge.  It was

8    quote unquote an event that prompted issuing one of these

9    primers, which is very unusual, and it was an event large

10   enough to prompt the regulators to be looking into this.

11        A reasonable jury can conclude, and I believe will

12   conclude, that it was impossible to get the warrants.  And

13   there is absolutely no record -- talk about nothing in the

14   record, there is absolutely no evidence in the record that the

15   warrants actually existed and could have been gotten.

16        THE COURT:  I'm going to deny this motion as well.  I

17   look forward to hearing how the jury understand the evidence

18   that's been presented to them.

19        As Mr. Levine pointed out, there was testimony

20   regarding the fact that under the Euroclear loan procedures, if

21   warrants were available at that time, they would have

22   automatically been -- and I am summarizing the testimony here

23   as I recall it -- that they would automatically have been

24   loaned and made available.  I think that a reasonable jury

25   could infer from that testimony that, therefore, because that

1   Euroclear procedure did not automatically kick in, that there

2   were no warrants available to feed that process.

3        I do believe that although Ms. Werner's testimony did

4   not have numerical estimates of the percentage of warrants that

5   were not available at the time, a jury could, listening to her

6   testimony, infer that there was a substantial disruption in the

7   marketplace that led to the issuance of the EMTA primer.  And,

8   additionally, as Mr. Levine points out, she did say as part of

9   her testimony that it was a significant concern that gave rise

10  to concern by the regulators.

11       Now, I don't need to conclude for myself that that

12  supports the defendants' defense of impossibility.  All I need

13  to decide for purposes of ruling on the Rule 50 motion is to

14  conclude whether or not there may be sufficient evidence on the

15  record for the jurors to conclude that the impossibility

16  defense requirements are satisfied.  And given the way that the

17  Second Circuit has told me I need to evaluate the evidence in

18  this case -- which is with all credibility assessments made

19  against the moving party and all inferences drawn against the

20  moving party -- I cannot conclude that a reasonable juror would

21  have been compelled to accept the view of the moving party.

22  And that is a relatively high bar, as you all know.

23       So, with that, I'm going to deny the motion, and

24  unless there is anything else, invite the jurors back in to

25  hear your closings.  Thank you.  Mr. Daniels.

1          (Jury present)

2          THE COURT:  Thank you.  You may be seated.

3          Mr. Levine?

4          MR. LEVINE:  Thank you.

5          Ladies and gentlemen of the jury, it's going to be

6    your turn soon.  I want to thank you for your service.  I know

7    this has been a burden on you in terms of your time, but we

8    truly appreciate it.

9          In my opening of this case I told you that this case

10   was about something for nothing.  I told you that this case is

11   about plaintiff trying to get millions of dollars for something

12   for which they paid absolutely nothing.  I said this is about a

13   case where plaintiffs are trying to get millions of dollars

14   from Natixis who through no fault of their own could not get

15   the warrants.  Those statements were true then, and they are

16   just as true now.  The only difference is you've seen the

17   evidence which supports those statements.

18         We have proven and plaintiffs have repeatedly admitted

19   that they have paid nothing -- not a little -- but nothing for

20   the warrants.

21         I think Peter Turnquest, Iris Sherman's boss, could

22   not have been more clear.  At page 688, lines 5 through 6 of

23   the transcript, when he was asked why Deloitte & Touche,

24   they're unaudited financial statements reflected no market

25   value for the warrants, he said, "I would say -- well,

1   obviously we didn't pay for them because they didn't cost us

2   anything."  I don't think it could be clearer:  Something for

3   nothing.

4            I told you that Clarex and Betax were not an elderly

5   couple who had their life savings stolen by a big bad bank.  As

6   everyone now knows, Clarex and Betax are investment vehicles

7   owned by a very wealthy Latin American family.

8            As Ms. Sherman told you -- and I believe Ms. Sherman

9   to have been an enormously credible witness; I believed her

10  testimony throughout -- she told you that the owners were

11  Scotia's clients.

12           In my opening I told you the owners were involved in

13  every aspect of this case.  It was their decision to set up

14  Clarex and Betax, they funded the trades, they negotiated the

15  trades, they realized the profits, and they incurred the

16  losses.  And, as I told you, they would not testify, and they

17  did not.

18           These are very wealthy sophisticated people.  In fact,

19  when we showed you the September 28, 2001 account statement,

20  that statement alone, that one month alone, reflected over $100

21  million in face value of foreign debt securities from Brazil to

22  Pakistan, to the Russian Federation, to Ukraine and Nigeria.

23           In fact, in this case alone, if you can put up Exhibit

24  EEE, please, or Exhibit 45, whichever is easier.  Thank you.

25  Second page.  As you heard, there was stipulated into the

1   record, and as has been testified about, in Nigerian bonds

2   alone they bought $188 million.  That's $188 million face value

3   of Nigerian par bonds.

4         This case really begins, has its origins in a phone

5   call from Sam Fitting.  Sam Fitting picks up the phone, and who

6   does he call?  He calls the owners.  Why?  Because he is going

7   to recommend that they buy Nigerian par bonds.  He does that on

8   five occasions.  In those phone calls Sam Fitting tells the

9   owners that his recommendation is based on the bonds alone.  He

10  tells the owners that the warrants played no role -- not some

11  role, not marginal role, not a little role -- no role in his

12  recommendation, and he ascribed no value to them.

13        Let's look at that testimony, page 341, lines 22

14  through 342, line 23:

15  "Q. Did you deal with a family member when you made your sales

16  call in connection with each of the five transactions at issue?

17  "A. I definitely did for the last four, and the most likely

18  event is that I did for the first one, but it's just so long

19  ago and not as memorable.

20  "Q. And when you dealt with the family member on these sales

21  calls, did you recommend the transaction?  Did you recommend

22  that they buy the Nigerian bonds and warrants?

23  "A. Yes.

24  "Q. Why did you recommend those securities?

25  "A. They were relatively low priced and a relatively high

 1   yield.  They had U.S. Treasury strips guaranteeing the

 2   repayment of principal at maturity.  They had a rolling

 3   interest guarantee, guaranteeing at least one year's worth of

 4   interest payments.  The history of these bonds was that Nigeria

 5   did pay the coupons.  And it's an oil exporting country.  It

 6   seemed like they would be likely that they would have the

 7   revenue to continue paying it.

 8   "Q. Those characteristics that you just described, were those

 9   characteristics of the bonds?

10   "A. Yes.

11   "Q. What if any role did the warrants play in your

12   recommendation to the owners?

13   "A. No role.

14   "Q. Why is that?

15   "A. I didn't have an opinion about the likelihood that the

16   warrants would pay anything."

17           In my opening statement I told you Sam Fitting would

18   testify just that way, and that his testimony would be

19   uncontroverted.  He testified just that way, and his testimony

20   is uncontroverted.

21           As I told you in my opening, the evidence would show

22   that indeed the owners bought the bonds because that's where

23   the value was.  It was the bonds Sam Fitting recommended, and

24   it was the bonds the owners bought.  In fact, all the evidence

25   proves that what the owners wanted and paid for, they got.

1   They negotiated the number of bonds, they negotiated the price

2   for the bonds, and the owners bought the bonds based on Sam

3   Fitting's recommendation in which the warrants played no role.

4   And everything that follows Mr. Fitting's sales call

5   demonstrate that the bonds had the value and the warrants had

6   little or no value.

7          Ms. Sherman.  Ms. Sherman testified, and her testimony

8   is completely consistent with what Sam Fitting had told the

9   owners.  That makes sense because she heard about these

10  transactions from Frank Wiedeman, the owner's financial

11  advisor.  She didn't speak to the owners.  Sam Fitting spoke to

12  the owners.  The owners spoke to Frank Wiedeman, Frank Wiedeman

13  spoke to Ms. Sherman and communicated to her what the

14  transaction was.  It was for the bonds.  She heard the value

15  was for the bonds.

16         And it's no wonder that they wanted the bonds.  They

17  paid a truly significant rate of return.  Both Ms. Sherman and

18  Mr. Fitting told you that the bonds paid six and a quarter

19  percent of their face value, not what they paid, but the face

20  value of the bonds, while Clarex and Betax paid only a portion

21  of the face value.

22         If you could please put up the annual rate of return

23  chart, the demonstrative.

24         On the February 8, 2000 transaction they purchased $5

25  million face value of par bonds, they paid $3,043,402.78, and

1    they received $312,500 a year.  A year.  A 10.10 percent

2    return.  Pretty fabulous return.

3          For the August 22, 2001 transaction, $16 million face

4    value of the bonds, they paid only $10,603,333.33, and they

5    received an annual payment -- an annual payment -- of $1

6    million a year, a 9.43 percent return.

7          On August 28, 2001 they bought $7 million face value

8    of the bonds, and they paid $4,642,604.17, and they received in

9    one year $437,000, a 9.41 percent return.

10          On September 5, 2001 the owners bought $10 million

11    face value of the bonds, and they paid $6,712,152.78, and they

12    received $625,000, a 9.31 percent return.

13          On September 10, the day before 9/11 -- and we are

14    going to talk about that -- they bought $8 million face value

15    of the bonds for $5,363,888.89, and they received an annual

16    payment of $500,000, a 9.3 percent return.

17          In total, they bought $46 million face value of the

18    bonds, they paid $30,365,381.95, and in one year they received

19    $2,874,500, a 9.46 percent return.

20          The value was in the bonds; they wanted the bonds.

21          Now, for that transaction in which Clarex and Betax

22    would receive $2,874,500 a year annually, Natixis charged a

23    mark-up.  Plaintiffs seem pretty shocked that Natixis was in

24    this for a profit.  I'm not quite sure why, but they seemed to

25    be.  They were paid $495,000.  Now, Sam Fitting testified he

1   didn't disclose what that mark-up was.  The owners asked about

2   it, and he wouldn't tell them, and the owners didn't care,

3   because they knew about it, and they paid, and they bought $188

4   million face value of the bonds even though they knew there was

5   a mark-up and they didn't know what it was.  They didn't care.

6   Why?  They wanted the bonds.

7        It's very important to remember they made no profit on

8   the warrants.  The mark-up was solely on the bonds.

9   Ms. Sherman testified that way, and Mr. Fitting testified that

10  way.  The mark-up was strictly on the bonds.

11       You know who else made a huge profit?  Scotia Trust.

12  Ms. Sherman is from Scotia Trust.  Mr. Rolle was from Scotia

13  Trust.  Ms. Sherman told you they currently charge $3 million a

14  year for their services, $3 million a year to manage someone's

15  money.  Back in 2000 and 2001 they earned 20 percent of assets

16  under management.  It's no wonder why the Scotia Trust people

17  were here.  They want to help their client, and I understand

18  that.  They are being paid a lot of money.

19       Do you know what else tells you this was all about the

20  bonds, that's what they ordered, that's what they wanted?  Ms.

21  Sherman testified about the delivery versus payment agreement.

22       Can we put up KK, please.

23       In paragraph 2 we talked to Ms. Sherman about what

24  that paragraph meant, and she told us that that meant when the

25  securities we ordered, when the securities we ordered were

 1   delivered, we paid.  When the securities we ordered were

 2   delivered, we paid.  The bonds were ordered, they paid.  The

 3   bonds came without the warrants, they paid.  When the

 4   securities they ordered were delivered, they paid.  And she

 5   said it was pursuant to that agreement.  And that happened on

 6   every single occasion.

 7        If we look at transcript page 204, lines 11 through

 8   18:

 9   "Q. When the bonds arrive, the payment is made?

10   "A. That's correct.

11   "Q. If the bonds arrive without the warrants, the payment is

12   still made?

13   "A. You're paying for the bonds.

14   "Q. My question is, when the bonds arrived, even without the

15   warrants, the payment was made, correct?

16   "A. Correct."

17        They wanted the bonds.  This notion that it's a fully

18   integrated transaction so plaintiffs are really paying for both

19   is absolutely nonsense.  It may have been a fully integrated

20   transaction, but they paid for the bonds; they didn't pay for

21   the warrants.  There is absolutely no evidence in this record

22   that they paid for the warrants.  They didn't refuse to pay if

23   the warrants didn't show up.  They didn't ask for their money

24   back if the warrants didn't show up.  They wanted the bonds.

25        Now, Ms. Sherman had a role at Scotia Trust in terms

1   of making sure that the securities department at Scotia Trust

2   knew how to properly place its orders or issue instructions to

3   Euroclear.  Euroclear, of course, is central to this entire

4   transaction.  And the way she knew what information to include

5   or to communicate to the securities people is when she got a

6   phone call from Frank Wiedeman.  He told her what the

7   transaction was.  She would then write up a ticket, and she

8   would submit it to the securities department, I believe it was

9   typically Mr. Rolle, so that they could properly place the

10  instructions with Euroclear.  Remember there had to be two sets

11  of instructions, one for the bonds, one for the warrants.  And

12  I walked you through in Ms. Sherman's testimony all of the

13  tickets that she had filled out, and every single instance,

14  there is not a single exception, the warrants showed no price.

15  They did not pay for the warrants; they paid for the bonds.

16          In every single fax that Mr. Fitting would send to

17  Ms. Sherman regarding the transactions -- because they had to

18  match, they had to make sure that Clarex and Betax on the one

19  hand and Natixis on the other hand were on the same page, that

20  they had the instructions correct, that the transaction was

21  right -- in every single fax, which Ms. Sherman told you she

22  reviewed for accuracy and compared, and Mr. Fitting always got

23  it right, every single fax reflected zero consideration, zero,

24  nil, nothing, zero dollars.  Remember those?  One actually said

25  free.  Free.

1          Every account statement you review, every trade

2   confirmation you see, showed no consideration for the warrants.

3   And that was true of Natixis and its counterparties as well.

4   When Natixis bought the bonds with the warrants from its

5   counterparties, it paid for the bonds, it paid nothing for the

6   warrant.  Every document you review will show that.

7          Mr. Domb is going to tell you this was a fully

8   integrated transaction, and that the price paid was for both

9   the bonds and the warrants together, but there is simply no

10  getting around the fact that nothing was paid for the warrants.

11  All the documents, all the testimony, nothing was paid for the

12  warrants.

13         I just want to remind you what Peter Turnquest said

14  when he was asked about the Deloitte & Touche financial

15  statements.  He said, I would say, well, obviously we didn't

16  pay for them because they didn't cost us anything.  You can't

17  get any clearer than that.

18         Mr. Domb is going to tell you -- and I think he is

19  right on this point -- that no consideration does not mean no

20  value.  That's true.  But it certainly is a strong indication

21  of what that value is, right?  I mean I suppose on every level

22  everything has some value, but the fact that you paid nothing

23  is a strong indication it's not worth much.

24         It's interesting, did you hear a single witness other

25  than professor Sundaram -- who we will talk about in a little

1      bit -- did you hear a single witness, Ms. Sherman, Mr. Fitting,

2      Mr. Rolle, Mr. Briggs, anybody, stand up there and say these

3      things are worth a lot of money, I just don't know what it was,

4      I just can't fix the value, but, wow, were these things

5      valuable.  No, the best they could do was it had a value; they

6      weren't worthless.  Mr. Fitting wrote a memo where he said they

7      weren't worthless.  When you describe something as it's not

8      worthless, what does that tell you?  It's virtually worthless;

9      it doesn't have much value.

10           You would have expected someone -- I mean Mr. Domb

11     asked Ms. Sherman did they have value, and her answer was,

12     yeah, they had value.  What does that mean?  The answer was

13     not, yes, they were enormously important to us, they had

14     tremendous value, we couldn't quite fix it because we didn't

15     know all the formulas, but they were really worth a lot of

16     money.  The answer was a very tepid it had value.  That's the

17     strongest statement they got out of any witness as to the

18     value, the perceived value of those warrants.

19           But don't take my word for it.  There are a couple

20     people who actually testified here without showing up, and one

21     of them was Deloitte & Touche.  I told you in my opening we

22     would show you the unaudited financial statements and that you

23     would hear from EMTA's counsel, Ms. Werner, and I told you that

24     the warrants had no market value, little or no market value.

25     And we did.

1           These are neutral parties.  They have no dog in this

2    fight.  They are just doing their jobs.  It's not Natixis

3    trying to make an argument.  They're just doing their jobs.

4           Put up Exhibit O, please.

5           So, Exhibit O is the Clarex Limited unaudited

6    financial statement for the year ended March 31, 2002 and

7    review report.

8           If you can go to the second page.

9           It reflects that the Nigerian par bonds for $91

10   million face value had a carrying value -- meaning what they

11   paid -- of $51,190,810 and a market value of $64,155,000.  They

12   made a significant profit on that, and they placed a value on

13   it.

14          If you go to the next page, 172,000 call warrants.

15   What's the value?  What's the carrying value?  What's the

16   market value?  No value.  No value.

17          There is no NA there like you find on the account

18   statements that says not available, price not available.  There

19   is nothing there that says we couldn't get this information.

20   They said no market value.

21          Let's go to Y, Exhibit Y, please.

22          That's the Betax unaudited financial statements for

23   the year ended March 31, 2002.  If you go to the second page,

24   the 67 million Nigerian face value par bonds, the carrying

25   value, what they paid, $44,118,750, a market value of

 1   $47,821,250.  For the 16,000 Nigerian call warrants, no

 2   carrying value; they paid nothing.  And that's a data point

 3   they could easily get, because they saw they paid nothing.

 4   It's not like you had to go to Bloomberg or the New York Times

 5   or the Wall Street Journal and figure that one out.  They saw

 6   they paid nothing; they had that data point.  Market value?  No

 7   market value.

 8            Mr. Domb is going to tell you not to pay attention to

 9   the financial statements because he is going to say Deloitte

10   had no way of getting information regarding the price of the

11   value of the warrants.  He doesn't know that.  There is not a

12   single witness who said that they couldn't get that

13   information.

14            Ms. Sherman said she didn't know where Deloitte got

15   its information, and Mr. Turnquest in what we read to you said

16   he didn't know how they got their information.  In fact, Mr.

17   Turnquest said they had to verify their information.  They

18   ascribed no value to the warrants.

19            Now, that makes sense, because Ms. Werner was here

20   yesterday, and she told you why it took them from 1996 when

21   they first learned about some fails until 2002 to make the

22   market practice change from trading the bonds with the warrants

23   together to trading them separately.  And she said it's because

24   the market ascribed no value to the warrants, nobody cared.

25            MR. DOMB:  Objection, your Honor.  I don't recall that

 1    testimony.

 2          MR. LEVINE:  We're going to read it into the record,

 3    and you will see it.

 4          So let's go to page 719, 8 through 20:

 5    "Q. Now, you mentioned in a prior answer when I asked you about

 6    why you were referring people to Euroclear in 1996, you

 7    mentioned that some fails may have already occurred.  Why if

 8    some fails had occurred in 1996 did it take EMTA until 2002 to

 9    change the market practice?

10    "A. Because life works slowly.  I think that people were not as

11    alarmed by the fails because there was no money attributable to

12    the warrants.  So, if the warrants did not have value at that

13    moment in time -- although they may have value in the future --

14    the market was not keen to try and separate the bonds from the

15    warrants.  So, if there is no problem, you don't deal with it.

16    There was no appetite for the market to force EMTA to put

17    together a market practice."

18          I trust that answers your question, Mr. Domb.

19          Now, one of the issues in this case is the statute of

20    limitations issue, as to whether or not the six year statute of

21    limitations has run on the February 8, 2000 transaction, on

22    those 5,000 warrants.  You are going to be instructed by the

23    court on this issue.  In particular, unless the statute is

24    extended by a written acknowledgment of a debt or promise to

25    perform, the statute has run.  The question is whether the

1    Natixis account statements constitute an acknowledgment or

2    promise to perform.  The burden of proof is on Clarex.  The

3    burden of proof is on Clarex, and they have not met it.

4         I told you in my opening that not even plaintiffs

5    believe this argument, and I think that the testimony has born

6    that out.  You saw Mr. Shipway.

7         If we look at Exhibit 68, this is the August 17, 2007

8    tolling agreement.  I'm sorry.  66.  What are the claims at the

9    bottom of the first page?  It's for 41,000 warrants.  It does

10   not include the 5,000 warrants from the February 8, 2000

11   transaction.

12        Let's go to Exhibit L.  This is the fourth amended and

13   restated tolling agreement.  This is dated July 17, 2008.  This

14   is after the account statements which go from October 2006

15   through August 2007.  That's the time period where the statute

16   of limitations is allegedly extended.  This is after that.

17   They enter into a tolling agreement with Natixis, and if you

18   look at the top of the second page, 41,000 warrants.  It does

19   not include the 5,000 from the February 8, 2000 transaction.

20        Now, what is interesting on this document -- and you

21   heard it read into the record today -- is that this document is

22   signed on behalf of Clarex and Betax by a Mr. Luis O'Naghten,

23   Mr. Domb's partner.  So when Mr. Domb asked Ms. Sherman were

24   you aware of the general obligations laws, and she said no, I

25   believe her.  But Mr. O'Naghten does.  Mr. O'Naghten does.  And

1    he signed this.

2           Exhibit M, this is Peter Turnquest's handwriting.  You

3    heard Ms. Sherman testify about it, and you heard Mr. Turnquest

4    himself testify about it.  This is after the time period where

5    the account statements are supposedly extending the statute of

6    limitations.  What does he write next to the 5,000?  Lost to

7    tolling.

8           Exhibit K, this is an October 9, 2009 power of

9    attorney.  Clarex and Betax hire CMFS to perform services on

10   its behalf, including bringing this lawsuit, and it assigns to

11   CMFS the right to bring these claims, their claims, the claims

12   they have against Clarex and Betax.  This is almost two

13   years -- it's more than two years after the account statements

14   which supposedly extend the statute of limitations has expired,

15   they enter into this.

16          And what do they say are the claims that Clarex and

17   Betax are assigning to CMFS?  If we can go to the last page,

18   please, page 3, at the bottom.  It's the 41,000 warrants.

19   41,000 warrants.  It does not include the 5,000 from the

20   February 8, 2000 transaction.

21          Exhibit 67, this is the 13th amended and restated

22   tolling agreement, it's dated August 17, 2007.  It's restated

23   in full as of December 16, 2011.  This is signed December 16,

24   2011, more than four years -- four years -- after the account

25   statements are supposedly extending the statute of limitations.

1    If you go to page 2, in the middle, list of the warrants, it

2    does not include the 5,000 from the February 8, 2000

3    transaction.

4          Now, Dan Briggs testified on this issue, and he

5    confirmed that the account statements reflected no such

6    obligation.  His testimony was that there may have been a legal

7    obligation to deliver the bonds -- I'm sorry -- to deliver the

8    warrants, but that was separate and apart from what the account

9    statements reflected.  The account statements only reflected

10   trades that didn't settle; it did not reflect an obligation or

11   a debt.

12         So, who does Clarex use as their expert on this point?

13   Mr. Shipway.  You saw Mr. Shipway.  I believe he is genuinely

14   trying his best.  I just think he was a little out of his

15   element.  He admitted he did not know what the account

16   statements were meant to convey.  If we go to page 476, lines

17   23 through 477, line 5:

18               (Continued on next page)

19

20

21

22

23

24

25

1   "Q. The truth of the matter is you don't know what information

2   Natixis was conveying when it prepared its statements, isn't

3   that correct?

4   "A. Ask the question again."

5           The question is read back.

6   "A. I don't know what information it was conveying."

7           If he doesn't know what it is conveying, how does he

8   know what it said?  He doesn't.

9           He then went on to admit that the account statements

10  do not reflect the debt or an obligation to pay.  On page 488,

11  lines 1 through 9, he is asked and he said:

12  "Q. On what basis do you make that conclusion?

13  "A. I think it goes back to what I originally said was if you

14  sell something for a client, you owe them the securities.

15  "Q. So it's not based on anything in the account statement,

16  it's just based on the original delivery obligations?

17  "A. That's correct.  There's a confirmation that originally

18  created this position right here."

19          That's correct.  It doesn't reflect it.  It couldn't

20  be any clearer.

21          One of our defenses in this case is the defense of

22  impossibility.  The Court is going to instruct you on that.

23  The Court is going to tell you that you must determine the

24  issue of impossibility independently for each contract.  It is

25  going to tell you that, for example, you must consider whether

1    it was impossible to perform the February 2000 contract at the

2    time of that transaction settlement date, which is three

3    business days later, on February 11, 2000.

4            For the transaction of August 22, 2001, you must

5    consider whether it was impossible to perform that contract at

6    the time of that transaction settlement date, three business

7    days later, on August 27, 2001.  Likewise for the three other

8    transactions, you must determine impossibility at the time of

9    each transaction settlement date.

10           Mr. Domb was asking a lot of questions about at the

11   time and two weeks after.  The two weeks after is out the

12   window, it's not part of the charge, it's not the law.  It's at

13   the time.

14           There are three elements to the impossibility that we

15   have to meet.  This is our burden:  Performance of the contract

16   or contracts was objectively impossible at the time of the

17   breach, the impossibility was caused by an unanticipated event

18   that could not have reasonably been foreseen or guarded against

19   in the contract, and Natixis did not cause the event that made

20   performance impossible.  We satisfy all three.

21           Let's start with was it our fault.  You heard from Ms.

22   Sherman, you heard from the admissions that were read in today,

23   that we entered the instructions to Euroclear properly, both to

24   Clarex and Betax through Euroclear concerning the trades for

25   Clarex and Betax, and with our counterparties.  We entered the

1    instructions correctly.  It was not our fault.  We did it

2    right.

3           But because the bonds traded with the warrants,

4    everybody had to enter two separate tickets and two separate

5    sets of instructions, as we heard.  That didn't happen in a lot

6    of cases.

7           Can you put up 103, please.

8           Exhibit 103 we showed to Ms. Werner, and she told you

9    that this was a market practice, and this was the market

10   practice in 1992 that established the bonds and the warrants

11   were to trade together.  From that, it required two separate

12   sets of instructions be issued, and it applied to Nigeria.  We

13   know this was a market practice that was established by EMTA.

14   If one of the parties didn't put in the instructions correctly,

15   the trades didn't settle.

16          As has been admitted many times, it is part of the

17   requests to admit, as I said, Natixis entered the instructions

18   properly each and every time.  This is just not in dispute.

19          What was unforeseen was the marketwide fails.  No one

20   could anticipate that.  In fact, Aviva Werner testified EMTA

21   didn't change its market practice recommendations until 2002.

22   At that time the practice was altered to allow the bonds and

23   warrants to trade separately.

24          Not even EMTA understood until 2002 the magnitude of

25   the fails, until the middle of 2002.  They were aware that

1     there were fails in 1996.  They were aware that there were

2     fails going along the way.  But even EMTA, the entity whose job

3     it is to monitor the market, did not know until the middle of

4     2002 how broad and wide the fails were.

5          Let me read you some of Ms. Werner's testimony.  I

6     apologize you won't be able to read it for yourselves.  At page

7     117, line 9, Ms. Werner says, when asked why it took so long to

8     change the practice, "Because by that point in time there were

9     so many fails in the market that we tried to stop the bleeding

10    to the extent that if we could come up with a market practice

11    that said that the warrants traded separately, from that point

12    on if there was a fail, it wouldn't be in the failure to

13    deliver the warrant together with the bond, because there

14    wouldn't be a trade of the bond and the warrant together

15    anymore.  So we tried to make sure that the accumulation of all

16    these fails had not continued.

17    "Q. You said so many fails in your prior answer.  What did you

18    mean by many fails?

19    "A. The market had accumulated a huge amount of fails because

20    either the buyer or the seller did not transfer the warrants

21    appropriately."  We did.  The market may not have, but we did.

22          She gives another answer.  She goes on.  "I think that

23    the warrants may have been available in the beginning when

24    these trades were done, but over time there were so many fails

25    that it seemed as though there was a shortage of warrants in

1   the market.  The warrants were disappearing."

2          She goes on to say, "After experience with Mexican and

3   Venezuelan warrants, which had a similar problem with Nigeria,

4   we drafted primers for Nigeria, for all of those, but with

5   respect to this one in particular, because we realized that the

6   problem had gotten out of control."  Out of control.

7          In fact, Ms. Werner told you that the failure was so

8   problematic and so widespread that regulators got involved.

9   Regulators don't get involved because one trade fails.  There's

10  a marketwide problem here.

11         We did protect ourselves.  We did protect ourselves.

12  As a member of Euroclear, we took advantage of Euroclear's loan

13  procedures.  Mr. Briggs told you all about the loan procedures.

14  There is not a single witness that contradicts anything he says

15  about the Euroclear's loan procedures.

16         Scotiatrust is a member of Euroclear.  Did they get up

17  there and say there is no such thing as Euroclear loan

18  procedure?  Did they tell you they wouldn't apply?  No.  Mr.

19  Briggs' testimony on the Euroclear loan procedures is

20  uncontroverted.

21         What is the Euroclear loan procedures?  That means it

22  is automatic that when there is a fail, Euroclear will cause a

23  loan of the security to be made to cover the transaction.  It

24  didn't happen.  The automatic loan procedure failed.  Why?

25  Because there were no warrants.  There were no warrants to

1   loan.  And that is uncontroverted.  The question is, what else

2   could Natixis have done on the settlement date?  Nothing.

3   There were no warrants to get.  Again, you know that because

4   the Euroclear loan procedure failed.

5        Ms. Werner told you who the members of Euroclear were.

6   It's the big institutions who buy these Nigerian bonds.  They

7   are the members of Euroclear.  If you can't borrow it from

8   them, who are you borrowing it from?  It would not have worked

9   at any price, because they weren't there.  It doesn't matter

10  how much money you offer for something; if it doesn't exist,

11  you can't get it.

12       How do plaintiffs attempt to undermine defendants on

13  this point?  Again with Mr. Shipway.  Again, unfortunately, he

14  was out of his element.  He admitted that for any buy-in to

15  work, there had to be warrants available.  But what did he tell

16  you?  He told you not only didn't he look into whether or not

17  there were warrants available, he was not asked to look into

18  whether or not warrants were available.

19       Why wasn't he asked to look into whether warrants were

20  available?  That is the natural thing to have done.  They

21  didn't ask him to do it, because if he had done it and he knew

22  how to do it, he would have learned there were no warrants

23  available, and when he took the stand he would have to have

24  told you that.  They didn't ask him, because they didn't want

25  you to hear his answer to that question.

1          "When you were deposed, you said that you didn't know

2     whether or not Natixis could get the warrants, isn't that

3     right?

4     "A. Yes.

5     "Q. You never looked into it, did you?

6     "A. I was never asked to look into it."

7          What is the natural thing, you ask?  Could they have

8     done it?  They didn't ask, because they knew it was impossible,

9     and they didn't want you to hear that answer.

10         He also went on to say, Mr. Shipway did, he

11    acknowledges that all the testimony about the availability of

12    the warrants that he gave, they could have done this, they

13    could have done this, they could have done this, was all

14    hypothetical and it was all meaningless, because all the things

15    he suggested to you could not have happened if there were no

16    warrants.  The only evidence you're hearing in this record is

17    there are no warrants.  The Euroclear loan procedures failed

18    because there were no warrants.

19         Perhaps even more importantly, you heard him, Mr.

20    Shipway admitted he knew virtually nothing about Euroclear.  In

21    fact, he admitted you guys even knew even more than he did.

22    You're the experts.  You are now the Euroclear loan procedure

23    experts.

24         Then they attacked Sam Fitting.  They very nicely

25    pointed out he didn't do anything.  There is a lot of things he

1   didn't do over this two-week period.  But it's not the two-week

2   period.  It's at the time.  It's at the time.

3          Sam Fitting also said I'm the wrong guy to ask, I'm

4   the sales guy, you want to talk about how you cover up failed

5   trades, you go to the settlements department.  We didn't put

6   anybody from the settlements department on the stand.  We

7   couldn't.

8          It took them 11 years to bring this lawsuit.  What

9   does that tell you about what they think about the value of

10  these warrants are?  It took them 11 years to bring this

11  lawsuit.  Everybody who worked in our settlements department is

12  gone.  We couldn't put them on the stand.  We would have liked

13  to, but we couldn't.

14         Mr. Fitting was asked about a document, Exhibit 15.

15  If we can put that up.  And if we can highlight that middle

16  email that says "Ask EMTA" and then the sentence that follows

17  it.  What does Mr. Fitting say in this email?  He testified he

18  didn't know what else he could do.

19         What does the email say?  He says, "Ask EMTA."  We

20  did.  You heard Ms. Werner:  There were no warrants.  We asked

21  EMTA.  Clarex didn't, we did.

22         What does he say in the next sentence?  "The fact that

23  by convention all consideration was attributed to the bonds for

24  settlement purposes and the warrant settled for zero value does

25  not mean that the warrants are worthless."  Is that how you

1   describe something that has a lot of value, they are not

2   worthless?  Mr. Fitting acknowledges they had a value.  Not

3   much, they are not worthless.  I don't know where that gets

4   you.

5       Dan Briggs did testify that there were procedures in

6   place at the time as to what Natixis was to have done.  He had

7   no reason to doubt that Natixis put in place all those

8   procedures, that they followed through all the procedures that

9   had been put in place.  One of the primary ones, of course, was

10  the Euroclear loan procedure.  Again, if it didn't take them 11

11  years to sue, we could have put somebody on the stand and they

12  could have told you in detail what they had done, but they

13  didn't.

14      Let's get to valuation.  If unfortunately we fail on

15  impossibility and you have to value these warrants, you have

16  two experts in front of you.  The Court will instruct you that

17  the value of the warrants is measured from the date of each

18  individual breach.  For instance, the August 22, 2001,

19  transaction is measured from that contract settlement date.

20  And for each one.  It's not all together, it's for each

21  individual one.

22      There may be an ambiguity as to the precise amount of

23  damages, but there is absolutely no ambiguity that there is

24  relatively little value to the warrants.  You heard Ms. Sherman

25  say it, you heard Ms. Werner say it, you heard Sam Fitting say

1    it.  They are not worthless.  They are not worthless.

2          So it is a battle of the titans, Professor Sundaram

3    and Dr. Okongwu.  They admit that the methodology is the same.

4    The only question is whether the input of the data is right.

5    As you heard from the testimony, Professor Sundaram's inputs

6    were flawed in each and every respect.  They were not only

7    guesses, he guessed wrong.

8          In contrast, Dr. Okongwu's inputs were based on actual

9    market data points, irrefutable market data points.  That is

10   critical to this exercise.  You cannot use future events to

11   calculate the value.  You can only use, what Dr. Okongwu told

12   you, what is known or knowable at the time.  What is known or

13   knowable at the time.

14         What is known and knowable on September 10, 2001?

15   Certainly not September 11th.  But that didn't stop Professor

16   Sundaram.  If he had gotten that report from a student, I think

17   he'd be asking them to find a new career.  He completely

18   ignored the events.

19         If you can put up Okongwu demonstrative 7.

20         I'm not going to bore you with this, because I'm not

21   even sure I understand all these things, like PPI index and all

22   that stuff.  But I think it is important enough to know that

23   whatever the PPI index was and how it is applied, Dr. Sundaram

24   told you he applied the wrong one.  When he showed up at trial

25   was the first time he told us that he had made a mistake and

1    that he was changing his valuation from 6.7 million to 5.5,

2    $1.2 million gone because he was wrong.  He guessed wrong.

3           How did he learn that it was wrong?  Because he

4    realized the mistake when he read the transcript of Dr.

5    Okongwu's deposition.  He learned from our expert that he was

6    wrong.

7           The convenience yield, because the mistakes just keep

8    on coming, the higher the convenience yield, the lower the

9    calculated value of the warrants.  Dr. Sundaram, Professor

10   Sundaram, starts at 2 percent but just says let's keep it at

11   zero because there is not much of a difference between zero and

12   2.  Then, lo and behold, it's not 2, it's 6.

13          Dr. Okongwu calculated that if he had properly

14   inputted 6, it would have decreased his valuation number,

15   Professor Sundaram's valuation number, by another $2 million,

16   to 3½ million.  And depending upon which oil he was observing,

17   WTI versus Brent, it could be as low as 2.7 million or

18   $2.8 million.  Under the best scenario for plaintiffs, their

19   top number is 3.5 million and much more likely 2.7.  Frankly, I

20   don't think you can rely on anything Professor Sundaram says.

21          It's only what you know or what's knowable, what's

22   known or knowable.  Professor Sundaram admitted, his greatest

23   achievement, was that when he looked into the future and saw

24   what the price of oil was and tied it to all his assumptions,

25   he was right.

1           How you know he was wrong on everything is because the

2   only way for him to look into the future, see what happened,

3   and tie it back to what he did and say I'm right is to say he

4   knew we were going to be attacked on September 11th, he knew we

5   were going to war in Iraq, he knew we were going to war in

6   Afghanistan, he was able to predict every world event.  No

7   human being on the planet could do it.

8           Professor Sundaram's report is worthless.  There is an

9   example of paying a tremendous amount of consideration for

10  nothing.  It's worthless.

11           Dr. Okongwu made his calculations based on data and

12  data alone.  I don't want to make a big point as to whether or

13  not to criticize on the basis that the convenience yields

14  worked out one day for 20 years afterwards assuming the cost of

15  oil is less than a dollar.  But this is a red herring.

16          Dr. Okongwu explained that this did not reflect the

17  rest of the calculations, which showed future prices of oil

18  consistent, not only with prices just a couple of years before,

19  consistent with just a couple of years before, valuation dates,

20  but also consistent with projections at the time in respected

21  publications.

22          He was not alone.  Were there other people who gave

23  other valuations?  Sure.  It's an art, not a science.  But he

24  was consistent.  He used market data points, and there were a

25  lot of people who agreed with him.

 1              Volatility.  Professor Sundaram looked at what

 2   happened in the past and dropped it down a bit and then

 3   hypothesized a flat line for volatility for the next 20 years.

 4   Dr. Okongwu looked at the actual real world market data for

 5   options on futures, which measure what the market thinks is

 6   going to happen in the future, and used that as his basis for

 7   volatility input.

 8              This is where plaintiffs' criticism comes in of Dr.

 9   Okongwu.  Their big criticism, if you look at 7, is that his

10   number of $298,968 uses the Nelson-Siegel method.  I do not

11   understand what the Nelson-Siegel method is, I confess to you.

12   Supposedly, it is not supposed to be applied to this.  Dr.

13   Okongwu pointed out may, it sometimes is, it sometimes isn't.

14              But even if you don't use it, you don't apply it,

15   $607,933, what is that consistent with?  That is consistent

16   with Ms. Werner telling you the market ascribed no value, no

17   value, to the warrants in 2000 and 2001.  What is that

18   consistent with?  That is consistent with Deloitte & Touche

19   telling you that it has no market value.  No market value.

20   That's consistent with Sam Fitting telling you they are not

21   worthless.  That's consistent with Iris Sherman telling you

22   they have a value.

23              What is Professor Sundaram's consistent with?

24   Fantasy.  Nothing.  Professor Sundaram actually sat on that

25   stand and told you that he was unaware of any nations that had

 1    defaulted for strategic reasons.  No country would do that, he

 2    said.  Mr. Heichel got up and said three words, "what about

 3    Argentina," and then it all came out.  Oh, yeah, Argentina.

 4    Then Professor Sundaram volunteered Brazil, and then we heard

 5    about Greece.

 6         I don't want to say he was being untruthful, but he

 7    knew about those countries and he told you that it didn't

 8    happen.  You cannot believe, unfortunately, anything Professor

 9    Sundaram said, and certainly his report is garbage.  Garbage

10    in, those are his inputs, garbage out.  Data points in, good

11    data points out.

12         If you don't want to apply Nelson-Siegel, you think it

13    is inappropriate, then it's $607,000.  If Dr. Okongwu properly

14    applied Nelson-Siegel, it's $298,968.

15         I thank you for your time.

16         THE COURT:  Thank you, Mr. Levine.

17         Mr. Domb.

18         MR. DOMB:  Members of the jury, I want to start with

19    two important things that are not in dispute in this case.

20    Number one, contracts existed between Natixis and our clients

21    for Natixis to deliver 46,000 warrants to Clarex and Betax in

22    five transactions, as you know.  Undisputed.  Number two,

23    Natixis breached those contracts by failing to deliver the

24    warrants.

25         The dates and the number of warrants are not in

 1   dispute.  So it is our clients who did nothing wrong.  Natixis

 2   breached.  That's admitted.  Natixis is the wrongdoer in this

 3   case.  What this trial has been about is whether Natixis can

 4   wriggle out from the consequences of its breaches.

 5            Next, I want to talk about a few red herrings in this

 6   case.  Mr. Siegel used that phrase.  I was interested to hear.

 7   A red herring is something that somebody says to draw your

 8   attention away from what is relevant and to talk about

 9   something that is not relevant.  It's to pull the wool over

10   your eyes.  There are a few of them here.

11            Number one, where are the owners?  You heard Mr.

12   Siegel in his opening and you heard him in his closing

13   arguments.  Where are the owners?  They are so critical to

14   this.  To that we say, where are the warrants?  What is the

15   relevance of the owners?  The owners are our clients.  I said

16   that from the beginning.  What is the big relevance?

17            I listened hard to see where is it going to come in in

18   the evidence that the owners were critical?  The only thing I

19   heard is that Mr. Fitting -- by the way, Mr. Fitting worked at

20   Natixis for I think 25 years, approximately.  He was prepared.

21   He met with Natixis's lawyers before his deposition, before the

22   trial.  They paid for his counsel.  But I found Mr. Fitting to

23   be a credible witness.  I don't think he lied.

24            When it came to the owners, he said, yes, I spoke to

25   the owners, and when I recommended these bonds, I really wasn't

1    thinking about the warrants, I thought the bonds were a great

2    deal and that's why I recommended them.  We don't dispute that.

3    The bonds were a great deal, and the bonds with the warrants

4    were an even greater deal.

5              Put up screenshot A, please.

6              I asked him, "It would have been a much better for the

7    client to have received both the bonds and the warrants rather

8    than to receive the bonds alone, would you agree with that?"

9    "A. Yes."

10             He did agree with that.  So, the bonds were a great

11   deal, the bonds with warrants an even greater deal.

12             The second red herring I want to talk about is the

13   plaintiffs paid zero for the warrants.  You heard this ad

14   nauseam.  I think with Ms. Sherman, Mr. Levine took her through

15   every scrap of paper he could find where it says the payment

16   for the warrants was zero.  We don't dispute that.  That's

17   another red herring.

18             We said from the beginning the warrants came with the

19   bonds.  When I gave my opening, I started to give you an

20   analogy and Judge Woods stopped me because he reminded me these

21   kinds of arguments are not proper for opening, they are for

22   closing argument.  The analogy is simple.

23             A man walks into a clothing store and they are

24   offering buy one suit, get one shirt free.  The suits are $500.

25   He says great, I need suits I'm in the market for suits or

 1   bonds.  He buys five of them.  Congratulations.  They write up

 2   the ticket, 5 suits, $2500.  Different ticket, 5 shirts, zero.

 3   Pay your money, go to the window and pick up your goods.  The

 4   man pays his money, he goes to the window.  Here are your

 5   suits.  Sorry, can't give you the shirts, don't have the shirts

 6   right now.

 7          Are the shirts worthless?  Are they worth little

 8   because we paid nothing?

 9          Third red herring:  The owners are wealthy, they are a

10   wealthy family, they are very wealthy.  This is my favorite

11   one.  From this case alone did we hide that?  I said myself

12   when I opened first, the owners are a wealthy family from Latin

13   America.  Mr. Levine took time to show you how I think in one

14   month there was something like either 70 or $90 million of buys

15   and sells in one month, $188 million in face value of bonds.

16   Of course.  You have to be wealthy to be investing at that

17   level.

18          But what does that mean?  It's a red herring.  Does it

19   mean that you can cheat people because they are wealthy:

20   Sorry, I know I sold you these items, I'm not delivering them,

21   I'm breaching, but you're wealthy so I'm excused?

22          Finally, the fourth red herring:  Natixis did

23   everything right.  You heard Mr. Levine say that at opening,

24   you heard it again in summation.  What he means by that is

25   Natixis properly filled out the tickets.  Yes, I sold you these

 1    bonds for these dollars, yes, I sold you these warrants for

 2    zero, I'm instructing Euroclear to deliver these warrants to

 3    you, here it is, and my instruction matches Scotiatrust's

 4    instruction.

 5            They did everything right, right?  No.  They didn't

 6    deliver the warrants.  That's what they had to do.

 7            Suppose it were the bonds.  We wrote up the right

 8    instruction, deliver the bonds.  Our client delivers the money.

 9    Oh, the bonds aren't there, sorry.  Is that doing everything

10    right?  No.  Doing everything right means doing what you agreed

11    to do.

12            Enough with the red herrings.  Let's talk about the

13    real issues in this case.

14            The first issue is statute of limitations.  There is a

15    dispute as to whether the first transaction, and only the first

16    transaction, is barred by statute of limitations.  It's not at

17    issue that we sued more than six years after the settlement

18    date or the breach date in that transaction.  It's not at

19    issue, and we don't dispute, that those 5,000 warrants are not

20    in the tolling agreements.  That's as clear as day, we never

21    said that.

22            By the way, the fact that my partner signed the

23    tolling agreement, irrelevant.  Imagine if we had not signed

24    the tolling agreements for the 41,000 warrants.  We would be

25    fighting here over whether the account statements are an

F63sclt2                    Summation - Mr. Doub

1    acknowledgment of the debt for all 46,000 warrants.

2           When Natixis wouldn't agree to include or wouldn't

3    timely enter into an agreement for the 5,000 warrants, we said

4    OK, let's at least protect the 41,000 warrants.  So now we have

5    only one issue on statute of limitations in this case, as to

6    the 5,000 warrants.

7           Because those 5,000 warrants were not included in the

8    tolling agreements, our clients at times felt, yes, we may have

9    an issue about that.  Mr. Turnquest wrote, gee, lost to

10   tolling.  That's obvious.  They are not in the tolling

11   agreement, they are lost to the tolling.

12          But that is not the issue in this case.  The issue is

13   not whether a party thinks a claim is barred.  The issue is

14   whether it is barred as a matter of law.  The law, New York

15   General Obligations Law that Judge Woods will instruct you

16   about, I don't have the exact words in front of me -- and you

17   will take the words from Judge Woods, not from me -- but in

18   substance it says that if a debtor, such as Natixis, sends a

19   written acknowledgment of the debt to the creditor, in this

20   case our clients, that restarts the 6-year statute of

21   limitations.

22          We brought this lawsuit in the year 2012.  If we have

23   statements, written statements, from Natixis within 6 years of

24   that date and that's where we start in October 2006, which is

25   6 years before we sued, if we have statements that show the

 1   written acknowledgment of the debt, it restarted the 6-year

 2   period.

 3        Let's put up Exhibit 86, Mr. Winter.

 4        We showed you several statements, by the way.  I'm

 5   only going to show you one.  Exhibit 86 pages P428 to 30 is the

 6   statement for February 2007.  Why am I showing you this one?

 7   Number one, it's after October of 2006, so we know it is within

 8   6 years of the time that we sued.  Number two, if you will go

 9   to the next page, on the bottom it lists the 39,000 warrants.

10   This is to Clarex and it is undisputed.  Everyone agreed that

11   those 39,000 warrants includes 5,000 warrants.

12        Put up the table of five transactions, please.  You

13   see these are the five transactions at issue.  If you take out

14   the middle one, which is 7,000 warrants to Betax, 46,000 minus

15   those 7 is the 39,000 to Clarex.  It is clear that the 39,000

16   warrants to Clarex includes the 5,000 in the first transaction.

17   We have a statement within the statutory period that lists it.

18        Now go back to 86, please, and show the next page

19   after the statement, which is the acknowledgment.  Here is

20   another reason I'm showing this statement.  Periodically,

21   Natixis would send an auditor's letter to Scotiatrust, Ms.

22   Sherman, and say here is our statement, please review it,

23   confirm that it's correct, and send it back to our auditors.

24        You remember Ms. Sherman's testimony.  She signed it.

25   She didn't review all the statements, but she certainly

1  reviewed this one.  When I asked her would you have signed this

2  if the statement did not include the 39,000 warrants, she said

3  of course not.  Because, as Ms. Sherman testified, when she

4  received these statements, she saw they were correct.  Natixis

5  had not yet delivered the 39,000 warrants, Natixis owed those

6  39,000 warrants to Clarex, Clarex owned them.

7          This is as clear an acknowledgment, the actual

8  statements of Natixis on its letterhead -- at the time it was

9  known as Bleichroeder, but it's the same entity -- the

10  statement of your own broker-dealer telling you, the customer,

11  this is what you own in your portfolio.

12          Talking about trying to wriggle out, Mr. Briggs tried

13  to wriggle out of the fact of what the statement said by saying

14  oh, that's in the COD, cash on delivery portion, not in the

15  cash portion.  Go back to the statement, please.  Next page.

16  This one does have a cash portion.  Both of those -- it is hard

17  to read because they are in gray.  Highlight the headline.

18          It's in the portfolio holdings part of the account.  A

19  customer receives a statement from its own broker-dealer saying

20  this is in your portfolio.  And yet Mr. Briggs is trying to

21  deny, or tried, I don't think he did, what this means.  It's a

22  clear acknowledgment of the debt.

23          Mr. Shipway, our securities expert, I'm not going to

24  repeat.  I think you will remember I took him through his

25  career, 40 or 50 years in the securities industry as a senior

1    examiner for NASD, heading up operations at a major broker-

2    dealer, board of directors of the Chicago Stock Exchange, set

3    up his own electronic stock exchange called Primex, consultant

4    for FINRA.

5         He had the temerity to come in and say, yes, these

6    statements actually say what they say, that this is an

7    acknowledgment of the debt that these 39,000 warrants are owed.

8    What does he get for saying that?  Mr. Levine yelled at him.  I

9    don't know if you recall, but I was very surprised that Mr.

10   Levine wasn't content to ask him questions, but he really

11   yelled at Mr. Shipway, as if saying something loudly enough can

12   make it true.

13        Natixis did not call a securities expert to rebut Mr.

14   Shipway.  They scorn Mr. Shipway and try to say he is not

15   experienced enough, he is out of his element, but we didn't

16   hear a rebuttal from another securities expert.

17        Even Mr. Briggs, when I asked him the plain fact of

18   what does this indicate -- by the way, I was looking at another

19   statement, the one for the 7,000 warrants.  Put up screenshot

20   D, please, and highlight it so we can read it.

21        I asked him not for a legal opinion, because when I

22   was asking questions he said, I can't give you a legal opinion.

23   "But I'm asking you as a operations person and executive

24   director of Natixis, is it your testimony that this statement

25   does not reflect the debt of 7,000 warrants from Natixis to

1    Betax?

2    "A. A debt?

3    "Q. An obligation to deliver.

4    "A. I can't answer that, sir."

5          He was unwilling to state the obvious.  But what our

6    witnesses said is not rebutted.

7          This is also consistent with Mr. Fitting.  Put up

8    screen quote C, please.  I won't read all of it.  Towards the

9    end of one of the answers, Mr. Fitting, when he was discussing

10   his conversations with Ms. Sherman at the time that they were

11   discussing, hey, where are the warrants, he says, "I believe

12   the substance," meaning the substance of our conversations,

13   "was that we," Natixis, "owed them the warrants and she wanted

14   the warrants."

15         That is consistent with the account statements as

16   well.  Use your common sense.  Why did Natixis list these

17   39,000 warrants in the portfolio holdings of its own account

18   statements to Clarex?

19         I won't dwell on the Euroclear instructions.  You

20   heard testimony from Mr. Rolle from Scotiatrust who explained

21   how the Euroclear instructions have to match.  We are not

22   contending here, although I actually think it would be a good

23   argument, we are not contending that the Euroclear instructions

24   satisfied the General Obligations Law of a written

25   acknowledgment even though I believe even they do.

```
 1              MR. LEVINE:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3              MR. DOMB:  I will say only this.  A Euroclear

 4   instruction --

 5              MR. LEVINE:  Move to strike.

 6              THE COURT:  Yes, please strike that last remark.

 7   Thank you.

 8              MR. DOMB:  I'm going to a different point now, your

 9   Honor.

10              THE COURT:  Thank you.

11              MR. DOMB:  You did hear testimony from Mr. Briggs that

12   Natixis' instructions to deliver 5,000 warrants to Clarex were

13   in place from the settlement date of that transaction, February

14   11, 2000, until August of 2007.  It never changed.  You heard

15   him say that Natixis had the ability to withdraw those

16   instructions, but they never did that.

17              Getting back to the account statements, these account

18   statements --

19              MR. LEVINE:  Your Honor, that has nothing to do with

20   the argument on statute of limitations.

21              THE COURT:  Continue, please.

22              MR. DOMB:  The account statements confirm Natixis's

23   debt of the 5,000 warrants to Clarex.  Therefore, the 6-year

24   statute of limitations restarted with each of those account

25   statements, including the one I just showed you.  We started
```

1   the lawsuit less than 6 years after that.  Therefore, the claim

2   on the 5,000 warrants is not time-barred.

3       I am going to move on to the next topic, which is

4   impossibility.  I will start this topic with what I think is a

5   very important part of it, which is the legal elements.  Mr.

6   Levine also gave you the legal elements, and he stated them

7   correctly.  There are three elements.  Again, I'm not quoting.

8   Take Judge Woods's instructions.

9       In substance, the first element is that performance

10  has to be, quote, objectively impossible.  The second one is

11  that the breach has to be caused by some unanticipated event

12  that could not reasonably have been foreseen by Natixis or

13  guarded against by Natixis.

14      The third one I'll just mention, but I'm not

15  contending it:  Natixis did not cause the unforeseen event.

16  I'm not going to argue that one.  I'm going to give Natixis the

17  benefit of the doubt even though, as we heard the testimony,

18  Natixis didn't do anything to try to rectify these fails.

19      Let's focus on the first two elements.  Natixis has to

20  prove both.  The first one, what does it mean performance has

21  to be objectively impossible?  It means what it actually sounds

22  like it means:  It cannot be done.

23      You will also hear words as part of the instructions

24  that involve the destruction of the subject matter of the

25  contract or means of performance.  That sounds a little

1   legalese.  The classic example is a painter agrees to paint a

2   house by a certain date.  The house burns down before that date

3   comes.  Well, that's impossible, he can't paint a house that

4   has burned down.

5          Does that apply to the delivery of securities?  No.

6   Securities don't burn down.  There were 1.8 million warrants

7   issued with these bonds.  They didn't burn.  They didn't

8   disappear.  They were out there.  All you had to do was pick up

9   the phone and find them.

10          Objectively impossible doesn't mean that performance

11  was difficult or really, really difficult.  You will also hear

12  that for performance to be impossible, it has to be so even to

13  the point of insolvency or bankruptcy.  You're going to hear

14  Judge Woods say those words.  What does that mean?  That means

15  that Natixis was obligated by law to devote all its resources

16  if necessary, even to the point of bankruptcy, to rectify the

17  failure to deliver the warrants.

18          Now, were the bonds and warrants available at the time

19  of the breach that Natixis could have gotten?  Mr. Fitting said

20  he believes they were.  Screenshot B, please.  Here I was

21  talking to him about the first transaction, February 11, 2000.

22  "Q. Do you have any knowledge whether during that period there

23  were bonds with warrants available for sale that Natixis could

24  buy?

25  "A. I believe there were."

 1            I told you before I think that Mr. Fitting did not

 2    lie, he testified truthfully.  You will remember later, instead

 3    of going through each one, I asked him, would your answers be

 4    the same for the other transactions, and he said he would.

 5            I also asked him, screen J, please, was it possible,

 6    paraphrasing here -- you can read it to yourself.  This was on

 7    cross-examination.

 8    "Q. Assuming you had bought the bonds and the warrants

 9    together, using Mr. Domb's question, separating out the

10    warrants, could you have separated out the warrants and

11    delivered them to Clarex and Betax individually.

12    "A. Yes.

13    "Q. How would you do that?

14    "A. I would have the warrants in my Euroclear account and

15    deliver them to Betax and Clarex."

16            What does that mean?  We brought this out several

17    times.  All Natixis had to do on each of the settlement dates

18    is buy those bonds and warrants from somebody else, deliver the

19    warrants or however many they owed our clients, and keep the

20    bonds.

21            Remember when I said that and Mr. Fitting said

22    something like, gee, that would mean I would be stuck with the

23    bonds with no warrants to sell?  I said, well, isn't that the

24    position you put our clients in, you gave us the bonds without

25    the warrants, but you had the ability?  Remember, this is to

 1    the point of insolvency or bankruptcy.  They had the ability to

 2    go out and buy bonds and warrants, deliver the warrants to us,

 3    and keep these bonds.

 4          By the way, according to Mr. Levine, and I agree with

 5    him, the bonds themselves were a great investment.  It would

 6    have been no hardship for Natixis to keep bonds.  They would

 7    have made all that money that Mr. Levine showed you in his

 8    closing argument that our clients were able to earn on the

 9    bonds.

10          That's just the first element of objectively

11    impossible.  Natixis also has to prove the second element of

12    impossibility, that they couldn't have foreseen or guarded

13    against this event, the failure of warrants.  Well, was it

14    foreseeable?

15          Even for the first transaction, which was the first

16    time Mr. Fitting testified that this has happened, that Natixis

17    had been unable to deliver warrants?  Even for that one, it was

18    foreseeable because Ms. Werner said that when she joined EMTA

19    in 1996, there were already problems involving Mexico,

20    Venezuela, and Nigeria.  So the problems with the Nigerian

21    deliveries went back to 1996.  This is by testimony that

22    Natixis elicited from Ms. Werner.

23          Natixis was dealing in these bonds since 1992.  I

24    won't put that up, but you remember the spreadsheet from 1992

25    to 2001, they were selling all those $188 million in bonds to

 1   our clients.  If there were failures in the market dating back

 2   to 1986, Natixis knew or should have known about them.

 3           That's just addressing the first transaction, which I

 4   believe they did have and should have foreseen.  Put up the

 5   table of five transactions, please.

 6           As to the other four transactions, which happened in

 7   August and September 2001, 18 months later, can there be any

 8   doubt that Natixis foresaw those?  This is not speculation.

 9   This is fact.  They knew when they entered into the very first

10   one on August 22, 2001, that they still hadn't delivered 5,000

11   warrants from 18 months before.  Could they foresee a problem

12   at that time?  Of course.

13           Then, as each of those transactions went by -- and

14   they all occurred, those last four, over a period of about two

15   weeks -- the settlement date came, Natixis and our clients knew

16   that there was a fail, and Natixis nevertheless went on to sell

17   bonds and warrants knowing that only a few days earlier they

18   had been unable to deliver warrants.  So, was it foreseeable?

19   Of course it was.

20           What about guarded against?  What "guarded against"

21   means, a party like Natixis can guard against these

22   eventualities in the contract.  They have a customer agreement.

23   We asked Mr. Briggs to read the paragraph 5 that basically says

24   if we have sold you securities and you demand them and you

25   don't owe us any money, we, Natixis, have to deliver them to

1    you.  That agreement governs the entire relationship between

2    the parties.

3          Natixis tried again to pull the wool over your eyes to

4    say, oh, no, no, no, these were cash versus delivery

5    transactions, therefore there is another agreement called the

6    DVP, delivery versus payment, agreement that applies.  I'm not

7    even going to put that up.  I think that was Exhibit LL.  You

8    can look at these two agreements yourself if you want.

9          LL was the customer agreement that covers the whole

10   relationship.  KK is that DVP agreement that has a very narrow

11   and specific purpose.  That agreement says, and if you want to

12   read it, it's written in very obscure language, but this is

13   what it really says:

14         If we, Natixis, sell you securities and you're going

15   to take delivery in some other custodian, such as Euroclear, we

16   need to have your authorization in writing for us to deliver

17   the securities to that person that you designate, Euroclear.

18   So please sign here, we will put it in our file, when we send

19   securities to Euroclear we are protected.  That's all that that

20   DVP agreement does.

21         The true relationship between the parties and if you

22   read the introduction of the customer agreement, is in the

23   customer agreement.  It says it governs all the accounts

24   between us.

25         Then I asked Mr. Briggs, does that customer agreement

1    have anything like an act of God or force majeure or some

2    clause to protect you, Natixis, in the event something

3    unforeseen happens?  No, it does not.

4         So, on all those scores Natixis has failed the two

5    legal elements of impossibility:  Objectively impossible and,

6    number two, unforeseen and cannot be guarded against.

7         Who has the burden of proving impossibility?  Natixis

8    does.  It's an affirmative defense.  It's basically saying,

9    yes, I know I breached but please excuse me because.  They have

10   the burden of proving that.  We don't have to prove anything.

11   They have the burden.

12        Yet we did prove the opposite.  We proved that it was

13   possible to deliver the warrants.  Natixis did nothing to even

14   find out.  Mr. Fitting and Mr. Briggs both said the same thing:

15   I didn't do anything on the settlement dates and I don't know

16   of anybody else at Natixis who did to rectify these failures.

17        Mr. Shipway gave you a list of things that a broker-

18   dealer in this situation can do to rectify the failure.  He can

19   telephone other broker-dealers.  I need warrants, you got

20   warrants?  I need bonds with warrants, do you have those?  They

21   didn't do that.

22        They could institute buying procedures.  Buying

23   procedures means Natixis says, I didn't get them from JPMorgan

24   and Citibank and therefore I couldn't deliver to my customer,

25   I'm going to tell Citibank and JPMorgan that I'm going to go

 1    out and find these warrants, buy them, and if I pay a

 2    reasonable price, they have to pay me.  They didn't do that,

 3    either.

 4          They could have even offered to buy our own clients'

 5    warrants.  Our clients had 142,000 warrants which they knew

 6    about.  Mr. Shipway said, look at your own customers.  Are

 7    there other customers who are holding warrants?  Offer to buy

 8    them and then you can deliver them.  They did none of that.

 9          Natixis earned, as you saw, and I won't put it up,

10    $495,000 for these five transactions.  What did they do for

11    that?  Mr. Fitting, I assume, picked up the phone and spoke

12    with JPMorgan or Citibank, maybe he called one or two others,

13    to source these bonds and warrants that he sold to us.  Then he

14    wrote up the tickets, and then it went to his settlement

15    department, confirmations went out, great.  For that work he

16    earned $495,000.

17          I'm not saying it's excessive.  That's what broker-

18    dealers do.  They buy for a price and they sell for a higher

19    price and they make a profit.  But you would think that for

20    that kind of a deal, when something went wrong, they would do

21    something, pick up the phone and say can you help me, can you

22    find some warrants, because I just stuck my customer without

23    46,000 warrants.

24          I have to address this Euroclear lending and borrowing

25    program that Mr. Levine spoke about and Mr. Briggs briefly

914

1   testified about.  First, I have to tell you, when do you think

2   was the first time I heard about this program?  At trial.  Mr.

3   Briggs was deposed, he did not mention that.  When I asked him

4   what did you do, he said, nothing and I don't know of anybody

5   else who did.

6           But then he said, oh, yes, we have this lending

7   program with Euroclear which is automatic.  If we fail to

8   deliver, they will somehow magically find some, lend them to

9   us.  What is the implication of that?  Lend them to Natixis,

10  Natixis would then deliver them to us.  Then Natixis all these

11  14 years would have on its books warrants that it owes to

12  somebody else.

13          Mr. Briggs spoke about it.  Did he show you any proof?

14  I asked him, you were in charge, you were the designated

15  witness for Natixis.  You pored over all the documentation in

16  this case.  Did you find any document concerning that lending

17  program?  No.  Did they have any document to show that Natixis

18  was even a member of this program?  No.  You have to take his

19  word at trial, mentioned for the first time.

20          Did you have any documents to show that these bonds

21  and warrants were qualified under that program?  Because in

22  that program it's not every security in the world that gets

23  qualified.  Does he have any proof that it even applied to

24  these bonds and warrants?  No.

25          Does he have any proof that Natixis registered these

 1   securities with that program?  No.  Does he have any proof of

 2   what other entities, if any, registered these bonds and

 3   warrants?  No.  There's nothing.  So, you can ignore this

 4   business of, gee, because we were a member of this automatic

 5   program, it means that there were no warrants to be had,

 6   because if there had been warrants, we would have gotten them.

 7   That's pure speculation and it is unproven.

 8          We have other evidence to rebut it.  Mr. Fitting said

 9   that the original issue of bonds was about $2 billion.  He was

10   actually a little bit over Mr. Shipway, who looked into it,

11   said it was about 1.8 billion or a little under 2 billion.

12   Remember, for every thousand dollars of bonds, you get one

13   warrant, or for every million, you get a thousand.  That means

14   that there were 1.8 million warrants issued with the bonds.

15   They were out there.  They didn't disappear.

16          Ms. Werner came in and Mr. Levine promised you that

17   someone from this association that deals with emerging markets

18   was going to prove that it was impossible to get warrants.  Did

19   she do that?  No.  She was unable to say that.  She didn't say

20   that.  I believe her testimony was truthful.  Let's put up

21   screen quote H, please.  Can you make that a little bigger.

22          This is the series of questions where my colleague Mr.

23   Joelson asked her if she had any information on the

24   availability of the warrants or bonds and warrants on each of

25   the five dates in question.  Those five dates are important

 1   because, here I agree with Mr. Levine, Judge Woods will

 2   instruct you impossibility is to be measured as of the dates in

 3   question.

 4          Mr. Joelson asked her, "Do you have any information on

 5   the availability of bonds and warrants on February 11?"

 6          She says, "I do not.

 7          "What about August 27, 2001?

 8          "I do not."

 9          Then he asked one wrap-up question for each of the

10   other three dates.  She does not.

11          So there is no evidence on the lack of availability of

12   warrants or bonds and warrants on those dates.  Remember, Mr.

13   Fitting said that he believes there were bonds and warrants

14   available on the settlement dates.

15          Let's put up screen quote F, please.  Yes, Ms. Werner

16   said that there were problems with warrants dating back to 1996

17   and then getting progressively worse, but she couldn't quantify

18   it.  Mr. Joelson asked her, "Do you have any percentage to give

19   to the jury as far as the amount of failures?"  She doesn't.

20          "You can't say whether it was even a majority of the

21   transactions, correct?

22   "A. Right, I can't."

23          So, on this state of the evidence there is no evidence

24   that it was impossible for Natixis to obtain warrants on the

25   key dates.  Remember what Mr. Shipway said?  At a high enough

F63SClH2                    Summation - Mr. Doub                    917

1    price you can find someone to sell you the securities you want.

2    That was at page 503 of the transcript.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. DOMB:  Now, thinking about that line, remember I'm

2     jumping ahead just a little bit.  Remember what I asked Dr.

3     Okongwu, his valuation was very low, I think $2.88 for the

4     warrants on February 2000, and I said, well, gee, if you knew

5     that on February 11, 2000, and somebody was holding these

6     warrants on that date, and that person agreed with you that

7     they were worth only about $3, would he or she sell them for

8     $4, $5?  He said, sure, because he used the phrase that person

9     would be indifferent as to having a warrant or having $2.88.

10            So, if he is right, if Dr. Okongwu is right, that's

11    how easy it would be for Natixis to go out and find some

12    warrants on February 11, 2000.  But I also asked Dr. Okongwu

13    what if someone didn't agree with you and thought that those

14    warrants were worth $160 say, which is the number that Dr.

15    Sundaram valued them at.  Same answer, you could buy those same

16    warrants.  Even though they're worth $160, you just have to pay

17    a little more, 2 or $300.  Surely you are going to get them.

18    And remember Natixis was bound even to the point of insolvency

19    to correct this failure.  So, whatever they were worth, they

20    were able to go out and get the bonds and warrants.

21            One final word on impossibility.  If it was really

22    impossible for Natixis to deliver warrants on those five dates,

23    don't you think Mr. Fitting would have told Ms. Sherman?  They

24    were constantly on the phone, Ms. Sherman said two or three

25    times a day sometimes because of transactions, and she would

1    remind him about the warrants.  And Mr. Fitting said I trust

2    Ms. Sherman's recollection of those conversations more than I

3    do.  Don't you think if it was impossible, that Mr. Fitting

4    would say, Iris, I'm sorry, we cannot give you the warrants,

5    it's impossible?  No, he didn't say that.  He said, I know we

6    owe you the warrants, we'll get you the warrants.

7           Let me turn to valuation.  I see I have a little time,

8    about 20 minutes left.  I will try to make it less.

9           OK, this case really is about valuation.  If you see

10   the case as I do with regard to the statute of limitations and

11   impossibility, you'll get over those defenses, and you will get

12   to the true question which is valuation.  And this is I admit a

13   difficult question for you because how are you going to decide?

14          You had two brilliant men who are experts in their

15   field come and testify.  So, how are you going to do it?  Well,

16   I'll talk a little bit about their qualifications, their

17   motivation and some of the merits.

18          Bear with me, but let's start with qualifications.  As

19   I said, both are highly intelligent, highly accomplished, and I

20   respect both very much, but their work experiences are quite

21   different.

22          Dr. Okongwu, after receiving his Ph.D. from Berkeley

23   in economics he went to work for NERA.  That's a consulting

24   group; it's a reputable consulting group.  And what has he done

25   there for the last I think since 1999?  So for about 15 years

1   his main job has been to be a witness, an expert witness.  He

2   is a professional expert witness, and he is very polished and

3   he does it very well.  But he approached his job from that

4   perspective.  He is hired by clients to obtain and to help them

5   achieve a certain result, and he is very good at it.

6          Professor Sundaram, what's his life experience?  Above

7   all he is a professor.  After he finished his Ph.D. in

8   economics at Cornell he taught for a number of years at

9   University of Rochester upstate, and then he went to the Stern

10  School, which is a very well known national business school of

11  New York University.  I think he has been there for something

12  like 16 years.  He is an academic.  He has authored the

13  textbook in the field, Derivatives Pricing.  Mr. Heichel tried

14  to impeach him with one or two sentences from that.  I think

15  they had to do with the convenience yield of oil, as if Dr.

16  Sundaram didn't know about the convenience yield of oil in his

17  own textbook.

18         He has written countless articles, but not only is he

19  an author, he has been an editor I think for six years of the

20  journal that deals with derivative pricing.  I forget the name

21  of it, but it's in his resume.

22         And not only has he been an editor of that and other

23  journals, he is a referee.  I think his resume lists 20 or 30

24  journals for which when they receive a manuscript for

25  publication they say, well, we don't know if this is any good,

1    let's send it to somebody who knows what he is talking about,

2    and they send it to professor Sundaram.  I don't know how he

3    has time to do the things he does, but he reads it, and he is a

4    referee for those journals.  He also trains banks, big banks.

5    The undergraduates come to a bank, he teaches them options

6    valuation.  When the MBA people come into a bank, he is hired

7    to train them.  He even has a business where he prepares and

8    gives software to big banks on how to do valuation.

9            So, again, I say both men have terrific

10   qualifications, but I will say that Dr. Sundaram is even more

11   excellent, let's put it that way.

12           And that gets me to the second point, which is

13   motivation.  When you look at the life experiences they've had,

14   who has a motive to approach this from a neutral perspective

15   and to try to get the right answer as opposed to who has the

16   perspective of being I'm an expert witness and I'm being hired

17   by a party to get a certain result?

18           Now, is professor Sundaram perfect?  No.  He admitted

19   to two mistakes.  And admitting to mistakes is a good thing to

20   do, because even I make mistakes every day.  We all do.  And

21   it's a very good thing to admit to them.  And let me mention

22   what they were.

23           When he did his valuation one of the inputs was to

24   look at the PPI, the producer price index, which is a kind of

25   inflationary index.  And who publishes that?  The US Department

1    of Labor.  And you can go to their website, and it turns out

2    that they have dozens of categories of PPI.  And Dr. Sundaram

3    found the one that he thought was the one called for by the

4    warrant.  We showed you the warrant document.  And he looked at

5    it, the history of it, and he saw that it was fairly flat, so

6    he picked a PPI of zero percent.  And then when he read Dr.

7    Okongwu's deposition a few months later he saw that Dr. Okongwu

8    used -- I don't remember the exact amount, but it was somewhere

9    between .5 and one percent.  And Dr. Sundaram said, hey, how

10   can that be?  So, he went back and realized he had looked at

11   the wrong line in the Labor Department website.

12          So, he said, well, I had run a test when I did the

13   valuations a few months earlier using a one percent PPI, and

14   now that I see the mistake I did, I think that valuation --

15   which was in his table 2, not table 1 -- I think that that now

16   represents my best judgment of value.  And so that's the one he

17   adopted, even though it's one percent which is higher actually

18   than the PPI that Dr. Okongwu correctly picked out.

19          The other mistake was actually just a mistake at his

20   deposition.  It had to do with a positive and negative sign.

21   He was being asked about a relationship between I think

22   interest rates and convenience yield or something like that,

23   and he said the difference was 2.  And as he explained -- and I

24   think you may have heard this explanation -- when he left the

25   deposition he realized that he said 2; he should have said

F637CLA3                     Summation - Mr. Doub

1   negative 2, because on his data the negative numbers were in

2   red, the positive numbers were in black, and he had forgotten.

3   He was focusing on the numbers, and he had forgotten that the

4   number was in red.

5            But did that change his valuation?  No.  Because when

6   he did his valuation, he had that data in front of him in red

7   and black.  So, his mistake was a misstatement at the

8   deposition, which he told me about immediately.  And he sent a

9   letter to Mr. Heichel I think the next day correcting that

10  mistake.  So, he made a couple of mistakes, but Dr. Okongwu, he

11  did not admit to any mistakes.

12           Now, let me talk a little bit about the merits.  There

13  were basically three areas of input that they disagreed pretty

14  significantly on, and that accounts for the difference in their

15  valuations.  Credit risk was one of them.

16           Doctor Okongwu used a very high rate of interest to

17  discount the value of the warrants because he felt that Nigeria

18  was a big credit risk.  The problem with that approach,

19  according to Dr. Sundaram, is that Dr. Okongwu treated the

20  warrants as if they were a regular obligation, as if they were

21  a loan.  And, as I brought out with Dr. Okongwu, when you make

22  a loan, when you take out a loan, you are required to pay that

23  no matter what.  It's not tied to how much money you earn, to

24  what the price of oil is or to any other contingency.  So, if

25  things go badly for you, you still have to pay that loan.

1            But that's not what these warrants are.  These

2    warrants say if things go badly, you don't have to pay a dime.

3    Only if things go really well and the price -- well for my

4    Nigeria -- and if the price of your oil goes up, you will be

5    flush with money -- I think that was Dr. Sundaram's term, flush

6    with money -- and you will have the money to pay.

7            So, there is a significant difference and a reason for

8    the difference in the way the two men approached credit risk.

9    And here Dr. Okongwu, in explaining why he applied a big

10   discount, in his report he cited a couple of instances in which

11   payments were due under the warrants, and they were delayed by

12   a few months.  One was in 2001, and he made a point of saying

13   that it was in May of 2001 and therefore it preceded those four

14   transactions in 2001.  But the other one was in 2004.  And here

15   is Dr. Okongwu who has told you when I value warrants, I only

16   look at the information available at the time.  And we all

17   agree with that principle.  Dr. Sundaram does also.  But he is

18   peeking ahead and looking at something that happened in 2004.

19   And that was a delayed payment.  But does he take the time to

20   go down the page and look at --

21           MR. LEVINE:  Objection, your Honor.  Objection.  That

22   wasn't his testimony.  We had a sidebar on this exact point.

23   That should all be stricken.

24           THE COURT:  Thank you.  Objection sustained.

25           MR. LEVINE:  Will that portion be stricken?

1          THE COURT:  Yes, it is stricken.  Thank you.

2          MR. DOMB:  Your Honor, I don't believe you struck

3   simply the fact that his footnote appears in his report.

4          THE COURT:  That is correct.

5          MR. DOMB:  I will simply stop there and say you heard

6   the footnote being read.  Dr. Okongwu cited an event involving

7   a payment in November of 2004 in his report that valued the

8   warrants.

9          The next input that the two experts disagreed on was

10  volatility.

11         Would you put up graph 7.

12         This is Dr. Okongwu's volatility graph.  And I think

13  you probably remember it, it happened just yesterday, that Dr.

14  Okongwu -- and this is a general point because Mr. Levine said

15  that Dr. Okongwu looked at actual data as opposed to supposedly

16  making things up like professor Sundaram did.  Well, the data

17  that Dr. Okongwu looked at was either in the first six months

18  or the first two to three years, depending on what grade of oil

19  he was looking at.  He spotted those on the chart, and then

20  what does he do?  He uses a technique called Nelson-Siegel to

21  draw a curve over the next 17 years.

22         And this is a big disagreement between the experts.

23  You heard Dr. Sundaram said it's absurd to extrapolate, to take

24  a few points and then from the relationship of those points,

25  within a six to two year period extrapolate and figure out what

1    that curve is going to look like for the next 17 years.

2              He used a colorful example.  It's like looking at a

3    child for the first years, that the rate of growth of height in

4    a child for the first few years, and extrapolating from that,

5    you're going to say, well, when this three year old child gets

6    to be an adult, you know, she will be 15 feet tall.  So that's

7    the kind of distortion you get when you use a technique that

8    you should not be using.

9              Now show graphic number 10, please.

10             Professor Sundaram said we're valuing these things in

11   2013; I valued the warrants given the information available as

12   of the valuation dates; but in my field when you have data

13   beyond that, you look at it.  He used the word imperative.

14   Why?  Just to make sure that your results are not completely

15   out of whack.  So he did that for Brent oil.

16             And this is his graphic.  The green line is the

17   volatility curve of Dr. Okongwu that we just looked at.  The

18   red line is the 30 percent volatility that Dr. Sundaram assumed

19   in his valuation.  And the reason he did that, I wouldn't dwell

20   on it, is that he had looked at data preceding the transaction

21   dates to see what the volatility was like.

22             What's the blue line?  Now we are in 2013, we know

23   what the volatility was, and that's what it was.  That's

24   actual.  It just shows the distortions that went into Dr.

25   Okongwu's report.

1    Finally the convenience yield was the third and major

2    element of disagreement.

3    Show graph 9, please.  It's the graph.  Let me see.

4    Number 8.  My mistake.

5    Again, the blue line is this Nelson-Siegel technique,

6    which somehow goes up from those data points as opposed to what

7    he did in his volatility, which goes sharply down.  Each of

8    these works in favor of Dr. Okongwu if you want to drive down

9    the price of the warrants.

10    But the one that I find sticks in my mind is that when

11    you look at the figures -- and that was in table 9 -- when you

12    look at the figures that correspond to this graph of Dr.

13    Okongwu's, that corresponds to someone -- and you will remember

14    this testimony -- someone in 2010 being able to enter into a

15    contract to buy a barrel of oil 20 years later for 50 cents.

16    And he didn't do that computation at the time he did his

17    valuations.  He heard about it when Dr. Sundaram testified at

18    his deposition, and then he did those computations.

19    And Dr. Okongwu, does he admit a mistake?  No.  He

20    says, oh, but that's only one of them; that's only the first

21    transaction; the other transactions are more in line because

22    they're between $5 and $9.  Well, it's also absurd to think

23    that in 2001, when the price of oil was about $27 a barrel,

24    that 20 years later you could buy that same barrel of oil --

25    that you could enter into a contract in 2001 to buy that barrel

1   of oil 20 years later for $5 or 6.  But Dr. Okongwu does not

2   admit mistakes; he sticks by his guns.

3        And I think you may remember Dr. Sundaram also

4   testified that convenience yield has been negative for most of

5   the last seven years, so convenience yield can be negative in

6   oil, notwithstanding the fact that convenience yield is often

7   observed for oil.

8        Dr. Okongwu's valuations defy common sense.  We showed

9   you some examples of what the maximum pay-out was compared to

10  what his valuations were.  I have another way of looking at it.

11  You remember that each payment, the maximum was $15, and

12  they're twice a year.  So, in one year the maximum pay-out

13  would be $30.  For 46,000 warrants, if you have the maximum

14  pay-outs for one year, that would be $1,380,000 in one year for

15  these 46,000 warrants.  That's just arithmetic, 30 times

16  46,000.

17       Dr. Okongwu's valuation for the entire 20 year period

18  is less than $300,000, which is less than one fourth of what

19  the warrants would pay in one of those years only.  I think

20  it's clear that Dr. Okongwu selected for the subjective

21  elements that go into his valuation the most extreme

22  assumptions that he felt he could justify to drive down the

23  value as much as possible.

24       Now we get to the point of how are you going to

25  decide.  I'm going to ask you not to be like Solomon, not to

F637CLA3                    Summation - Domb

1   split the baby.  This is not a case where one expert says this

2   much, another expert says that much, how are we going to know,

3   let's split the baby.  That's not the result that we think is

4   correct, and there is a couple of reasons for that.  The first

5   reason is a very important legal principle.  If damages are

6   difficult to calculate precisely -- which is true in this case.

7   We're valuing something based on unknown future events.

8           MR. LEVINE:  Objection.  That's not the standard and

9   not what you are going to be charging the jury.

10           THE COURT:  Please continue.  Adhere to the charge.

11           MR. DOMB:  As I said before, when I speak about a

12   legal principle, it's my understanding of it.  Judge Woods will

13   instruct on the law, and if I am wrong, you disregard what I

14   said.  I'm trying to explain it as best I can in my words.

15           If damages are difficult to calculate precisely, it's

16   the wrongdoer that bears the burden of the uncertainty.  It's

17   the party that breached, not the wronged party.

18           Our clients are the wronged parties.  So long as our

19   clients put forth an estimate of damages that rests on a stable

20   foundation, then we are entitled to those damages.  If you find

21   that Dr. Sundaram's valuation is a reasonable estimate that

22   rests on a stable foundation, it doesn't matter if Natixis'

23   expert Dr. Okongwu came up with another reasonable estimate

24   that also rests on a stable foundation.  Under that legal

25   principle the burden of the uncertainty falls on Natixis, not

1    on us.  So, that's the reason I don't want -- and I don't think

2    it would be right for the jury to compromise and split the

3    baby.

4              And there is another reason.  The law says that our

5    clients are entitled to damages -- if you find that we are

6    entitled to damages -- as of the breach dates and, therefore,

7    we cannot argue for anything else other than the breach dates.

8    But there was an upside to these warrants.  That was the whole

9    point of the warrants, and I think Natixis' expert -- or

10   Mr. Fitting described it.

11             MR. LEVINE:  Objection, your Honor.

12             THE COURT:  Let him continue.  Please continue.  I

13   would like to hear the statement.

14             MR. DOMB:  The warrants had a lot of potential value.

15   It could be a lot, it could be a little.  But it's undeniable

16   that they had a lot of potential value, and by not delivering

17   those warrants to us on the dates of breach, Natixis deprived

18   our clients of the potential value of those warrants.

19             Now in closing I want to display visual aid 4, please.

20   These are the four tables, the four variations that professor

21   Sundaram came up with.  And I don't know if any of you are

22   taking notes.  Judge Woods say you may.  In case you are not

23   taking notes, I know I read these into the record, but I want

24   to make sure you know what we're asking for.  And I am going to

25   read into the record now.  Judge woods said when you deliberate

F637CLA3                    Summation - Mr. Domb

1   nobody can remember these figures, how are you going to fill

2   out a jury form.  So, if you have trouble remembering the

3   figures, I am going to read them into the record now, and they

4   will be easy to find.

5           As you recall, our claim is in table 2, and that's for

6   the reason I said about the PPI before.  So, with respect to

7   the February 11, 2000 transaction involving 5,000 warrants, we

8   ask that you award Clarex $797,990.

9           With respect to the August 27, 2001 transaction we ask

10  that you award Clarex $1,784,528.

11          With respect to the August 31, 2001 transaction we ask

12  that you award Betax $794,682.

13          With respect to the September 10, 2001 transaction we

14  ask that you award Clarex $1,199,260.

15          And finally, with respect to the September 13, 2001

16  transaction we ask that you award Clarex $944,088.

17          I give you my final thanks, and I ask you to listen

18  carefully to Judge Woods' legal instructions, after which we

19  will await your just verdict.  Thank you.

20          THE COURT:  Thank you, Mr. Domb.

21          So, ladies and gentlemen of the jury, it is now almost

22  noon.  The next step in this proceeding is I am going to read

23  you a series of instructions that will guide your deliberations

24  as you consider the evidence that you have heard here in light

25  of the arguments just given to you by counsel.  Because I think

1   that that's something that I'd like you to have full focus and

2   attention on, I'm going to suggest that we take our lunch break

3   now, and that we come back in half an hour so that you can

4   listen to the instructions with complete focus.

5              So, this is going to be particularly difficult perhaps

6   for you now, having heard the arguments and all of the

7   evidence, but I'm going to ask again for this one last lunch

8   break that you not discuss the case amongst yourselves.  You

9   have not yet been charged, so please do not discuss the case

10  amongst yourselves.  Again, don't research it.

11             After you come back from the lunch break, I will give

12  you your instructions, and then you will proceed to deliberate

13  the case.  So, please don't discuss it yet, but I will see you

14  back here at 12:30 for the instructions.  Thank you.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury not present)

 2          THE COURT:  Thank you both very much.  Those were nice

 3     closing arguments; I appreciate it.  I am going to ask us to

 4     take a recess for half an hour, come back here at 12:30, and we

 5     will go through the instructions and charge the jury.

 6          Yes, Mr. Levine?

 7          MR. LEVINE:  In light of what Mr. Domb's what I would

 8     describe as misrepresentation of the jury charges on damages, I

 9     would request that you insert the language we were proposing

10     yesterday, directing the jury that they are not required to

11     take the number of either expert, that they are entitled to

12     determine whatever measure of damages they deem appropriate, as

13     long as it is consistent and supported by the evidence.

14          The way Mr. Domb spoke to them is as if you can pick

15     one or the other, and all you have to do, if there is an

16     ambiguity, you have to go with us.  It's not a baseball

17     arbitration.  This was the exact issue we raised, and I think

18     Mr. Domb has created the problem for himself, and we would ask

19     that that be put in.

20          MR. DOMB:  Your Honor, I disagree.  As part of my

21     argument I told the jury what I am asking them to do.  I did

22     not characterize that as the law at all.  And what you inserted

23     yesterday I think is sufficient, and it would be prejudicial

24     for us if you were to somehow instruct contrary to the argument

25     that I made, which is fair argument.
```

1          THE COURT:  OK, thank you.

2          I'm going to decline to change the draft charges for a

3   couple of reasons:  One, the instructions already include a

4   lengthy and agreed-upon section regarding how expert witnesses'

5   testimony is to be evaluated, which takes into account exactly

6   the kind of concern, Mr. Levine, that you are describing, i.e.,

7   how is it that the jurors are to weigh the evidence.

8          In addition, Section G of the jury instructions also

9   direct the jurors on how to weigh the evidence.  In both cases

10  I think it's clear that they are not required to act in a

11  non-Solomonic way, as requested by Mr. Domb, to split the baby.

12         I did address the specific request that you had

13  yesterday, Mr. Levine, by essentially reasserting or reminding

14  the jurors of that fact after the damages section of the

15  instructions.  However, the law regarding how they are to

16  approach damages is very clear.  I don't want to change the --

17  and I think that we have agreed on what the law is.  I don't

18  want to change the instructions to spin how they should be

19  approaching the law.  I'd rather them be guided by the general

20  instructions regarding evaluation of evidence and expert

21  testimony generally.

22         I didn't stop you, Mr. Domb, with respect to your

23  characterization of the damages calculation because I didn't

24  think that you strayed from what is actually in the charges on

25  that count.

1              So, I'm not going to make the adjustment that you are

2     asking, Mr. Levine, which I don't interpret as a request to

3     change the instructions of the law with respect to calculation

4     of damages, but, rather, to just point them back to the fact

5     that they balance, and they must balance as the evidence as

6     triers of fact.

7              Anything else before we break?  OK.  Thank you.  I

8     will see you here promptly at 12:30.

9              (Luncheon recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                A F T E R N O O N   S E S S I O N

2                         12:30 p.m.

3          (Jury present)

4          THE COURT:  Please be seated.

5          Thank you again, ladies and gentlemen of the jury.  I

6     am going to ask my deputy Mr. Daniels to hand you each a copy

7     of a jury charge, which I'm also going to ask Mr. Daniels to

8     mark as Court Exhibit 1.

9          As he is handing that out, I'm going to explain to you

10    what I'm going to do now, which is basically read these out

11    loud to you.  I am going to be reading verbatim what it is

12    that's written on those sheets.  You should listen to me.  Some

13    of you may be oral learners, some of you may like reading

14    things, so I give you the option.  If you'd like to follow

15    along on the text, feel free.  If you would like to just listen

16    to what I have to say, please just listen to me.

17         When you retire to begin your deliberations, I'm going

18    to send back copies of these charges with you so that you can

19    refer to them during your deliberations.

20         Members of the jury, you have now heard all of the

21    evidence in the case.  We have now reached that point where you

22    are about to begin your final function as jurors which, as you

23    all appreciate, is one of the most important duties of

24    citizenship in this country.

25         It is my duty at this point to instruct you as to the

1    law.  My instructions will be in four parts.  First, I will

2    start with some general introductory instructions about the

3    role of the court and the jury, evaluating evidence, and the

4    burden of proof.  Second, I will describe the law to be applied

5    to the facts as you find them to be established by the proof.

6    Third, I will give you instructions concerning the evaluation

7    of evidence.  The fourth and final section of these

8    instructions will relate to your deliberations.

9         It is your duty to accept these instructions of law

10   and apply them to the facts as you determine them, just as it

11   has been my duty to preside over the trial and decide what

12   testimony and evidence is relevant under the law for your

13   consideration.  On these legal matters, you must take the law

14   as I give it to you.  If any attorney has stated a legal

15   principle different from any that I state to you in my

16   instructions, it is my instructions that you must follow.

17        You should not single out any instruction as alone

18   stating the law, but you should consider my instructions as a

19   whole when you retire to deliberate in the jury room.  You

20   should not be concerned about the wisdom of any legal rule that

21   I state.  Regardless of any opinion that you may have as to

22   what the law may be -- or ought to be -- it would violate your

23   sworn duty to base a verdict upon any view of the law other

24   than the one that I give you.

25        Because my instructions cover many points, you have

1    been handed a copy of the instructions I will read.  You should

2    feel free to read along or just to listen to me.  You will be

3    able to take your copy of the instructions into the jury room.

4           You, the members of the jury, are the sole and

5    exclusive judges of the facts.  You pass judgment upon the

6    evidence.  You determine the credibility of the witnesses.  You

7    resolve such conflicts as there may be in the testimony.  You

8    draw whatever reasonable inferences you decide to draw from the

9    facts as you have determined them, and you determine the weight

10   of the evidence.  You should not take anything that I may have

11   said or done during the trial as indicating what I think of the

12   evidence or what your verdict should be.

13          In determining the facts, remember that you took an

14   oath to render judgment impartially and fairly, without

15   prejudice or sympathy, based solely on the evidence and the

16   applicable law.  You are to evaluate the evidence calmly and

17   objectively, without prejudice or sympathy.  You are to be

18   completely fair and impartial.  Your verdict must be based

19   solely on the evidence developed at this trial, or the lack of

20   evidence.

21          This case should be decided by you as an action

22   between parties of equal standing in the community, of equal

23   worth, and holding the same or similar stations in society.

24   The plaintiffs, Clarex and Betax, are corporations.  The

25   defendant, Natixis, is also a corporation.  As I explained at

1    the beginning of the trial, Natixis and certain predecessor

2    entities were previously known by different names, such as

3    Arnold and S. Bleichroeder, Inc., and these other names are

4    also listed as defendants, which were also corporations.  The

5    mere fact that a party is a corporation does not mean that it

6    is entitled to any lesser or greater consideration than you

7    would give to any other party.  It is your decision, after

8    reviewing all of the evidence, whether to accept or reject all

9    or parts of the testimony of all of the witnesses, and to give

10   the testimony whatever weight, if any, you find it deserves.

11   Moreover, the fact that the plaintiffs are foreign corporations

12   does not entitle them to any lesser or greater consideration by

13   you.  You must treat all parties to a litigation fairly.

14          As I have told you many times, in reaching a verdict,

15   you must consider only the evidence you have seen and heard in

16   this courtroom.  In determining the facts, you must rely upon

17   your own recollection of the evidence.

18          Evidence consists of the testimony of witnesses,

19   including any excerpts of deposition testimony that were read

20   into the record.  Evidence also includes the exhibits that have

21   been received.  Evidence also includes any facts that the

22   lawyers stipulate to or that the court may instruct you to

23   find.  The attorneys in this case entered into a stipulation

24   agreeing to certain facts.  This means that there is no dispute

25   as to these facts and these facts are established for the

purpose of this case.  You must consider the agreed facts along

with all of the other evidence presented and give the agreed

facts such weight as you find appropriate.  Finally, evidence

also includes all facts admitted in response to a request for

admission.  Requests for admission are written statements of

fact submitted by one party prior to trial to the opposing

party.  The opposing party has a certain amount of time in

which to respond to the requests.  You must assume the facts

admitted by the recipient of a request to admit are true.

Therefore, you are not permitted too disregard or disbelieve

the contents of these requests, even in light of any other

evidence presented.  The requests admitted in evidence are

binding and conclusive on the defendant for the purposes of

this trial.

          Nothing else is evidence.  The statements and

arguments made by the lawyers are not evidence, because the

lawyers are not witnesses.  Their arguments are intended to

convince you what conclusions you should draw from the evidence

or lack of evidence.  Now, those arguments are important.  You

should evaluate them carefully.  But you must not confuse them

with evidence.  As to what the evidence was, it is your

recollection that governs, not the statements of the lawyers.

          A question put to a witness -- whether asked by a

lawyer or by me -- is never evidence.  It is the answer to the

question that is evidence.  One exception to this is that you

1    may not consider any answer that I have directed you to

2    disregard or that I ordered to be stricken from the record.

3    You are not to consider such answers.

4         Finally, any statements that I may have made during

5    the trial do not constitute evidence.  Similarly, any

6    statements or rulings that I have made during the trial, are

7    not any indication of my views of what your decision should be.

8    The decision here is for you alone.

9         All this means, of course, that anything you may have

10   seen or heard outside the courtroom is not evidence and must be

11   disregarded.  You are to decide the case solely on the evidence

12   presented here in the courtroom.

13        There are two types of evidence that you may properly

14   use in reaching your verdict.  Direct evidence is direct proof

15   of a fact, such as when a witness testifies to a fact based on

16   what he or she personally saw, heard, or observed.  In other

17   words, when a witness testifies about a fact in issue that is

18   known of the witness's own knowledge -- by virtue of what he or

19   she sees, feels, touches or hears -- that is called direct

20   evidence of that fact.  Direct evidence may also be in the form

21   of an exhibit.

22        Circumstantial evidence is proof of facts from which

23   you may infer or conclude that other facts exist.  The word

24   "infer" or the expression "to draw an inference" means to find

25   that a fact exists from proof of another fact.  In deciding

1    whether to draw an inference, you must look at all and consider

2    all of the facts in the light of reason, common sense, and

3    experience.  Whether a given inference is or is not to be drawn

4    is entirely a matter for you the jury to decide.

5    Circumstantial evidence does not necessarily prove less than

6    direct evidence, nor does it necessarily prove more.

7            I will repeat the example I gave at the beginning of

8    trial to help you think about the difference between direct and

9    circumstantial evidence.  Assume that when you came into the

10   courthouse this morning the sun was shining and it was a nice

11   dry day outdoors.  Also assume that the courtroom blinds were

12   drawn and that you cannot look outside.  Assume further that,

13   as were you sitting here, someone walked in with an umbrella

14   that was dripping wet and then, a few minutes later, somebody

15   else walked in with a raincoat that was also dripping wet.

16           Now, because you could not look outside the courtroom

17   and you could not see whether it was raining, you would have no

18   direct evidence of the fact that it was raining.  But, on the

19   combination of facts that I have asked you to assume, it would

20   be reasonable and logical for you to conclude that it was

21   raining.

22           That's all there is to circumstantial evidence.  You

23   infer on the basis of reason, experience, and common sense from

24   one established fact the existence or nonexistence of some

25   other fact.  The matter of drawing inferences from facts in

1   evidence is not a matter of guesswork or speculation.  An

2   inference is a logical, factual conclusion that you might

3   reasonably draw from other facts that have been proven.

4          Circumstantial evidence is of no less value than

5   direct evidence.  The law makes no distinction between the two,

6   but simply requires that you, the jury, decide the facts in

7   accordance with all the evidence, both direct and

8   circumstantial.

9          Counsel have not only the right, but the duty to make

10  legal objections when the other side offers testimony or other

11  evidence which the attorney believes is not properly

12  admissible.  Therefore, you should draw no inference or

13  conclusion for or against any party based on the fact that

14  there is an objection to any evidence.  Nor should you draw any

15  inference from the fact that I sustained or overruled an

16  objection.  Simply because I have permitted certain evidence to

17  be introduced does not mean that I have decided on its

18  importance or significance.  That is for you to decide.

19         Counsel also have the right and the duty to ask the

20  court to make rulings of law and to request conferences out of

21  the hearing of the jury.  These conferences involve legal and

22  procedural rulings, and none of the events related to these

23  conferences should enter into your deliberations at all.  You

24  should not show any prejudice against an attorney or his client

25  because the attorney objected to the admissibility of evidence,

or asked for a conference out of the hearing of the jury or
asked the court for a ruling on the law.

At times I may have admonished a witness or directed a
witness to be responsive to questions or to keep his or her
voice up.  At times I may have asked questions myself.  Any
questions that I asked, or instructions that I gave, were
intended only to clarify the presentation of evidence and to
bring out something that I thought might be unclear.  You
should draw no inference or conclusion of any kind, favorable
or unfavorable, with respect to any witness or any party in the
case, by reason of any comment, question, or instruction of
mine.  Nor should you infer that I have any views as to the
credibility of any witness, as to the weight of the evidence,
or as to how you should decide any issue that is before you.
That is entirely your role.

You have had the opportunity to observe the witnesses.
It is now your job to decide how believable each witness is in
his or her testimony.  You are the sole judges of the
credibility of each witness and of the importance of his or her
testimony.

How do you determine where the truth lies?  You should
carefully scrutinize all of the testimony of each witness, the
circumstances under which each witness testified, the
impression that the witness made when testifying, and any other
matter in evidence that may help you decide the truth and the

importance of each witness's testimony.  In other words, what
you must try to do in deciding credibility is to size a witness
up in light of his or her testimony, the explanations given,
and all of the other evidence in the case.

Few people recall every detail of every event
precisely the same way.  A witness may be inaccurate,
contradictory, or even untruthful in some respects and yet
entirely believable and truthful in other respects.  It is for
you to determine whether such inconsistencies are significant
or inconsequential.

There is no magic formula to evaluate evidence.  You
should use all the tests for truthfulness that you would use in
determining matters of importance to you in your everyday life.
Please remember, however, that you may not use your experience
and common sense to fill in or create evidence that does not
exist.  You use them only to draw reasonable inferences from
proven facts or to weigh and evaluate the evidence provided
during the trial.

The law does not require you to accept all of the
evidence admitted at trial.  In determining what evidence you
accept, you must make your own evaluation of the testimony from
each of the witnesses and the exhibits that are received in
evidence.  If you find that a witness has testified falsely as
to any material fact, or if you find that a witness has been
previously untruthful when testifying under oath or otherwise,

you may reject that witness's testimony in its entirety, or you

may accept only those parts that you believe to be truthful or

that are corroborated by other independent evidence in the

case.

       If you find that a witness is intentionally telling a

falsehood, that is always a matter of importance that you

should weigh carefully.  Yet, a witness may be inaccurate,

contradictory, or even untruthful in some respects and entirely

believable and truthful in other respects.  It is for you to

determine whether such inconsistencies are significant or

inconsequential and whether to accept or reject all or to

accept and reject a portion of the testimony of any witness.

You are not required to accept testimony even though the

testimony is uncontradicted and the witness's testimony is not

challenged.  You may decide because of the witness's bearing or

demeanor, or because of the inherent improbability of the

testimony, or for other reasons sufficient to yourselves, that

the testimony is not worthy of belief.

       You have heard evidence that, at some earlier time,

witnesses have said or done something that counsel argues is

inconsistent with their trial testimony.  Evidence of prior

allegedly inconsistent statements was introduced to help you

decide whether to believe the trial testimony of a witness.  If

you find that I a witness made an earlier statement that

conflicts with the witness's trial testimony, you may consider

 1    that fact in deciding how much of the witness's trial

 2    testimony, if any, to believe.

 3              In making this determination, you may consider whether

 4    the witness purposely made a false statement, or whether it was

 5    an innocent mistake.  You may also consider whether the

 6    inconsistency concerns an important fact or merely a small

 7    detail, as well as whether the witness had an explanation for

 8    the inconsistency and, if so, whether that explanation appealed

 9    to your common sense.

10              In evaluating the credibility of the witnesses, you

11    should take into account any evidence that a witness may

12    benefit in some way from the outcome of the case.  Such

13    interest in the outcome creates a motive to testify falsely and

14    may sway a witness to testify in a way that advances his or her

15    own interests.  Therefore, if you find that any witness whose

16    testimony you are considering may have an interest in the

17    outcome of this trail, then you should bear that factor in mind

18    when evaluating the credibility of his testimony, and accept it

19    with great care.

20              Keep in mind, though, that it does not automatically

21    follow that testimony given by an interested witness is to be

22    disbelieved.  There are many people who, no matter what their

23    interest in the outcome of the case may be, would not testify

24    falsely.  It is for you to decide, based on your own

25    perceptions and common sense, to what extent, if at all, the

1   witness's interest has affected his or her testimony.

2           In this case, I permitted certain witnesses to express

3   their opinions about matters that are in issue.  A witness may

4   be permitted to testify to an opinion on those matters about

5   which he or she has special knowledge, skill, experience and

6   training.  Such testimony is presented to you on the theory

7   that someone who is experienced and knowledgeable in the field

8   can assist you in understanding the evidence or in reaching an

9   independent decision on the facts.

10          In weighing this opinion testimony, you may consider

11  the witness's qualifications, his or her opinions, the reasons

12  for testifying, as well as all of the other considerations that

13  ordinarily apply when you are deciding whether or not to

14  believe a witness's testimony.  You may give the opinion

15  testimony whatever weight, if any, you find it deserves in

16  light of all of the evidence in this case.  You should not,

17  however, accept opinion testimony merely because I allowed the

18  witness to testify concerning his or her opinion.  Nor should

19  you substitute it for your own reason, judgment and common

20  sense.  The determination of the facts in this case rests

21  solely with you.

22          In this case, you have heard testimony of two

23  witnesses who have been called by both sides to give their

24  opinion about the value of the warrants at the time of the

25  transactions at issue.  The testimony of these witnesses is in

1    conflict.  They disagree.  You must remember that you are the

2    sole trier of the facts, and their testimony relates to a

3    question of fact -- that is, the value of the warrants; so, it

4    is your job to resolve the disagreement.

5         The way you resolve this conflict between these

6    witnesses is the same way that you decide other fact questions

7    and the same way you decide whether to believe ordinary

8    witnesses.  In addition, since they gave their opinions, you

9    should consider the soundness of each opinion, reasons for the

10   opinion and the witness's motive, if any, for testifying.  You

11   may give the testimony of each of these witnesses such weight,

12   if any, that you think it deserves in light of all of the

13   evidence.  You should not permit a witness's opinion testimony

14   to be a substitute for your own reason, judgment and common

15   sense.  You may reject the testimony of any opinion witness in

16   whole or in part, if you conclude the reasons given in support

17   of an opinion are unsound or, if you, for other reasons, do not

18   believe the witness.  The determination of the facts in this

19   case rests solely with you.

20        The law does not require any party to call as

21   witnesses all persons who may have been present at any time or

22   place involved in the case, or who may appear to have some

23   knowledge of the matters at issue in this trial.  Nor does the

24   law require any party to produce as exhibits all papers and

25   things mentioned in the evidence in the case.  You are not to

1    rest your decision on what some absent witness who was not

2    brought in might have testified to, or what he or she might not

3    have testified to.  No party has an obligation to present

4    cumulative testimony.

5         Before I instruct you on the issues you must decide, I

6    want to define for you the standard under which you will decide

7    whether a party has met his or her burden of proof on a

8    particular issue.  The standard that applies in this case is

9    the preponderance of the evidence.

10        To establish a fact by a preponderance of the evidence

11   means to prove that the fact is more likely true than not true.

12   A preponderance of the evidence means the greater weight of the

13   evidence.  This means that the party with the burden of proof

14   must produce evidence that, considered in light of all of the

15   facts, leads you to believe that what that party claims is more

16   likely true than not.  It refers to the quality and

17   persuasiveness of the evidence, not to the number of witnesses

18   or documents, or the length of time taken by either side.  In

19   determining whether a claim or fact has been proven by a

20   preponderance of the evidence, you may consider the relevant

21   testimony of all witnesses, regardless of who may have called

22   them, and all the relevant exhibits received in evidence,

23   regardless of who may have produced them.

24        The concept of preponderance of the evidence is often

25   illustrated with the idea of scales.  You put on one side all

1  of the credible evidence favoring one party and on the other

2  all of the credible evidence favoring the other.  So long as

3  you find that the scales tip, however slightly, in favor of the

4  party with the burden of proof -- that what the party claims is

5  more likely true than not true -- then that element will have

6  been proved by a preponderance of the evidence.

7       If you find that the credible evidence on a given

8  issue is evenly divided between the parties -- that is that it

9  is equally probable that one side is right as it is that the

10  other side is right -- then you must decide that issue against

11  the party having this burden of proof.  That is because the

12  party bearing this burden must prove more than simple equality

13  of evidence -- the party must prove the element at issue by a

14  preponderance of the evidence.  On the other hand, the party

15  with this burden of proof need prove no more than a

16  preponderance.

17       It is important to remember that this is a civil case.

18  You may have heard of the "beyond a reasonable doubt" standard

19  in criminal cases.  That requirement does not apply to a civil

20  case, and you should put it entirely out of your mind.

21       Members of the jury, I am now going to instruct you on

22  the substantive law to be applied to this case.

23       As you have heard, Clarex and Betax seek to recover

24  damages for breach of contract.  Plaintiffs claim that they

25  entered into five contract with Natixis in five separate

transactions:

      1.  February 8, 2000 for 5,000 warrants;

      2.  August 22, 2001 for 16,000 warrants;

      3.  August 28, 2001 for 7,000 warrants;

      4.  September 5, 2001 for 10,000 warrants; and

      5.  September 10, 2001 for 8,000 warrants.

And that Natixis breached each of those contracts. Betax was involved in the transaction of August 28, 2001 for 7,000 warrants; Clarex was involved in the rest of the transactions.

Plaintiffs have the burden of proving four elements by a preponderance of the evidence.  First, that the plaintiff had a contract with Natixis to deliver the warrants in the transaction you are considering; second, that the plaintiff did what it was required to do under the contract that you are considering; third, that Natixis breached the contract by not doing what it was required to do under the contract you are considering; and, fourth, that the plaintiff was damaged because of Natixis' breach.  In this case, the parties have agreed that Natixis had contracts with the plaintiffs to deliver the warrants at issue, that the plaintiffs performed their obligations under the contracts, and that Natixis breached its contracts with plaintiffs by failing to deliver the warrants at issue.  Therefore, all elements of the plaintiffs' claims for breach of contract are established

1    except for the amount of each plaintiff's damages.

2           Natixis has raised a statute of limitations defense

3    with respect to one transaction involving the warrants and the

4    defense of impossibility with respect to all five transactions.

5    Therefore, you must next consider Natixis' statute of

6    limitations defense for the February 8, 2000 transaction and

7    you must consider Natixis' defense of impossibility for all

8    five transactions.  If you find that these defenses do not

9    apply to any one of the transactions, you will then go on to

10   consider whether plaintiff was damaged in that transaction, and

11   if so, the amount of damages suffered by the plaintiff in that

12   transaction.

13          The law specifies how much time a plaintiff has to

14   bring certain kinds of claims.  These laws are called statutes

15   of limitations.  In a contract case such as this, the New York

16   statute of limitations provides that a claim must be brought

17   within six years of the date of the breach of contract.  This

18   means that a plaintiff cannot recover on a contract claim

19   brought more than six years after the date of the breach, even

20   if the claim is only a day late.

21          Here, plaintiffs brought this case on October 24,

22   2012, which is more than six years after all of the

23   transactions at issue in this case.  However, as you have

24   heard, the parties earlier entered into a series of "tolling

25   agreements," which stopped the running of the statute of

1    limitations for four of the five transactions at issue.

2    Therefore, there is no dispute that the claims related to four

3    of the five transactions at issue here -- the transactions that

4    took place on August 22, August 28, September 5, and September

5    10, 2001 -- were all brought on time.

6           The parties did not, however, enter into a tolling

7    agreement related to the 5,000 warrants at issue in the

8    transaction of February 8, 2000.  Natixis asserts as a defense

9    that the six year statute of limitations bars Clarex's claim

10   based on the 5,000 warrants at issue in the transaction of

11   February 8, 2000.  Clarex argues that Natixis was obligated to

12   deliver those 5,000 warrants on February 11, 2000.  The court

13   has already determined that the statute of limitations began to

14   run on Clarex's claim on February 11, 2000.  Therefore,

15   ordinarily, the six year statute of limitations would have

16   expired on February 11, 2006.  Because Clarex started this

17   action after that date, on October 24, 2012, Natixis argues

18   that Clarex's claim regarding the 5,000 warrants is

19   time-barred.

20          Clarex asserts that its claim for the 5,000 warrants

21   is timely because of New York General Obligations Law Section

22   17-101.  The statute reads, in relevant part that "An

23   acknowledgment or promise contained in a writing signed by the

24   party to be charged thereby is the only competent evidence of a

25   new or continuing contract whereby to take an action out of the

1    operation of the provisions of limitations of time for

2    commencing actions under the civil practice law and rules other

3    than an action for the recovery of real property."  In other

4    words, this law provides that a written acknowledgment of a

5    debt or promise to perform a previously defaulted contract can

6    restart the six-year limitations period for the plaintiff to

7    bring an action to enforce the obligation.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

        1    The acknowledgment or promise must have been

        2    communicated to the plaintiff or its representative at any time

        3    on or after October 24, 2006, six years before Clarex filed

        4    this lawsuit.  The parties do not dispute that Natixis sent to

        5    Clarex written account statements on or after October 24, 2006.

        6    Therefore, the question for you, the jury, to decide is whether

        7    these statements constituted an acknowledgment or promise to

        8    perform.

        9    In order to constitute an acknowledgment of a debt or

        10   promise to perform a previously defaulted contract, the writing

        11   must recognize an existing obligation to pay or perform and not

        12   contain anything inconsistent with an intention on the part of

        13   Natixis to perform.  The critical determination is whether the

        14   acknowledgment imports an intention to pay a debt or to perform

        15   its obligations under the defaulted contract.  The plaintiff,

        16   Clarex, bears the burden of proof of establishing by a

        17   preponderance of the evidence that the requirements of this law

        18   have been met.

        19   If you find that Natixis did not acknowledge a debt or

        20   promise to perform a previously defaulted contract with respect

        21   to the 5,000 warrants on or after October 24, 2006, then

        22   Clarex's claim is barred by the statute of limitations and you

        23   must find for Natixis on this claim and not consider it

        24   further.

        25   If you find that Natixis did acknowledge a debt or

1    promise to perform a previously defaulted contract with respect

2    to the 5,000 warrants on or after October 24, 2006, then you

3    must find that Clarex's claim is timely and is not barred by

4    the statute of limitations.

5            Natixis contends that even if you find that it had a

6    contractual obligation to deliver some or all of the warrants

7    to Clarex or Betax, its performance should be excused by the

8    legal doctrine of impossibility.  In order to establish

9    impossibility, Natixis has the burden of proving by a

10   preponderance of the evidence three elements:

11           1.  Performance of the contract or contracts was

12   objectively impossible at the time performance was due;

13           2.  The impossibility was caused by an unanticipated

14   event that could not have been reasonably foreseen or guarded

15   against in the contract; and

16           3.  Natixis did not cause the event that made

17   performance impossible.

18           Impossibility excuses a party's performance only when

19   the destruction of the subject matter of the contract or the

20   means of performance made performance objectively impossible.

21   That performance of the contract would be more difficult or

22   costly than anticipated does not excuse a party's performance

23   under the doctrine of impossibility.

24           Where impossibility or difficulty of performance is

25   occasioned only by financial difficulty or economic hardship,

1     even to the extent of insolvency or bankruptcy, performance is

2     not excused.  Furthermore, whether performance was impossible

3     is evaluated at the time performance was due.

4          You must determine the issue of impossibility

5     independently for each contract.  So, for example, you must

6     consider whether it was impossible to perform the February 8,

7     2000, contract at the time of that transaction settlement date,

8     which was three business days later, on February 11, 2000.

9          For the transaction of August 22, 2001, you must

10    consider whether it was impossible to perform that contract at

11    the time of that transaction settlement date, three business

12    days later, on August 27, 2001.  Likewise, for the three other

13    transactions, you must determine impossibility at the time of

14    each transaction's settlement at it.

15         If you decide that Natixis's performance under

16    contract was objectively impossible, was caused by an

17    unanticipated event that could not have been reasonably

18    foreseen or guarded against in the contract, and that Natixis

19    did not cause the event that made performance impossible, then

20    its obligation to deliver the warrants under that contract was

21    excused.  Therefore, Natixis would not be liable to Clarex or

22    Betax for the breach of that contract.

23         If you decide that Natixis's performance was not

24    excused by the doctrine of impossibility, you will find for

25    Clarex or Betax on that breach of contract claim and you will

1   go on to determine what amount of damages plaintiffs are

2   entitled to.

3         I will now instruct you on damages.

4         You should not infer that plaintiffs are entitled to

5   recover damages for their claims merely because I'm instructing

6   you on damages.  My instructions on damages are provided for

7   your guidance only in the event that you find in favor of the

8   plaintiffs on the issue of liability in accordance with my

9   other instructions.

10        There are two plaintiffs in this case.  You must

11  decide whether each plaintiff is entitled to damages.  As I

12  have already reminded you, Betax was involved in the August 22,

13  2001 transaction, while Clarex was involved in the other four

14  transactions.

15        Because you must treat each transaction independently,

16  you may award damages to one plaintiff, both plaintiffs, or

17  neither plaintiff.  Based on the evidence, you must decide

18  whether each plaintiff is entitled to damages and what amount

19  of damages is to be awarded.

20        If you find that Natixis is liable for breach of

21  contract, you must then determine whether plaintiffs have

22  sustained damages as a result of the breach and, if so, the

23  amount of plaintiffs' damages.

24        Damages in a contract action are calculated at the

25  time of breach and are meant to put the plaintiffs in the same

 1   position they would have been in had the contract been

 2   performed.  Thus, for any of the contracts at issue in this

 3   case, the measure of damages is the value of the warrants on

 4   the date Natixis was contractually required to have delivered

 5   them but did not.

 6        The value of the warrants at the time of breach takes

 7   expected future losses or profits into account.  Taking the

 8   first alleged breach of contract as an example, if you find

 9   that Natixis had a contractual obligation to deliver 5,000

10   warrants on February 11, 2000, then plaintiffs' damages are the

11   value of the 5,000 warrants on February 11, 2000.  You should

12   apply this approach independently to each of the five contracts

13   at issue, calculating damages on the date of breach for each of

14   the five contracts.

15        In deciding what the value of the warrants was on a

16   particular date, you should be guided by the evidence presented

17   in this case, including expert testimony, as you see fit.

18   Clarex and Betax have the burden of proving that they sustained

19   damages as a result of the breach.

20        If the plaintiffs showed they more likely than not

21   suffered damages, the amount of damages need only be proved

22   with reasonable certainty.  Let me read that again.  If the

23   plaintiffs show they more likely than not suffered damages, the

24   amount of damages need only be proved with reasonable

25   certainty.  Put differently, plaintiffs need only show a stable

1    foundation for the reasonable estimate of damages.

2          Where the existence of damage is certain and the only

3    uncertainty is the amount of damages, the burden of uncertainty

4    as to the amount of damage is upon the breaching party.  It is

5    the breaching party who must shoulder the burden of the

6    uncertainty regarding the amount of damages.

7          I remind you that you, the jury, are the sole triers

8    of fact, including the factual question of the value of the

9    warrants, and that in so doing you may give the opinion

10   testimony whatever weight, if any, you find it deserves in

11   light of all of the evidence in this case.

12         Members of the jury, that almost completes my

13   instructions to you.  You are about to go into the jury room to

14   begin your deliberations.  All of the evidence will be given to

15   you at the start of deliberations.  If you want any of the

16   testimony read, you may also request that.  Please remember

17   that it is not always easy to locate what you might want, so be

18   as specific as you possibly can in requesting exhibits or

19   portions of the testimony.

20         If you want any further explanation of the law as I

21   have explained it to you, you may also request that from the

22   Court.  If there is any doubt or question about the meaning of

23   any part of that charge, you should not hesitate to send me a

24   note asking for clarification or for further explanation.

25         Your requests for exhibits or testimony, in fact any

 1   communications with the Court, should be made to me in writing

 2   signed by your foreperson and given to one of the marshals.  I

 3   will respond to any questions or requests you have as promptly

 4   as possible, either in writing or by having you return to the

 5   courtroom so I can speak with you in person.

 6           If at any time you are not in agreement, you are not

 7   to reveal the standing of the jurors, that is, the split of the

 8   vote, to anyone, including me, at any time during your

 9   deliberations.  Do not ever indicate, in a note or otherwise,

10   what the vote is or which way the majority is leaning or

11   anything like that.  Nobody outside the jury should know how

12   the jury stands on any issue until a unanimous verdict is

13   reached.

14           Some of you may have taken notes periodically

15   throughout this trial.  I want to emphasize to you as you are

16   about to begin your deliberations that notes are simply an aid

17   to memory.  Notes that any of you may have made may not be

18   given any greater than the weight or influence in your

19   determination of the case than the recollections or impressions

20   of other jurors, whether from notes or memory, with respect to

21   the evidence presented or what conclusions, if any, should be

22   drawn from such evidence.

23           Any difference between a juror's recollection and

24   another juror's notes should be settled by asking to have the

25   court reporter read back the transcript, for it is the court

1    record rather than any juror's notes upon which the jury must

2    base its determination of the fact and its verdict.

3         To prevail, the plaintiffs or defendant must sustain

4    its burden of proof with respect to each element of their claim

5    or affirmative defense.  If you find that one of the plaintiffs

6    has succeeded, you should return a verdict in that plaintiff's

7    favor.  If you find that one of the plaintiffs has not

8    succeeded, then you should return a verdict for the defendant

9    on that claim.

10        With respect to the claim for the 5,000 warrants, if

11   you find that Clarex has not met its burden of showing that

12   Natixis acknowledged the debt, you must find that the statute

13   of limitations bars plaintiffs' claim and you must return a

14   verdict for Natixis.  Similarly, if you find that Natixis has

15   failed to sustain its burden with respect to its affirmative

16   defense based on the doctrine of impossibility, you must return

17   a verdict against Natixis on that defense.

18        Your verdict must be unanimous.  Each juror is

19   entitled to his or her own opinion, but you are required to

20   exchange views with your fellow jurors.  This is the very

21   essence of jury deliberation.  It is your duty as jurors to

22   consult with each other and to deliberate with a view to

23   reaching an agreement.  Each of you must decide the case for

24   yourself, but you should do so only after consideration of the

25   case with your fellow jurors.

1     As you deliberate, please listen to the opinions of

2     your fellow jurors and ask for an opportunity to express your

3     own views.  Every juror should be heard.  No one juror should

4     hold center stage in the jury room, and no one juror should

5     control or monopolize the deliberations.  You should all listen

6     to one another with courtesy and respect.

7     If, after stating your own view, and if, after

8     listening to your fellow jurors, you become convinced that your

9     view is wrong, do not hesitate because of stubbornness or pride

10    to change your view.  On the other hand, do not surrender your

11    honest convictions and beliefs concerning the weight or effect

12    of the evidence solely because of the opinions of your fellow

13    jurors or because you are outnumbered or for the mere purpose

14    of returning a verdict.  Your final vote must reflect your

15    conscientious belief as to how the issues should be decided.

16    Your verdict must be unanimous.

17    You are not to discuss the case until all jurors are

18    present.  Five or six or even seven jurors together is only a

19    gathering of individuals.  Only when all eight jurors are

20    present do you constitute a jury, and only then may you

21    deliberate.

22    Your first task will be to selected a foreperson.  The

23    foreperson does not have any more power or authority than any

24    other juror, and his or her vote or opinion does not count for

25    any more than any other juror's vote or opinion.  The

foreperson is merely your spokesperson to the Court. He or she

will send out any notes for the Court, and when the jury has

reached a verdict, he or she will notify the marshal and fill

out and sign the verdict form and give the verdict in open

court. If you do not wish to select a foreperson, Juror No. 1,

Ms. Morgan, will serve as foreperson by default.

Your verdict will be organized according to a verdict

form, a copy of which is attached to the end of these

instructions. You have all received the verdict forms. Do not

write on your individual copies of the verdict form. Mr.

Daniels will give the official verdict form to Juror No. 1.

You should give it to the foreperson after the foreperson has

been selected.

Mr. Daniels.

As you will see, the form contains a set of questions.

The purpose of the questions is to help us, the Court and the

parties, understand what your findings are. You should draw no

inference from the way the questions are worded as to what the

answers should be. The questions are not to be taken as any

indication that I have any opinion as to how they should be

answered.

Before the jury attempts to answer any question, you

should read the entire set of questions and make sure that

everybody understands each question. Before you answer the

questions, you should deliberate in the jury room and discuss

1    the evidence that relates to the questions you must answer.

2    When you have considered the questions thoroughly and the

3    evidence that relates to those questions, the foreperson should

4    record your answers and the date on the official form.

5              You should answer every question except where the

6    verdict form indicates otherwise.  You should also proceed

7    through the questions in the order in which they are listed.

8              After you have reached a verdict, the foreperson

9    should fill in the verdict sheet, sign and date it, and give a

10   note to the marshal outside your door stating that you have

11   reached a verdict.  Do not specify what the verdict is in your

12   note.

13             Finally, I say this not because I think it is

14   necessary but because it is the custom in this courthouse to

15   say it, you should treat each other with courtesy and respect

16   during your deliberations.  All litigants stand equal in this

17   room.  All litigants stand equal before the bar of justice.

18   All litigants stand equal before you.

19             Your duty is to decide between these parties fairly

20   and impartially and to see that justice is done.  Under your

21   oath as jurors, you are not to be swayed by sympathy.  You

22   should be guided solely by the evidence presented during the

23   trial and the law as I gave it to you without regard to the

24   consequences of your decision.

25             You have been chosen to try the issue of fact and

1   reach a verdict on the basis of the evidence or lack of

2   evidence.  If you let sympathy interfere with your clear

3   thinking, there is a risk that you will not arrive at a just

4   verdict.  All parties to a civil lawsuit are entitled to a fair

5   trial.  You must make a fair, impartial decision so that you

6   will arrive at the just verdict.

7            Members of the jury, that concludes my instructions to

8   you.  I ask your patience for just a few moments longer.  It is

9   necessary for me to spend a few moments with the parties and

10  the court reporter at the side bar.  I ask you to remain

11  patiently in the jury box without speaking to each other

12  because the case has not yet been formally submitted to you.

13  We will return in just a moment to submit the case to you.

14  Thank you.

15           (At the side bar)

16           THE COURT:  Any reason why I should not now submit the

17  case to the jury?

18           MR. LEVINE:  No.

19           MR. DOMB:  No, your Honor.

20           THE COURT:  Thank you.

21           (In open court)

22           THE COURT:  The marshal will now be sworn.

23           (Marshal sworn)

24           THE COURT:  Members of the jury, you may now retire to

25  deliberate.

 1                  (1:20 p.m., the jury commenced deliberations.)

 2                  (Jury not present)

 3                  THE COURT:  Thank you very much.  Now we wait.  Mr.

 4     Daniels just handed the jurors the exhibits that were

 5     introduced into evidence during the course of the trial.  Have

 6     you shown the parties the list of exhibits that you have been

 7     tracking?  Would you mind conferring with them to make sure we

 8     don't have a disconnect with respect to the list.

 9                  Secondly, in the event that there are any notes from

10     the jury, I'd like to ask for some lawyer from each side to be

11     within a short phonecall of the courthouse.  I'd like to

12     respond to any note that they send out as promptly as possible.

13     I don't expect you necessarily to sit here, though, for the

14     entire time.  Can you be ready so that if you get a phonecall

15     from me, somebody can be here within 15 minutes in the event

16     that any note comes?

17                  MR. LEVINE:  Yes.

18                  MR. DOMB:  I assume you need our cell phone numbers.

19                  THE COURT:  I will need your cell phone numbers.  Mr.

20     Daniels will collect those now.

21                  Thank you.  Is there anything else?  If not, I'm going

22     to take a recess until we hear back from our jurors.

23                  (Recess)

24                  (1:45 p.m., jury not present)

25                  THE COURT:  I have received a note from the jury.  I

1    am going to mark it as Court Exhibit 2.  I am going to read it.

2    Please let me know if you have any comments.

3              "Please provide transcript from Mr. Domb's closing

4    statement regarding what his clients are asking for in damages

5    by transaction totaling $5,520,548."  Mr. Daniels, please hand

6    this to the parties.

7              MR. LEVINE:  I have no problem.

8              THE COURT:  Is the reporter capable of reading back to

9    the jurors selections from Mr. Domb's closing statement?

10             MR. DOMB:  Your Honor, would it be OK to print that

11   part of the record, since it is part of the record?  It is just

12   like a portion of the page.

13             THE COURT:  I wouldn't object to that.  The question

14   is whether or not we could print out that portion of the

15   record.

16             MR. LEVINE:  I would rather have it read.

17             THE COURT:  Thank you.  We will read it to them when

18   they come back in.  They can take notes.

19             MR. DOMB:  In that case I would ask that the jurors be

20   provided with pads and pencils.  No one can memorize those

21   numbers.

22             THE COURT:  Mr. Daniels will provide the jurors when

23   they come in.

24             (Jury present)

25             THE COURT:  You may be seated.  Ladies and gentlemen

```
 1   of the jury, thank you for your note.  Instead of providing the

 2   written transcript of that portion of Mr. Domb's closing

 3   argument, I am going to ask the court reporter to read that

 4   section of the transcript to you verbatim.  To the extent that

 5   you do not all have notepaper and pen available, I am going to

 6   ask Mr. Daniels to make that available to you.

 7        I ask the court reporter please to read that back.

 8   The jurors have a notepad and paper, so please proceed.

 9        (Record read)

10        THE COURT:  May the record please reflect that the

11   jurors were just read the components of Mr. Domb's closing

12   statement regarding what his clients are asking for in damages

13   by transaction.

14        Jurors, thank you very much for your note.  If you

15   have any other questions for the Court as you continue

16   deliberations, please again submit a note to the marshal, and

17   we will reconvene so that I can answer it.  Thank you very

18   much.

19        (Jury not present)

20        THE COURT:  I have asked Mr. Daniels to mark this note

21   as Court Exhibit number 2.  I am handing it to Mr. Daniels.

22        Thank you very much.  I'm very appreciative of the

23   fact that you were all here to respond to the note.  I would

24   ask that you stay close by.  We are going to take a recess

25   until we get a note from the jury.  Thank you.
```

 1          (Recess)

 2          (3:25 p.m., jury not present)

 3          THE COURT:  I have received a note.  I am going to ask

 4   Mr. Daniels to mark as Court Exhibit number 3.  It reads, "We

 5   have reached a verdict."

 6          Mr. Daniels, would you mind please bringing the jurors

 7   in.

 8          One quick note as we are waiting for the jurors.  To

 9   ease the process, I'm going to read the verdict form.

10          (Jury present)

11          THE COURT:  Ladies and gentlemen of the jury, I

12   received your note.  I see that you have reached a verdict.

13   Can I ask, did you select a foreperson other than Ms. Morgan?

14   Who is you are foreperson.  Mr. Bahmer?

15          JUROR NO. 5:  Yes.

16          THE COURT:  Thank you.  Would you mind handing the

17   verdict form to Mr. Daniels.

18          To ease the process, first I'm going to ask Mr.

19   Daniels to mark this as Court Exhibit number 4.  Then I'm going

20   to read it.  After I have read it, I'm going to poll each of

21   the jurors individually and ask you if this represents your

22   verdict.

23          I'm reading from Court Exhibit 4.

24          "February 8, 2000 transactions for 5,000 warrants.

25          "1.  Has Clarex proven by a preponderance of the

evidence that the requirements of New York General Obligations

Law section 17-101 were satisfied with respect to this claim?

Yes.

"2.  Has Natixis proven by a preponderance of the

evidence that the failure to deliver the 5,000 Nigerian

warrants under this contract was excused by the doctrine of

impossibility?  No.

"3.  Has Clarex proven by a preponderance of the

evidence that it suffered damages as a result of Natixis's

breach of the contract for the 5,000 Nigerian warrants?  Yes.

"4.  What amount of damages is Clarex entitled to with

respect to this transaction?  $797,990.

"August 22, 2001, transaction for 16,000 warrants.

"5.  Has Natixis proven by a preponderance of the

evidence that the failure to deliver the 16,000 Nigerian

warrants under this contract was excused by the doctrine of

impossibility?  No.

"6.  Has Clarex proven by a preponderance of the

evidence that it suffered damages as a result of Natixis's

breach of the contract for the 16,000 Nigerian warrants?  Yes.

"7.  What amount of damages is Clarex entitled to with

respect to this transaction?  $1,784,528.

"August 28, 2001, transaction for 7,000 warrants.

"8.  Has Natixis proven by a preponderance of the

evidence that the failure to deliver the 7,000 Nigerian

1  warrants under this contract was excused by the doctrine of

2  impossibility?  No.

3        "9.  Has Betax proven by a preponderance of the

4  evidence that it suffered damages as a result of Natixis's

5  breach of contract of the contract for the 7,000 Nigerian

6  warrants?  Yes.

7        "10.  What amount of damages is Betax entitled to with

8  respect to this transaction?  $794,682.

9        "September 5, 2001, transaction for 10,000 warrants.

10        "11.  Has Natixis proven by a preponderance of the

11  evidence that the failure to deliver the 10,000 Nigerian

12  warrants under this contract was excused by the doctrine of

13  impossibility?  No.

14        "12.  Has Clarex proven by a preponderance of the

15  evidence that it suffered damages as a result of the Natixis's

16  breach of the contract for the 10,000 Nigerian warrants?  Yes.

17        "13.  What amount of damages is Clarex entitled to

18  with respect to this transaction?  $1,199,260.

19        "September 10, 2001, transaction for 8,000 warrants.

20        "14.  Has Natixis proven by a preponderance of the

21  evidence that the failure to deliver the 8,000 Nigerian

22  warrants under this contract was excused by the doctrine of

23  impossibility?  No.

24        "15.  Has Clarex proven by a preponderance of the

25  evidence that it suffered damages as a result of Natixis's

c63rclx4
974

1   breach of the contract for the 8,000 Nigerian warrants?  Yes.

2            "16.  What amount of damages is Clarex entitled to

3   with respect to this transaction?  $944,088."

4            Mr. Bahmer, this is your signature at the bottom of

5   this form?

6            THE FOREPERSON:  Yes, your Honor.

7            THE COURT:  Juror No. 1, would you please stand and

8   tell me if this is your verdict.

9            (Jury polled; all answered in the affirmative)

10           Thank you.

11           Can I see counsel briefly at the side bar.

12           (At the side bar)

13           THE COURT:  For the record, I have just handed counsel

14   the verdict form completed by the jurors.

15           MR. LEVINE:  It says what it says.

16           THE COURT:  Thank you.  Any reason for me not to

17   discharge the jury?  Is that a no for you, Mr. Levine?

18           MR. LEVINE:  That's a no.

19           THE COURT:  Mr. Domb?

20           MR. DOMB:  No, your Honor.

21           THE COURT:  Thank you.

22           (In open court)

23           THE COURT:  Jurors, I want to thank you for your

24   service.  You have been very gracious with your time.  America

25   is unique in that we guarantee parties a right to a jury trial

1    in civil matters.  It is a duty.  As your families and your

2    colleagues at work all know, it can be an imposition.  But it

3    is also an incredible right.

4         I hope your experience from this leaves you with a

5    good impression of the way that our system of justice works.

6    It brings you together to decide a matter of immense importance

7    to the parties in this case.  It is through the participation,

8    work, and attention of you in this case and people like you in

9    every other case that our system of justice works.  I think

10   that is one of the reasons why America is as great country as

11   it is and why so many parties choose to do business in America,

12   New York in particular.

13        Thank you very much for your service.  I can't thank

14   you enough.  I'm sure that the lawyers would say the same from

15   their part.  Thank you for being prompt.  We were able to get

16   through this process expeditiously because you came in on time

17   and you came with your eyes ready to look and your ears ready

18   to listen.  Thank you very much for that, too.

19        I am going to excuse you now, discharge you.  I am

20   going to tell you that you can now, unlike every other time,

21   talk about this case.  You can tell your friends about it.  You

22   can your families about it.  You are, however, under no

23   obligation to talk about it with anybody.  If you want to talk

24   about it, that's great.  If you don't want to talk about it,

25   that's absolutely your right as well.

963rclc4

 1             If you do choose to talk about it with anybody, I just

 2    ask you to be considerate of your fellow jurors and the

 3    conversations that you may have had in the jury room.  But

 4    that's just a request, not a mandate.

 5             With that, all I can do is thank you for your service.

 6    If you have two minutes, I'd like to come back and thank you in

 7    person in the jury room.  For now, you are all discharged.

 8             I would like to ask everybody to stand in recognition

 9    of your service.  Thank you.

10             (Jury excused)

11             THE COURT:  Thank you very much.  This has been a

12    pleasure working with you.  Is there anything in terms of

13    business that I need to accomplish before I adjourn and say

14    good-bye to our discharged jurors?

15             MR. DOMB:  There is probably a rule on point, but I'm

16    not remembering it.  I would like a little time to submit a

17    proposed judgment, including prejudgment interest to the date

18    of judgment.  We have a trip that luckily now I can make

19    starting tomorrow.  I don't know what timing you have in mind,

20    but I would like to have until a week from this coming Friday,

21    if possible.

22             THE COURT:  The normal process, as I understand it

23    here, is that our clerk's office would calculate post-default

24    interest at the time that they are calculating the amount due.

25    The clerk's office then enters a judgment with the interest

1    already applied.

2              MR. DOMB:  Wonderful.  Then we don't have to do

3    anything.

4              THE COURT:  I don't think you have to do anything, but

5    let me double-check with my clerk's office.  If that turns out

6    to be the wrong answer, we will reach out to both parties and

7    schedule a conference.

8              MR. DOMB:  Excellent.  Thank you, your Honor.

9              THE COURT:  Thank you.

10             Anything from your part, Mr. Levine?

11             MR. LEVINE:  No, your Honor.

12             THE COURT:  Let me thank you all very much for your

13   very expert presentations throughout the course of this case.

14   It's been a pleasure working with all of you.  I look forward

15   to seeing you again soon.  Thank you very much.

16             (Trial concluded)

17

18

19

20

21

22

23

24

25