UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

                                              :
CLAREX LIMITED and BETAX LIMITED,             :
                                              :
                              Plaintiffs,     :          1:12-cv-7908-GHW
                                              :
              -v -                            :       MEMORANDUM OPINION
                                              :            AND ORDER
NATIXIS SECURITIES AMERICAS LLC,              :
NATIXIS BLEICHROEDER LLC, NATIXIS             :
BLEICHROEDER, NATEXIS                         :
BLEICHROEDER, INC., NATIXIS                   :
BLEICHROEDER, INC., and ARNHOLD AND           :
S. BLEICHROEDER, INC.,                        :
                                              :
                              Defendants.     :
                                              :
---------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/29/14

GREGORY H. WOODS, District Judge:

Following a jury verdict for plaintiffs Clarex Ltd. and Betax Ltd. (collectively, "Clarex"),

defendants Natixis Securities Americas LLC, Natixis Bleichroeder LLC, Natixis Bleichroeder,

Natexis Bleichroeder, Inc., Natixis Blecihroeder, Inc., and Arnhold and S. Bleichroeder, Inc.

(collectively, "Natixis") move for a new trial and for judgment as a matter of law under Fed. R. Civ.

P. 59 and 50.  For the reasons that follow, Natixis's motions are denied.

I.      BACKGROUND

Clarex brought this breach of contract action related to contracts with Natixis to buy a

number of bonds issued by the Republic of Nigeria, together with a number of warrants.  These

warrants entitled their holder to receive payments that fluctuated in amount based on the price of

oil.  Over the course of five separate transactions, Natixis sold $46 million in face value of Nigerian

bonds to Clarex.  The parties agreed that Natixis was also obligated to deliver a total of 46,000

Nigerian warrants to Clarex on various settlement dates occurring in 2000 and 2001, and the parties

further agreed that Natixis failed to deliver those Nigerian warrants to Clarex together with the

Nigerian bonds on those settlement dates.  Clarex claimed that Natixis's failure to deliver the warrants caused them to sustain damages.

Natixis presented two defenses at trial.  First, Natixis asserted that it was impossible for it to perform its obligations under the contract to deliver the warrants at the time of the transactions at issue because of adverse market conditions in effect at the time of the expected settlement dates. Therefore, Natixis contended that its performance should be excused by the doctrine of impossibility.  Second, Natixis contended that one of the contracts at issue – specifically, a February 8, 2000 transaction involving 5,000 Nigerian warrants – was barred by the six-year statute of limitations.

The jury found that the claim related to the February 8, 2000 transaction was timely and that impossibility did not bar claims related to any of the transactions.  Tr.[1] at 971-974.  The jury awarded damages as follows:  $797,990 for the February 8, 2000 transaction; $1,784,528 for the August 22, 2001 transaction; $794,682 for the August 28, 2001 transaction; $1,199,260 for the September 5, 2001 transaction; and $944,088 for the September 10, 2001 transaction.  *Id.*  The Court entered a judgment for those amounts, plus interest, on June 5, 2014.  Dkt. 143.  Execution of the judgment was stayed pending resolution of this motion.  Dkt. 148.

## II.    RULE 59 MOTION

Rule 59 provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  The Second Circuit has explained that "a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice."

---

[1] References to "Tr." refer to the trial transcript, which is docketed at Dkt. 153, 155, 157, 159, 161, 163, and 165.

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (quotations and alteration omitted).

### A.      Jury Instruction on Damages

Natixis argues that a new trial is warranted because of errors in the Court's jury instructions on damages.  Rule 51 requires parties to raise any objections to the jury charge before the case is submitted to the jury.  Fed. R. Civ. P. 51(c)(2); *Barrett v. Orange Cnty. Human Rights Comm'n,* 194 F.3d 341, 349 (2d Cir. 1999) ("The purpose of Rule 51's timeliness requirement is to prevent unnecessary new trials because of errors the judge might have corrected if they had been brought to his attention at the proper time.") (quotations omitted).  "Failure to object to a jury instruction . . . prior to the jury retiring results in a waiver of that objection.  Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions."  *Jarvis v. Ford Motor Co.,* 283 F.3d 33, 57 (2d Cir. 2002) (quotations and alterations omitted).

Where a party fails to preserve an objection to a jury charge, Rule 51 provides that "[a] court may consider a plain error . . . if the error affects substantial rights."  Fed. R. Civ. P. 51(d)(2).  The Second Circuit has "warned that the plain error exception should only be invoked with extreme caution in the civil context."  *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996) (quotations, citations, and alterations omitted).  In fact, the Second Circuit has sometimes reviewed civil litigants' challenges to unpreserved jury instructions for "fundamental error," which is even more stringent than plain error because it requires the error to be "so serious and flagrant that it goes to the very integrity of the trial."  *SEC v. DiBella*, 587 F.3d 553, 569 (2d Cir. 2009).[2]

---

[2] The Second Circuit has noted but not yet resolved the uncertainty of whether plain error or fundamental error applies to unpreserved civil jury charges following the 2003 amendments to Rule 51.  *See Snyder v. New York State Educ. Dep't*, 486 F. App'x 176, 178 (2d Cir. 2012) (summary order) (collecting Second Circuit cases applying both standards for unpreserved jury instructions).  For the reasons stated below, the Court concludes that neither standard is satisfied here.

Natixis argues that the Court's instructions on damages were erroneous because they did not include a particular explanatory sentence from the Second Circuit's opinion in *Boyce v. Soundview Technology Group, Inc.*, 464 F.3d 376 (2d Cir. 2006) on the so-called "wrongdoer rule." Indeed, the Court relied heavily upon *Boyce* in crafting its charge to the jury. *Compare* Tr. at 959-61 *with Boyce*, 464 F.3d at 391-92. Natixis claims that the Court's instructions were erroneous because they did not state that "[a] person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain." *Id.* at 392 (quotations and citations omitted). Natixis argues that by failing to include this language, the instructions omitted a "critical predicate statement" and improperly suggested that defendants have the burden of proof on damages, Def. Br. at 19. Despite numerous opportunities to do so, Natixis never requested that the Court include this language, never objected to the jury charge on the basis that it improperly suggested that the burden to prove damages shifted to defendants, and in fact stated that it found the charges acceptable.

First, both sides submitted written requests to charge, Dkt. 79, 80, and both sides filed written objections to each others' proposals, Dkt. 90, 99. Although Natixis did not include any proposed instructions on the wrongdoer rule, *see* Dkt. 80 at 26-28, Clarex did, *see* Dkt. 79 at 49. Clarex's request cited specifically to *Boyce*, yet Natixis did not request that the language now at issue be added to the charge. Instead, Natixis objected to Clarex's proposed instructions largely on the ground that they were repetitive. Natxis wanted, at most, a one-sentence instruction that it said was the only sentence given by the district court in *Boyce* that the Second Circuit endorsed: "If the amount of damages is uncertain, the burden of uncertainty falls on the wrongdoer." Dkt. 99 at 23 (quoting *Boyce*, 464 F. 3d at 383). Natixis also objected to certain phrases in Clarex's proposed instructions, including that damages could be "reasonably estimated" rather than "reasonably certain" and that uncertainty "should be held against Natixis." Dkt. 99 at 23-24.

4

The Court took both sides' written requests and objections into account, and in fact accommodated Natixis's objections by tying its instructions more closely to the language used by the Second Circuit in *Boyce* rather than the modifications on that language requested by Clarex.  The Court provided a draft of its instructions to both sides on May 30, 2014, with ample time to review the charges prior to the charge conference on June 2, 2014.

At the charge conference, Natixis asked the Court to explain to the jury that they did not need to pick either expert's number and could choose any figure for damages that was supported by the evidence.  *See* Tr. at 933 (Natixis describing request made at prior day's charge conference). Natixis did not ask for the Court to explain that the reason for the wrongdoer rule was because "[a] person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain." *Boyce*, 464 F. 3d at 392.  Natixis did not express concern that the charge improperly shifted the burden of proof.

Following the charge conference, the Court circulated an updated draft of the charges to both sides.  The Court had made two changes to the damages section.  First, at the request of Natixis, the Court changed the word "wrongdoer" to "breaching party."  Second, the Court added the following sentence to address Natixis's request that the Court tell the jury they did not need to pick one expert or the other:  "I remind you that you – the jury – are the sole trier of the facts, including the factual question of the value of the warrants, and that in so doing, you may give the opinion testimony whatever weight, if any, you find it deserves in light of all the evidence in the case."  Before closing arguments began, the Court sought and received both sides' assurance that these changes (among others) "accommodated all the requests that we discussed."  Tr. at 848. Indeed, Natixis stated the charges were "[a]cceptable to defendant." Tr. at 848.

Following closing arguments, Natixis renewed its request first made at the charge conference to "direct[] the jury that they are not required to take the number of either expert, that they are

entitled to determine whatever measure of damages they deem appropriate, as long as it is consistent and supported by the evidence." Tr. at 933. Again, there was no mention of the explanatory language from *Boyce* now argued to be so critical. The Court rejected Natixis's request to further alter the jury instruction, explaining that the insertion made – along with the lengthy instructions on how to weigh evidence generally and how to assess expert testimony, including how to resolve conflicting expert testimony – sufficiently addressed Clarex's concerns and made clear that the jury could give the evidence on the calculation of damages the weight they thought it deserved and that the jury was the ultimate fact finder as to the amount of damages. Tr. at 934-35. These instructions were delivered to the jury. Tr. at 944-48 (describing evaluation of evidence); Tr. at 948-49 (describing evaluation of expert testimony); Tr. at 959-61 (describing law on damages).

Because Natixis never requested the explanatory language from *Boyce* and never objected to the proposed jury instructions on any ground related to that language, Natixis failed to preserve this objection. The Court does not believe it was required to state that "[a] person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain," *Boyce*, at 392. The Court "has discretion in the style and wording of jury instructions so long as the instructions, taken as a whole, do not mislead the jury as to the proper legal standard . . . ." *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 106-07 (2d Cir. 2001). The Court's instructions both accurately and adequately described the wrongdoer rule, including that plaintiffs bore the burden of proving damages and defendants shouldered the burden of the uncertainty as to the amount of those damages. As the Second Circuit has described, those are "[s]imply put" the key aspects of the wrongdoer rule, *Boyce*, 464 F. 3d at 392, and it was within the Court's discretion to not include further elaboration. Natixis cites to no authority, and the Court is aware of none, that require courts to instruct juries as to the rationale behind principles of law or to provide explanation for why certain legal rules are what they are. The instructions given did not

improperly suggest that the burden of proof was shifted; instead the instructions repeatedly stated that plaintiffs "*have the burden of proving* that they sustained damages," that only "[i]f the plaintiffs *show* that they more likely that not suffered damages" would "the amount of damages need only be *proved* with reasonable certainty," and that "plaintiffs *need only show* a stable foundation for a reasonable estimate of damages." Tr. at 960-61 (emphasis added). Therefore, the Court concludes that its instructions were in fact proper and thus neither plain nor fundamental error exists.

To the extent Natixis objects to the Court's failure to explicitly state that the jury need not choose one expert or the other, the Court believes the instructions more than adequately instructed the jury on its role as the finder of fact while declining Natixis's invitation to instruct that the jury could, essentially, "split the baby." As noted above, in addition to general instructions on how to weigh evidence, *see* Tr. at 944-48, the Court provided thorough instructions on how to evaluate expert testimony. These instructions included: the experts' testimony was to "assist" the jury "in understanding the evidence or in reaching an independent decision on the facts," that the jury could weigh expert testimony and give it "whatever weight, if any" the jury thought it deserved "in light of all of the evidence," that the jury should "not . . . accept opinion testimony" just because the Court permitted that testimony, that the jury should not "substitute it" for its own "reason, judgment, and common sense," that the experts specifically in this case disagreed and that it was the jury's role as the "sole trier of the facts" to "resolve the disagreement," that the jury could decide whether to believe the expert witnesses and consider their opinions' soundness, reasoning, and motive, and that testimony could be rejected in whole or in part. Tr. at 948-49. The Court reiterated the core of these instructions again during the damages instructions, reminding the jury that they were the "sole triers of fact, including the factual question of the value of the warrants," and that the jury could give the opinion testimony on the value of the warrants "whatever weight, if any, you find it deserves in light of all of the evidence." Tr. at 961. These instructions were more than sufficient to

make clear to the jury that they were not required to choose one expert's valuation or the other and that they could reach their own independent conclusion as to the value of the warrants.[3]

### B.  Commercial Impracticability Defense

Natixis next claims that the Court prevented Natixis from presenting evidence to the jury in support of the commercial impracticability defense and from arguing to the jury that its obligation to deliver the warrants was excused because the changed market conditions made such delivery commercially impracticable.  Def. Br. 1.  Natixis also asserts that the Court's decision not to instruct the jury on the defense of commercial impracticability was erroneous as a matter of law.  *Id.* According to Natixis, the Court therefore effectively limited it to arguing that market failure made performance objectively impossible, thereby requiring it to meet the higher burden associated with the defense of impossibility rather than the lower, and substantively different, burden associated with the defense of commercial impracticability.  *Id.*

These claims are without merit.  First, as part of its litigation strategy, Natixis plainly withdrew the impracticability defense before trial, and never attempted to reassert the defense before the case was submitted to the jury.  It was Natixis's choice not to present evidence in support of the defense and not to argue the defense at trial, and the Court was not required to instruct the jury on a defense that had been waived.  Second, even if Natixis believed it was entitled to a jury instruction on the defense notwithstanding its waiver, it did not properly object to the absence of an instruction on the defense, and therefore failed to preserve its right to relief under Rule 51.

---

[3] Natixis reads much into the fact that the jury requested a portion of the transcript that listed Clarex's expert's valuation, Tr. at 970.  There is no reason to assume that the jury's request meant they thought they had to choose one expert or the other.  The request does not evince any confusion regarding the interpretation of the charge.  There is no basis in the request not to conclude that the jury simply determined that plaintiffs' figures were reasonable and supported by the evidence, and rendered a verdict accordingly; Natixis's objections to the weight of the evidence are addressed and rejected *infra* at Section II(C).  Further, the Court notes that the jury may have requested these figures early on in deliberations simply because this was the only piece of the trial that was specifically highlighted to the jury as something they might want to request to see.  Tr. at 930-31.

1.     Waiver of the Defense

Natixis's conduct before and at trial clearly demonstrates that it waived the commercial impracticability defense.  A defendant has waived a defense when it intentionally relinquishes a known right.  *Patterson v. Balsamico,* 440 F.3d 104, 112 (2d Cir. 2006).  The waiver of a defense "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage."  *Meacham v. Knolls Atomic Power Lab.*, 627 F. Supp. 2d 72, 76 (N.D.N.Y. 2009) (quoting *Tom Rice Buick–Pontiac v. General Motors Corp.,* 551 F.3d 149, 157 (2d Cir. 2008)).  The waiver determination requires consideration of all circumstances relevant to the knowledge and intent of the party in question.  *See id.* (citing *In re Am. Express Merchants' Litig.,* 554 F.3d 300, 321 (2d Cir. 2009).  Here, the record is clear that Natixis had knowledge of the commercial impracticability defense and made a conscious choice to abandon it.  Natixis's knowledge of the impracticability defense is not disputed.  Natixis's intention to withdraw its commercial impracticability defense is clearly demonstrated by its conduct throughout the proceedings.

By way of background, Natixis initially asserted both the impossibility and commercial impracticability defense.  *See, e.g.,* March 7, 2014 Joint Pretrial Order 4-5, Dkt. 75; March 7, 2014 Proposed Jury Instructions, Dkt. 80.  At an off-the-record conference before the Court on March 27, 2014, Natixis clarified that these were alternative theories as to why its failure to deliver the warrants was excused, stating that it would assert impossibility with respect to the time period surrounding the dates of breach, i.e. 2000 and 2001, but that it would rely on a commercial impracticability defense with respect to the subsequent time period, when the price of the warrants had dramatically increased.

At a conference on April 18, 2014, the Court considered whether Clarex was permitted to pursue the theory that it had "waived" performance of the contracts on the original dates of settlement and therefore extended the date of performance through 2007, or whether Judge

Engelmayer – to whom this case was previously assigned[4] – had already foreclosed that theory by ruling that the dates of breach occurred in 2000 and 2001, i.e. on the original settlement dates of the contracts. *See generally* April 18 Conf. Tr., Dkt. 117. Perhaps believing at the time that its potential liability for damages would be dramatically lower if measured in 2000 and 2001 as opposed to 2007, when the warrants had become much more valuable, Natixis forcefully argued that Judge Engelmayer had ruled that the dates of breach occurred in 2000 and 2001, *id.* at 24:21-252 (stating that it relied on "Judge Engelmayer's decision that [the waiver theory] is out of the case, and that the breach is fixed in 2000 and 2001. We have valuation experts for 2000 and 2001, not for 2004, not for 2007 or 2011 or 2012, as they try to find what date we allegedly breached this. So we would be very badly prejudiced if [the waiver theory] were to be allowed to go forward.").

At a pretrial conference on May 6, 2014, the Court engaged in an extended colloquy with Natixis in order to clarify the circumstances under which Natixis would seek to assert its commercial impracticability defense. Natixis reiterated its position from the March 27, 2014 conference that it would only assert that defense if the Court permitted Clarex to pursue the waiver theory – i.e. to argue that the breach did not occur until sometime after the original settlement dates in 2000 and 2001 – therefore allowing Clarex to introduce evidence that the price of the warrants had increased in subsequent years. May 6 Conf. Tr. at 25:22-26:6, Dkt. 123. Natixis agreed, however, that if the Court decided to foreclose Clarex's waiver theory and limit the evidence to circumstances that existed at the time of the alleged breach in 2000 and 2001, then Natixis would rely on the impossibility defense and abandon impracticability. *See id.* at 29:24-30:3 ("We agree that commercial impracticability would be out if [plaintiff is] tied to the 2000 and 2001 date. If plaintiff persists and the court allows them to put in evidence regarding the changing nature of the obligation over time,

---

[4] This case was reassigned from the Hon. Paul A. Engelmayer to the undersigned on March 17, 2014.

then commercial impracticability absolutely is in the case . . . ."), 26:19-27:9 (stating that if evidence

relating to the price of obtaining warrants after 2001 were excluded, "then the issue of

impracticability really is somewhat moot, because we are measuring impossibility at the time of the

breach in 2001.").  In Natixis's view, the warrants were worthless in 2000 and 2001; thus, a

commercial impracticability defense would only be relevant if the warrants had become – as Natixis

claimed – prohibitively expensive in subsequent years.  *Id.* at 26:20-27:24 ("The difference between

impossibility and impracticability for the most part is principally the issue that under impracticability

if the obligation changes over time, and you can take into account a change in price which alters the

obligation . . . .").

Accordingly, Natixis went on to forcefully urge the Court, just as it did at the April 18

conference, to fix the dates of breach to 2000 and 2001 and to focus the case on whether Natixis's

breach was excused by impossibility during that time.  *See id.* at 26:16-18 ("2007 no longer exists

because your Honor correctly decided not to reverse Judge Engelmayer."); *id.* at 30:8-30:16 ("Our

position is that based on your Honor's rulings we think that these future events are out, just like

your Honor made the observation that [proposed evidence regarding circumstances post-2001, such

as the possibility of] buy-in in 2004, your Honor went on to say assuming you were to uphold Judge

Engelmayer, that type of evidence and testimony would no longer be relevant.  We think everything

should be tied to 2000 and 2001, but if they are allowed to put in this other evidence,

impracticability must be part of the case.").

The Court ruled in favor of Natixis on this issue at the May 14, 2014 final pretrial

conference.  First, the Court agreed with Natixis that Judge Engelmayer's previous ruling had fixed

the dates of breach in 2000 and 2001.  May 14 Conf. Tr. at 6:6-21, Dkt.137.  Second, it stated that

because the case law "indicate[s] that impossibility is evaluated at the time of performance," that

"impossibility will be tested at and around the time of the [breach,] not with evidence that postdates

[the breach] by up to seven years," *id.* at 7:6-9: 20.  Accordingly, the Court ruled, "evidence showing that performance was possible well after the original settlement dates cannot be used to prove the defendants' performance was not impossible in 2000 and 2001."[5]  *Id.* at 10:16-19.

The Court next considered the implications of its ruling on the status of Natixis's impracticability defense.  The Court stated that it did "not intend to charge on the issue of commercial impracticability" and that it understood "from our last call that [impracticability] is not as much as a concern for the defendants given my holding just made on impossibility," *id.* at 10:21-25, referring, of course, to Natixis's position at the April 18 and May 6 conferences that it would not pursue the impracticability defense if the Court ruled that the dates of breach occurred in 2000 and 2001.  Natixis did not object to the Court's understanding that the impracticability defense was no longer in play.  Weeks later, on the first day of trial, Natixis also did not object when the Court previewed for the parties a summary of the case that the Court intended to read to the members of the jury venire – a summary which included only Natixis's impossibility and statute of limitations defenses, and which did not mention a commercial impracticability defense.  Tr. at 4:7-6:14.  Thus, not only did Natixis's statements and conduct repeatedly and consistently make clear that its intent both before and at trial was to abandon its commercial impracticability defense, the Court understood Natixis to have a good strategic reason to do so – i.e., to limit its potential damages.

Indeed, Natixis essentially concedes that it waived the defense when it argues in its reply brief that at the May 6 conference, it stated that it would only pursue the defense if (1) Clarex were "precluded from introducing evidence concerning their assertion that Natixis's obligation to deliver the Warrants remained the same regardless of whether the nature of the obligation changed," Def.

---

[5] Although the Court did allow "evidence of the availability of warrants in the market beginning in 2004 or later" for the limited purpose of allowing Clarex to prove that contracts were formed and why its "action or inaction in mitigating damages were reasonable," *id.* at 14:19-23, Natixis subsequently withdrew its challenge to the existence of the contracts as well as its mitigation defense, in a successful effort to prevent *all* post-2001 evidence, for whatever purpose, from being admitted at trial.  May 15, 2014 Letter, Dkt. 122.

Reply Br. 2, and (2) the exclusion of post-breach evidence such as "'the [Nigerian warrant] tender and the redemption, and the buy-ins,'" *id.* (quoting May 6 Conf. Tr. at 26:19-27:8, Dkt.123). Because Clarex was purportedly not precluded from introducing such evidence, Natixis argues, Natixis never waived its impracticability defense. *Id.*

First, the Court is unconvinced that Natixis's waiver was conditioned on the preclusion of evidence concerning simply "whether the nature of the obligation changed." In fact, Natixis has never until now asserted a theory of impracticability premised solely on, say, a counterparty's failure to deliver the warrants to Natixis in 2000 and 2001. *Id.* at 4 ("So long as Natixis was able to demonstrate a changed obligation – including a change shortly after the contracts were entered into in 2000 and 2001 – it could have succeeded on an impracticability defense."). It is easy to see why Natixis belatedly asserts this theory, as it allows Natixis to argue that it should have been allowed to assert impracticability even if the evidence was limited to the 2000 and 2001 time period, contrary to its previously asserted position that the only evidence that would be relevant to the impracticability defense was that which started to accrue much later, when the warrants became more expensive, *see, e.g.*, Joint Pretrial Order, Dkt. 75 (stating that its defense of commercial impracticability was based on "a change in the cost of performance."); May 6 Conf. Tr. at 26:20-27:24, Dkt. 123 ("The difference between impossibility and impracticability for the most part is principally the issue that under impracticability if the obligation changes over time, and you can take into account a change in price which alters the obligation..."). The Court is unpersuaded that Natixis ever asserted a defense of commercial impracticability premised on anything other than a change in the price of the warrants.

The Court is also unconvinced that Natixis's waiver was conditioned upon the preclusion of evidence relating to the circumstances that existed after the dates of breach. After all, if Natixis's waiver was dependent upon that condition (or any other condition), and Natixis believed that

condition had been violated, one would think that Natixis would have reasserted the defense following the close of Clarex's case-in-chief on Friday, May 30, 2014. At that point, the violation of the purported condition would have been apparent. Natixis had two and a half days to consider the testimony presented in plaintiffs' case-in-chief, and to assert any objections or revise its strategy. Instead, Natixis commenced its own case the following Monday, June 2, 2014 without ever making the argument that it attempts to make now – that the Court had failed to enforce its May 14 ruling precluding Clarex from introducing post-breach evidence, and that Natixis should therefore be allowed to revive its impracticability defense.[6] Natixis also did not seek an instruction on the defense after reviewing the Court's proposed jury instructions and verdict sheet, which the Court provided to the parties a full four days in advance of the charge conference, *id.* at 639:8-639:25. Nor did Natixis raise the defense at the June 2, 2014 charge conference, *id.* at 845:13, or after the Court distributed a revised version of the jury instructions to the parties the following day, *id.* at 848:17:23. Natixis's conduct at every key juncture prior to the jury's verdict is consistent with a knowing waiver of the defense.

Thus, the Court finds that the fact that Natixis affirmatively stated before trial that it would not pursue the commercial impracticability defense, and the fact that Natixis never raised any desire

---

[6] Even granting that Natixis's waiver was conditioned upon the exclusion of such evidence, the Court finds that these conditions were never violated; rather, Clarex was precluded from introducing such evidence at trial. Specifically, the Court enforced its evidentiary rulings from the May 14, 2014 conference by excluding evidence relating to the rise in oil prices that triggered the first of the semi-annual payments per warrant in November 2004, the likely availability of warrants on the open market following Nigeria's bond redemption in 2006, Nigeria's tender offer to buy warrants at $220 a piece in 2007, and the fact that Natixis was involved in tendering 93,000 warrants at $220 a piece in 2007. Clarex was also precluded from introducing evidence at trial suggesting that Natixis could have and should have instituted the practice of buy-in as a result of any of those post-2001 events. While Natixis is correct that Clarex's trial witnesses Glen Shipway and Samuel Fitting were allowed to testify about the availability of buy-in procedures and other means by which Natixis could have attempted to obtain the warrants, *see* Def. Reply Br. 3, this testimony was limited to the possibility of buy-in during the 2000 to 2001 time period, fully consistent with the Court's May 14 ruling that testimony as to the practice of buy-in was permissible as long as it was limited to time period surrounding the dates of breach, a ruling that was reiterated on May 28, *see* Tr. at 98:3-99:9, and to which Natixis did not object. Thus, Natixis's waiver of the commercial impracticability defense – if it was in fact conditioned on the exclusion of such evidence – remained intact.

to reassert that defense during trial, conclusively establishes that Natixis waived that defense. *See Meacham*, 627 F. Supp. at 76 (quoting *Tom Rice Buick-Pontiac*, 551 F.3d at 157-58 ("[w]aiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage")); *Blissett v. Coughlin*, 66 F.3d 531, 539 (2d Cir. 1995) ("Consistent with their pretrial posture, Appellants made no further effort to establish a qualified immunity defense following the colloquy.  They did not seek to amend the proposed jury instructions to incorporate that defense, nor raise qualified immunity in any of their motions for judgment as a matter of law either during trial or after the verdict.  We find no error in the district court's ruling that the qualified immunity defense had been waived.").

Natixis made the strategic decision in this litigation to forcefully urge the Court to fix the dates of breach to 2000 and 2001 in order to limit its potential damages.  As part of that litigation strategy, Natixis relinquished its commercial impracticability defense well before trial, perhaps hoping that would influence the Court to rule in its favor with respect to Clarex's waiver theory. Because Natixis knowingly and intentionally waived the defense, it was not entitled to present evidence on the defense and to have the jury instructed on the defense.  *See Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388, 2012 WL 6720919, at \*21 (S.D.N.Y. Dec. 18, 2012) ("It was not error for the Court to allow Plaintiff to make the strategic choice to pursue the theory of liability that he did, and it does not become error retroactively, simply because Plaintiff now wishes that he had offered the jury an alternative avenue to find Defendant liable on his termination claims.").

### 2.   Failure to Object to Jury Instruction

As a preliminary matter, Natixis's claim that it was entitled to a jury instruction for a defense that, as Natixis concedes, was not supported by evidence introduced at trial is illogical.  Entertaining Natixis's argument that it was nevertheless entitled to a jury instruction on the commercial impracticability defense, however, the Court concludes that not only did Natixis waive its right to

pursue the defense through its affirmative withdrawal of the defense before trial and its failure to reassert the defense at trial, Natixis also lost its right to challenge the jury instruction on an additional ground – failure to properly object under Rule 51.  *See Countryman v. Farber*. 340 Fed. Appx. 703, 704 (2d Cir. July 27, 2009) (summary order).

Rule 51(d)(1)(B) provides that a defendant may assign as error "a failure to give an instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected."  Fed. R. Civ. P. 51(d)(1)(B).  Natixis requested an instruction on commercial impracticability in its March 7, 2014 requested jury instructions, *see* Dkt. 80.  However, in *Caruso v. Forslund,* the Second Circuit held that a party "may [not] rely on her submission of proposed jury instructions" which were not adopted by the district court to preserve an objection for appeal.  47 F.3d 27, 31 (2d Cir. 1995).  Thus – even assuming that Natixis did *not* subsequently withdraw its defense – Natixis was required to do more than request a charge on the defense; as Rule 51(d)(1)(B) and *Caruso* make clear, Natixis was also required to lodge an objection in order to preserve its objection for appeal.  It is undisputed that Natixis did not do so.  As discussed at length above, the record is clear that Natixis remained silent at every opportunity to make a timely and proper objection provided for under Rule 51:  before the jury was instructed, *see* Rule 51(b)(1), on the record and out of the jury's hearing before the instructions and arguments were delivered, *see* Rule 51(b)(2), at any time before the jury was discharged, *see* Rule 51(b)(3), or, in the event that it was not informed of an instruction or action on a request before that opportunity to object, promptly after learning that the instruction or request would be, or has been, given or refused, *see* Rule 51(c)(2)(B).  It was not until this motion – filed a month after the jury was discharged – that the Court learned, for the first time, that Natixis took issue with the absence of the commercial impracticability defense from the jury instructions.  Accordingly, Natixis has failed to preserve its right to assign error to the jury instructions.

16

Natixis argues in its reply brief that it did not object because at the May 14 conference, "the Court barred Natixis from pursuing the commercial impracticability defense.  Therefore, the fact that Natixis did not raise the issue of commercial impracticability after the Court ruled on the issue is a red herring."  Def. Reply Br. 4.  Though not explicitly stated, Natixis appears to be arguing that under Rule 51, it was not required to object because "the Court rejected the request in a definitive ruling on the record . . . ."  Fed. R. Civ. P. 51(d)(1)(B).

This argument is unavailing for a number of reasons.  First, as discussed at length above, the Court never "rejected the request" for a commercial impracticability defense; rather, Natixis, on its own prerogative, affirmatively withdrew the defense before the May 14, 2014 conference.  Second, the Court's statements at the May 14, 2014 cannot reasonably be construed as a "definitive ruling." Rather, the Court stated at the time, "I *do not intend* to charge on the issue of commercial impracticability" (emphasis added), *id.* at 10:21-25, and "I *do not expect* to charge on that [defense]" (same), *id.* at 11:15-16.  In addition, the Court premised its entire discussion that day by stating "[w]e are going to talk about the jury charge itself in more detail probably during the trial . . . ."  These equivocal statements, considered along with the Court's very brief thoughts – "as an aside" – of the merits of the commercial impracticability defense, *id.* at 10:25-11:15, make clear that the Court was in no way making a "definitive ruling" that excused Natixis's failure to object.  It was certainly not an order that precluded Natixis from offering an entire defense, as it now suggests.  Natixis had a full and fair opportunity to subsequently object; it chose not to, thereby waiving its objection.  *See Lavoie v. Pacific Press & Shear Co., Div. of Canron Corp.,* 975 F.2d 48, 55 (2d Cir. 1992) ("[F]ailure to object to a jury instruction . . . prior to the jury retiring results in a waiver of that objection . . . . Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions.").

Although Rule 51 does not require a court to consider a plain error in the instructions that has not been preserved, *see* Rule 51(d)(2), the Court will briefly note that it is far from clear that the commercial impracticability defense proposed by Natixis is viable as a matter of law.  As the Court alluded to at the May 14 conference, the New York courts do not appear to recognize commercial impracticability as a separate defense to the doctrine of impossibility; rather, impracticability is treated as a type of impossibility and construed in the same restricted manner.  *See Urban Archaeology Ltd. v. 207 E. 57th St. LLC*, 951 N.Y.S.2d 84 (Sup. Ct. 2009) *aff'd*, 891 N.Y.S.2d 63 (2009) ("The impossibility of performing the contract may be raised as an affirmative defense in a breach of contract action, but financial difficulty or economic hardship of the promisor, even to the extent of insolvency or bankruptcy, does not establish impossibility sufficient to excuse performance of a contractual obligation."); *Kel Kim v. Cent. Markets, Inc.*, 70 N.Y.2d 900, 902 (1987); *407 East 61st St. Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 281 (1968) ("[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused . . . .  In short, the applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts.").

Indeed, in *Heath-Chem Corp. v. Baker*, the Second Circuit rejected the plaintiff's attempt to invoke commercial impracticability, applying the impossibility doctrine narrowly:

> [T]he fact that the subsequent decline in the price of its stock made Health–Chem's performance of the contract more onerous does not establish a basis for a defense of frustration of purpose or commercial impracticability.

915 F.2d 805, 810 (2d Cir. 1990) (citing *407 E. 61st Garage*, 915 F.2d at 281-82, among other cases). *See also Walden Federal Savings & Loan Ass'n v. The Slane Co., Ltd.*, No. 09 Civ. 1042, 2011 U.S. Dist. Lexis 37010, at *2 (S.D.N.Y. Apr. 5, 2011) (rejecting commercial impracticability defense because

"New York courts refuse to excuse performance where difficulty is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy").  Given the New York courts's – and the Second Circuit's – seeming rejection of the commercial impracticability defense, the Court has very strong doubts that Natixis would prevail under either a plain or fundamental error standard, *see supra* n.2.  This Court declines to hold that a principal is excused from performing its obligation to deliver a security because performance has simply become more expensive or because its counterparty has failed to deliver the securities in a transaction in which such delivery is not an express condition.  Given the importance of the securities industry in New York, and the ramifications of an expansion of the impossibility defense as suggested by Natixis, its argument must be validated by clear authority, which the Court has not identified.

## C.    Weight of the Evidence

Natixis argues that a new trial is warranted because the jury's damages award, which corresponded with the figures offered by Clarex's expert witness Dr. Rangarajan Sundaram, is against the weight of the evidence, further demonstrating that the jury believed it had to choose one expert's valuation or the other.   Where a Rule 59 motion is based on the ground that the verdict was against the weight of the evidence, "a new trial may be granted even if there is substantial evidence supporting the jury's verdict" and "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998).  However, a court "should only" grant a Rule 59 motion where the jury's verdict is "egregious," and "a court should rarely disturb a jury's evaluation of a witness's credibility."  *Id.* (quotations omitted).

The Court cannot conclude that the jury verdict was egregious and in fact believes – essentially for the reasons stated by Clarex, Pl. Br. 19-20 – that Dr. Sundaram's testimony provided sound evidence upon which the jury could base its verdict.  Both experts were highly qualified, but

the Court finds the jury's answer to the factual question of the value of the warrants to be supported by the evidence and based upon numerous credibility decisions.  This trial involved what was essentially a "battle of the experts" that required the jury to assess the reasonableness of each experts' decisions made in their calculations and choice of inputs, assess the experts' explanations given for different choices made, alternatives considered, and mistakes acknowledged, and assess whether any underlying motivations had an effect on an experts' choices in calculating the valuations.  The Court finds no basis to upend the jury's reasoned judgment.

## III.   RULE 50 MOTION

Judgment as a matter of law is properly granted where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  Rule 50(b) permits the Court to hear a renewed motion for judgment as a matter of law following such a motion made at trial.  In ruling upon such a motion, a court may allow the judgment to stand, order a new trial, or direct the entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b)(1)-(3).

The standard when assessing such a motion is whether "the evidence, viewed in the light most favorable to the non-movants without considering credibility or weight, reasonably permits only a conclusion in the movants' favor."  *Jund v. Town of Hempstead*, 941 F.2d 1271, 1290 (2d Cir. 1991).  Granting a Rule 50(b) motion is therefore proper where:  "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him."  *Id.*  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and the court "must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing*

*Products, Inc.,* 530 U.S. 133, 150-51 (2000) (quotations omitted).  "A motion under Rule 50(b) is not

allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was

submitted to the jury."  *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 485 n. 5 (2008); *see also Galdieri–*

*Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 286 (2d Cir. 1998) ("[T]he movant is not

permitted to add new grounds after trial.").  Motions before trial do not constitute Rule 50 motions.

*See United States v. Painting known as Le Marche,* No. 06 Civ. 12994 (RJS), 2010 WL 2229159, at *2

(S.D.N.Y. May 25, 2010) *aff'd sub nom. United States v. Davis,* 648 F.3d 84 (2d Cir. 2011).[7]

Natixis moved solely on the statute of limitations issue as to the February 8, 2000

transaction, on the ground that there was no testimony that account statements reflected a debt

owed in accordance with New York Gen. Obl. Law § 17-101.[8]  Tr. at 637-638.  The Court agrees

with its prior ruling, made during trial, that there was sufficient evidence in the form of testimony

from Glen Shipway and Ira Sherman for a reasonable juror to conclude that the account statements

reflected Natixis's acknowledgment of a debt or obligation to perform under the defaulted contract.

*Id.* at 649, 450, 453, 479-482 (Shipway); 149-150 (Sherman).  The Rule 50 motion is therefore

denied.

---

[7] The Second Circuit provides an exception to this rule to prevent "manifest injustice" or correct "purely legal error." *Fabri v. United Tech. Int'l, Inc.,* 387 F.3d 109, 119 (2d Cir. 2004).  Neither is present here, nor does Natixis make any argument that the circumstances would warrant invoking those exceptions.  In fact, Natixis's Rule 50 motion is four lines in its brief, Def. Br. at 25, and only mentioned in passing in its reply, Def. Reply Br. at 10.

[8] The statute reads, in relevant part, that "[a]n acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules other than an action for the recovery of real property."  In other words, this law provides that a written acknowledgement of a debt or promise to perform a previously defaulted contract can restart the six-year limitations period for the plaintiff to bring an action to enforce the obligation.

**IV.     CONCLUSION**

For the foregoing reasons, defendants' motions are denied.  The Clerk of Court is directed

to close the pending motion at docket number 167.

SO ORDERED.

Dated:  August 29, 2014                                    _____
New York, New York                                         GREGORY H. WOODS
                                                                          United States District Judge